UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

- against -

Case No. 09-CR-170 (JFB)

JOSEPH ROMANO,

Defendant.
------------------------------------------------------------------X

# OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

Defendant JOSEPH ROMANO, by his attorneys, Ansanelli Law Group, LLP, submits the following Objections to the Presentence Investigation Report ("PSR"). References to paragraphs correspond to those contained in the PSR.

## PART A. THE OFFENSE

### The Offense Conduct

Determination of the Loss

¶ 28. When gain is used as the measure of the loss, it is improper to calculate the amount of the loss by aggregating the gain of all defendants. The amount of the loss is determined only by the amount of the Defendant's gain. This is more fully addressed in the accompanying Defendant's Sentencing Memorandum.

### Adjustment for Acceptance of Responsibility

¶ 42. The PSR erroneously reports that the Defendant stated that he "virtually maintained no involvement in the business". In fact, the Defendant did not say that, and instead, the Defendant

explained that he was present in Florida and physically absent from the premises beginning in 2004. (See Affidavit of Joseph Romano submitted herewith). The Defendant fully admits that he created the illegal business, obtained profits from the business as reflected in the Plea Agreement, and was at all times fully aware of the illegalities and fraudulent misrepresentations of the business.

Further, the PSR mistakenly reports that the Defendant blamed Michael DiBari for "concoct[ing] the scheme to defraud that is detailed in the offense conduct section of this report." The Defendant did not say that. In fact, the Defendant said that Michael DiBari developed the script that was utilized by the company. This is fully consistent with the Defendant's allocution during the Plea Proceedings, which was accepted by the Court and the Government, in which he denied creating the script and corrected the government's allegation to the contrary. (see pp. 248-250 of the Transcript of Plea Proceedings, excerpts of which are annexed to Affidavit of Joseph Romano as Exhibit "A"). The Defendant takes full responsibility for creating the criminal enterprise.

Similarly, the PSR falsely reports that the Defendant "disclaimed any involvement in orchestrating the scheme or helping to directly carry it out." The Defendant did not say that. Once again, the Probation Officer misinterprets the Defendant's denial that he created the script and the Defendant's physical absence after 2004, and wrongly concludes that these constitute disclaimers of involvement.

Finally, the PSR incorrectly reports that the Defendant has not expressed remorse for the victims. This is entirely untrue. Not only has the Defendant expressed his remorse and concern for the victims to the Probation Officer and to others, but his agreement to make substantial

restitution is a truer measure of remorse. Additionally, the letter from the Defendant's Pastor also demonstrates the degree of the Defendant's remorse.

¶ 43. The PSR erroneously concludes that the Defendant "did not clearly demonstrate acceptance of responsibility for his offense", and "described his involvement in the instant offense as a mere onlooker". In fact, the Defendant accepts full responsibility for his actions, including but not limited to his role in organizing and creating the scheme to defraud. The Probation Officer apparently mistakenly inferred a denial of responsibility from the Defendant's denial that he created the script and the Defendant's expressions of his physical absence after 2004.

The PSR also misrepresents the Defendant's statements concerning the victims. Although it is conceded that the vast majority of the victims were elderly and that many were "re-loaded", counsel was afforded the opportunity to inspect the lead sheets allegedly used by the organization's participants to contact potential coin purchasers. These lead sheets included individuals and institutions, such as synagogues and churches, and individuals who apparently represent all adult age groups.

Finally, the PSR incorrectly alleges that the Defendant "failed to voluntarily terminate or withdraw from criminal conduct or association", citing only the Defendant's telemarketing activities in Florida. In fact, there was no finding that the Defendant engaged in any criminality in Florida, nor have there been any arrests or prosecutions arising from the Defendant's Florida conduct. The only determination following the bail revocation hearing was that the Defendant engaged in telemarketing conduct, rather than that he engaged in criminal conduct.

¶ 44. The Defendant vehemently denies stating that he would "fucking kill" the prosecutor or anyone else associated with this case, either in those words or in sum and substance. The allegation is rank hearsay from an unidentified source, and should therefore be rejected. It is gratuitously offered as support for the Probation Officer's erroneous conclusion that the Defendant fails to accept responsibility.

## PART C. OFFENDER CHARACTERISTICS

### Family Ties, Family Responsibilities, and Community Ties

¶ 71. The PSR incorrectly reports that, "During the presentence interview, the defendant stated that the children are receiving extra help from tutors and an occupational therapist to help them cope with the absence of the defendant."

This is an inaccurate report of the Defendant's statement. The Defendant did not make this statement. In fact, the Defendant stated that the children are in need of such services, but are not receiving the additional support services because the family can no longer afford to pay the costs associated with such additional services. (See Defendant's Memorandum with exhibits to Probation Department separately submitted herewith).

Annexed to the Memorandum submitted to the Probation Department is the report of Dr. Michael Eberlin ("Eberlin Report"), in which the children's need for additional support services is identified as a critical component of their educational structure and emotional well being.

Further, the PSR also mistakenly reports the reasons proffered by the Defendant's wife for her unwillingness to undergo a required hysterectomy. (See Affidavit of Karen Romano submitted herewith). As per her Affidavit, the recuperation period for this surgery is four to six weeks, not one or two weeks as mistakenly reported in the PSR. Additionally, the Defendant's

wife did not assert that she does not want to be a "burden" to anyone, but rather that there was no other person available who could drive the children back and forth to school and their various activities on a daily basis over such an extended period of time. Most importantly, the PSR omits the most compelling reason for her unwillingness to undergo surgery. Mrs. Romano chooses to avoid any risk of the possibility of a complication from surgery that may leave her children without the presence of either of their parents.

¶ 74. The PSR reports that the Defendant failed to comply with his reporting conditions. In fact, the Defendant mistakenly believed that there were occasions when he fulfilled his responsibilities by telephone contact rather than by physically appearing at the Probation Department. This was nothing more than a misunderstanding that was clarified during a court appearance in this matter, without any repercussions or the filing of any notices of violation. The "lack of cooperation" alleged in the PSR is gratuitous, unsupported and untrue.

¶ 78. The PSR cynically reports that, "Notably, she indicated that the children have not been taken to see a counselor to help them deal with the defendant's absence. . . Although she presented as distraught during the home visit, his wife, too, has not taken part in any mental health treatment to help her cope with the effect of the defendant's absence."

In fact, the children's psychiatric and emotional issues arose long before the Defendant's incarceration and are independent of the Defendant's absence. Although the Defendant's absence expectedly exacerbates their symptoms, the children's disabilities are systemic and much more profound that merely reeling from their father's absence. (See Eberlin Report).

Additionally, the PSR unduly minimizes the reason that wife has "not sought treatment for herself or the children". The PSR attributes the sole reason expressed by Mrs. Romano to

that it such treatment is "cost prohibitive." While it is true that the cost is prohibitive for the Defendant's family and is a significant factor in the inability of Mrs. Romano to obtain the help and treatment so desperately needed by the Defendant's family, cost is clearly not the primary reason for foregoing such treatment. The PSR completely overlooks Mrs. Romano's own emotional disabilities and fragile state as significant contributors to the failure to seek treatment for herself or the children. As documented in the Eberlin Report, Mrs. Romano is overwhelmed, distraught and emotionally incapable of managing the emotional needs of her family. As reported by Dr. Eberlin: "Sadly, Mrs. Romano does not have the physical strength, flexibility, resilience, or capacity to successfully parent these very special children beyond merely surviving....She clearly does not have the energy, resilience, wisdom, physical health, or skills needed to meet the stressors presently confronting her and physical complications manifest in frequent and severe bouts of pelvic pain make it much more difficult for her to marshal calm and control at home." Dr. Eberlin further states, "The situation at times has potential to be very dangerous, especially when dealing with defiant behaviors, temper outbursts, explosive rages, and physical aggression. The combination of the boys' size, emotional disabilities, ADHD symptoms and the importance of intensive and continuous supervision is an untenable situation without the support and participation of both parents in this family constellation." It is not by choice that Mrs. Romano has not sought out treatment for herself or her children, but rather it is because she is emotionally incapable of doing so.

¶ 79. The PSR mistakenly conveys the ready availability of family assistance by the Defendant's elderly mother. The PSR states, "It bears noting that when queried, the defendant's mother advised that she resides across the street". It would be expected that most mothers, when questioned in this manner, would likely respond as did the Defendant's mother. However this

response is grossly impractical. Although the Defendant's mother has occasionally helped with the children in the past, her assistance is sporadic. (See Affidavit of Karen Romano). The Defendant's mother's availability to help with the children is also limited because she is elderly and works part time as a nurse. Mrs. Romano cannot rely on the Defendant's mother to help with the children.

¶ 80. The PSR inaccurately portrays the children of the Defendant as emotionally stable, healthy and happy, by mistakenly relying on the representations of the Defendant's mother: "During a telephonic interview, his mother . . . noted that his wife is 'overwhelmed' by the defendant's legal situation, but is doing the best she can in light of her difficult situation . . . His mother opined that the defendant's three children miss him a great deal, but she was of the impression that the children are in generally good spirits and will 'get used to' the defendant's absence from the home . . . The defendant's mother described the children as 'bright' and noted that she is unaware if they are suffering from any mental health concerns, learning difficulties or behavioral problems. She was of the opinion that the children are 'fine', that they do not lack discipline, and that they 'seem better' now than when the defendant was first incarcerated."

In fact, the Defendant's mother is totally unaware of and insensitive to the problems and needs of the children. She is not in a position to assess the children's emotional state of mind. First, the Defendant's children resided in Florida until the Defendant's incarceration in 2010, while the Defendant's mother resided in New York. The Defendant's mother infrequently saw her grandchildren during the time they resided in Florida. The Defendant and his wife chose not to discuss these private issues with the Defendant's mother and, given the long distance between the families, the Defendant's mother has no firsthand knowledge regarding their mental health,

learning difficulties or behavioral problems. As established by the numerous psychological and psychiatric reports prepared by various mental health care professionals and the Eberlin Report, the children have been struggling with these issues long before their father's incarceration and their ultimate return to New York. Yet, the Defendant's mother is completely unaware of any of this considerable and troubling history. Clearly she is in no position of offer any comment or opinion as to the existence and/or extent of the children's mental health, learning difficulties or behavioral problems.

¶ 94. Apparently, it was important for the Probation Officer to portray the Defendant as uneducated and lazy. The Defendant in fact battled academic obstacles and withdrew from high school in 1981. He was resilient, however, and returned to graduate during the following year. After his military service, the Defendant enrolled in Nassau County Community College to continue his education. He obtained his pilot's license, and has continued to broaden his education even during his incarceration.

**Employment Record**

¶ 109. Although it is correct that the defendant has not yet filed his income tax returns for 2008 and 2009 because of the seizure of corporate records by the government, the PSR inaccurately states, "Defense Counsel advised that the defendant has obtained an extension to file those returns, but to date, although it was requested, he has not provided proof of the defendant's extension to file." Counsel never advised the Probation Department that extensions had been filed, nor was counsel ever requested to provide proof of filing. (see Kugler Declaration). All tax filings were handled by the Defendant's accountant, Brian Marcus, and if extensions were filed, it would have been handled exclusively by him.

**Financial Condition: Ability to Pay**

¶ 110. a. Copies of deeds to all of the defendant's real property are and have been available upon request.

b. footnote 1: Bank balances for the forfeited accounts could not be provided. Counsel was advised by the banks that they were unable to divulge information as a result of the government's liens on the accounts. Counsel therefore disclosed the existence of the accounts but was not able to provide copies of statements or to report any bank balances for the forfeited accounts.

c. footnote 4: The forfeited properties were disclosed on Schedule G - Real Estate. Appraisals were not obtained on these properties, however, and value could not be determined. The government provided its estimate of values of the forfeited properties, which may or may not reflect the actual fair market values.

d. The cost of 35 East 38th St., Apt 6F, New York is mistakenly reported as $340,000. Its cost is actually $430,000.

e. The mortgage balance on the premises located at 35 East 38th St., Apt 6G, New York is actually $318,000, as per the Equifax credit history reported on page 42 of the PSR.

f. footnote 11: Defendant's wife's life insurance is not within the defendant's control and as such it was not included on Schedule D-Life Insurance.

**MONTHLY CASH FLOW**

¶ 111. The monthly cash flow was inaccurately determined in the PSR. The PSR reports that the Defendant's wife advised that the mortgage payments on 6011 North Ocean Blvd. and property taxes on that property as well as on 67 Montauk Highway are not being made, and as a result, the Probation Department commensurately reduced the reported expenses in the

Defendant's monthly cash flow statement. The Probation Department thereby overlooked two notable consequences: (1) By not making mortgage and property tax payments on the above mentioned properties, the net equity in these properties is further reduced, and liabilities are increased thereby. These twin consequences reduce the Defendant's reported net worth in his personal financial statement; and (2) Even with the reduction of expenses as determined by the Probation Department, the Defendant is nevertheless generating a negative cash flow of $1,716.75, which must be paid by the on-going liquidation of the Defendant's remaining and dwindling assets. Given the current market conditions the Defendant's other assets, which consist primarily of real property, they are likely to ultimately sell for far less than the values reported in the Defendant's personal financial statements. This would further deplete the cash available for this family to pay its monthly living expenses.

**PART E. MITIGATING AND AGGRAVATING FACTORS FOR THE COURT TO CONSIDER**

¶ 126. The PSR incorrectly alleges once again that the Defendant engaged in "criminal activity while on bond" in Florida. There was no such determination, and the Defendant's conduct has not resulted in any arrest or criminal prosecution. It is an enormous leap of a cavernous logical gap to conclude that the Defendant engaged in criminal activity because he engaged in telemarketing conduct.

¶ 127. The Defendant vehemently denies uttering any threat concerning any prosecutor. Moreover, the evidence that he did so is paltry, at best, and must be rejected.

**ADDITIONAL FACTS FOR THE COURT TO CONSIDER**

The PSR failed to take into consideration the character letters furnished as part of the submission of Defendant's counsel to the Probation Officer. This submission is reproduced in its entirety, and submitted herewith.

Dated: Amityville, New York
December 15, 2011

Respectfully submitted,
Ansanelli Law Group, LLP

By: Mark E. Goidell, Esq. (MEG-4786)
Attorneys for Defendant Joseph Romano
92 Broadway
Amityville, New York 11701
(631) 598-0337