UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA

- against –

JOSEPH ROMANO,

Defendant
-----------------------------------------------------------X

**AFFIDAVIT**

Case No. 09-CR-170(JFB)

STATE OF NEW YORK )
) ss.:
COUNTY OF NASSAU )

JOSEPH ROMANO, being duly sworn, deposes and states the following under penalty of perjury:

1. I am the Defendant in the above-captioned action, and as such, I am fully familiar with the material facts and circumstances stated herein.

2. I submit this Affidavit in support of my Objections to the Presentence Investigation Report ("PSR") in the above-captioned action prepared by United States Probation Officer Gregory Giblins and dated March 30, 2011. The primary purpose of this Affidavit is to clarify statements that I made during the presentence investigation that are relevant to my participation in the conspiracy to commit mail fraud and wire fraud to which I pled guilty on September 28, 2010. This Affadavit also provides an explanation for certain actions attributed to me in the PSR.

3. The PSR erroneously concludes that I do not demonstrate acceptance of responsibility for my criminal conduct. First, this contention is belied by the fact that I pled guilty and, in doing so, agreed to waive appeal from any sentence imposed, even one that imposes incarceration of up to 188 months incarceration. In order to clarify that I do accept

responsibility for my crimes, I confirm that I personally, knowingly, and intentionally participated in a conspiracy to defraud customers of the coin companies which I owned and operated from August 2001 to November 2008 (successively named Last Quarter Coin, American Coin Company, and All American Coin Company). I devised this scheme to defraud by determining to sell coins to customers at artificially inflated prices after falsely misrepresenting their value and origins. I conspired to fraudulently obtain money from customers by hiring and supervising salesmen and counseling them to make materially false misrepresentations relating to the value and grade of coins offered for sale to customers. I stated in my Presentence Interview that I established Last Quarter Coin as a legitimate business, which is the truth. In fact, however, its character changed soon thereafter, and it did not operate as a legitimate business. I implemented the scheme to defraud which I devised.

4. After this scheme to defraud was set in operation, I moved to Florida in 2004. I was not actively involved in the operations of the American Coin Company thereafter and did not develop the "investor pitch." During my plea allocution (excerpts of the Transcript are annexed hereto as Exhibit "A"), I made this clear to the Government and to the Court. However, I was aware that the salesmen I hired and oversaw used an "investor pitch" in order to fraudulently obtain money from customers. The "investor pitch" induced customers to purchase coins based on the false representation of the existence of an investor willing to repurchase the coins at a profit. During my plea allocution, I stated that while I did not train the salesmen on an "investor pitch," I was aware of the "investor pitch" and approved of others doing the training. It is in this respect that I did not directly participate in that aspect of the fraud. However, I nonetheless conspired with the salesmen who used the "investor pitch" by implicitly condoning their use of the "investor pitch" to defraud customers.

5. The PSR erroneously reports that I stated that after 2004, I "virtually maintained no involvement in the business," and that I "disclaimed any involvement in orchestrating the scheme or helping to directly carry it out." (PSR, ¶ 42). I did not make those statements, either verbatim or in sum and substance. I told the Probation Officer that I was not physically present, other than on rare occasions, and therefore I was uninvolved in the day-to-day activities of the business.

6. Further, the PSR erroneously reports that I stated that "Michael DiBari, a co-defendant, concocted the scheme to defraud". (PSR, ¶ 42). I did not make that statement, either verbatim or in sum and substance. I told the Probation Officer that I did not author the "investor pitch", and that I believed that it was created by Michael DiBari.

7. The PSR also mistakenly reports that I "expressed no remorse for the victims". (PSR, ¶ 42). I did not make that statement, either verbatim or in sum and substance. During the interview, in the presence of my counsel, I expressed my genuine remorse for the victims to the Probation Officer. I regret the harm that I caused to everyone involved, including the victims, and my family. I know that I violated the trust of the victims of my criminal conduct, and intend to make them whole to the best of my abilities. My remorse is reflected in my conduct, as well. I have agreed to substantial restitution of 7 million dollars. That is the true measure of remorse. The letter from my Pastor further demonstrates the remorse that I continue to feel and express.

8. The conclusions in the PSR that I "did not clearly demonstrate acceptance of responsibility" and that I portrayed myself as a "mere onlooker" (PSR, ¶ 43).are a far cry from my statements to the Probation Officer that I was physically absent from the business premises following my move to Florida in 2004, and that I did not create the "investor pitch". I did not minimize my conduct, and I accept full responsibility, as detailed above.

9. The PSR also casts doubt on my statements concerning the selection of the victims of my fraud. (PSR, ¶ 43). In fact, the business made sales calls from "lead sheets", which contained the names and numbers of institutions, organizations, businesses, and individuals. All were contacted for sales. As I explained to the Probation Officer, although the sales calls were made to a wide variety of potential purchasers, it was generally if not exclusively the elderly who agreed to purchase the coins.

10. The PSR also incorrectly reports that because of the telemarketing conduct in which I engaged in Florida, I "failed to voluntarily terminate or withdraw from criminal conduct or associations" (PSR ¶ 43; see also ¶ 126). In fact, I engaged in no criminal conduct in Florida, and no crimes have been charged or prosecuted in connection with my Florida activities.

11. The PSR states that, following my arrest, I stated to a co-defendant that if Assistant United States Attorney Lara Treinis-Gatz recommended that I receive a ten-year sentence, I would "fucking kill her." (PSR ¶¶ 44, 127). I did not make any such statement. I do not have and never had any intention to threaten the Assistant United States Attorney or to harm any person.

12. Finally, the PSR states that my probation and pretrial services officer in Florida advised that during my release on bond, I failed to comply with reporting conditions on several occasions. (PSR ¶ 74). During the time of my release, I believed I was complying with reporting conditions when I reported to my probation officer by telephone. This matter was resolved during a Court appearance when the Court directed me to report to my probation officer

in person, which I fully complied with after receiving that admonition.

JOSEPH ROMANO

Sworn to before me this
14th day of December, 2011.

Notary Public

MARK E GOIDELL
Notary Public, State of New York
No. 02GO4852193
Qualified in Suffolk County
Commission Expires January 13, 2014

P:\ALG\clients\romano-j\criminal\romano adv united states of america\086 joseph romano affadavit.docx

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
UNITED STATES OF AMERICA,
: CR-09-170 (JFB)

-against-
: United States Courthouse
Central Islip, New York

JOSEPH ROMANO, SALVATORE ROMANO,
and VINCENT ROMANO
Defendant.
: September 28, 2010
9:45 a.m.
-------------------------------X

TRANSCRIPT OF PLEA
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government: LORETTA E. LYNCH, ESQ.
UNITED STATES ATTORNEY
BY: LARA TREINIS-GATZ, AUSA
THOMAS SULLIVAN, AUSA
One Pierrepont Plaza
Brooklyn, New York 11201

For the Defendants: CHARLES CARNESI, ESQ.
For Deft. J. Romano

MARTIN GEDULDIG, ESQ.
For Deft. V. Romano

JOHN MERINGOLO, ESQ.
For S. Romano

Official Court Reporter: Paul J. Lombardi, RMR, FCRR
Ph. (631) 712-6106 100 Federal Plaza - Suite 1180
Fax (631) 712-6122 Central Islip, New York 11722

Proceedings recorded by mechanical stenography.
Transcript produced by CAT.

should not be permitted to plead guilty to count one, Mr. Carnesi?

MR. CARNESI: No, sir.

THE COURT: Mr. Meringolo.

MR. MERINGOLO: No, your Honor.

THE COURT: Mr. Geduldig.

MR. GEDULDIG: No, Judge.

THE COURT: At this point, gentlemen, I need you to tell me in your own words what it is that you did that makes you guilty of count one in the superseding indictment.

We'll start with Joseph Romano. Tell me in your own words what it is you did.

DEFENDANT J. ROMANO: From 2001 through 2008 I conspired with others to commit wire fraud by using a telephone to contact potential customers and induce them into purchasing coins through false representations as to the value of the coins and the existence of an investor willing to repurchase the coins at a profit.

These representations were made from the Eastern District of New York.

THE COURT: You knew at the time you made those representations that they were false?

DEFENDANT J. ROMANO: Yes, your Honor.

THE COURT: You said you used the telephone.

Some of these customers, you were in the Eastern District of New York, were some of these customers out of state?

DEFENDANT J. ROMANO: Yes.

THE COURT: And at the time you participated in this agreement to defraud these customers, you knew it was wrong and against the law?

DEFENDANT J. ROMANO: Yes, your Honor.

THE COURT: Are there any other questions the government would like me to ask Joseph Romano?

MR. SULLIVAN: Your Honor, just about the use of the United States mails, either to ship coins or receive checks.

THE COURT: In addition to the interstate wires, did you use the mail to both ship coins and receive payments?

DEFENDANT J. ROMANO: Yes.

THE COURT: Anything else?

MR. SULLIVAN: No, your Honor.

Thank you.

THE COURT: Salvatore Romano, tell me in your own words what it is you did that makes you guilty.

DEFENDANT S. ROMANO: From 2001 to 2008 I conspired with others in the Eastern District of New York to sell coins over the phones by knowing and inducing people to purchase coins for inflated values.

I misrepresented that there were investors and that they had purchased these coins. This was done over the phones and were shipped by mail.

THE COURT: Okay.

Again, let me follow up. When you made these misrepresentations to customers or investors on the phone, did you know that these statements that you were making were false and were inducing them into making the purchase?

DEFENDANT S. ROMANO: Yes, your Honor.

THE COURT: When you were using the phones, you were here on Long Island somewhere?

DEFENDANT S. ROMANO: Yes, your Honor.

THE COURT: Were some of the customers when you were engaged in these conversations outside the State of New York?

DEFENDANT S. ROMANO: Yes, your Honor.

THE COURT: Did you also use the mail to ship coins to people or to receive payment?

DEFENDANT S. ROMANO: Yes, your Honor.

THE COURT: And at the time that you did this, did you know that it was wrong and against the law?

DEFENDANT S. ROMANO: Yes.

THE COURT: Any other questions to Salvatore Romano?

MR. SULLIVAN: No, your Honor.

THE COURT: Vincent Romano.

Go ahead.

DEFENDANT V. ROMANO: From 2003 to 2008, myself, my brothers, and others conspired to sell collectible coins at excessive prices. My role in the operation was to purchase and grade the coins. I gave up the grade which I knew to be wrong and excessive and false.

The coins were then sold at highly exaggerated prices based on the grades that I provided. I knew the salesmen made these representations from the telephone, using the telephone, and I knew the nature of it was untrue.

The coins were then mailed to the US mail a couple of times UPS and DHL and Federal Express.

THE COURT: With respect to the false statements regarding the grade of the coins, you knew at the time those statements were made by -- you caused the salesman to make these statements or you made the statements yourself to the customers?

DEFENDANT V. ROMANO: I didn't deal with any customers.

I graded the material.

THE COURT: You were in agreement with others that the salesman would make the false statements

regarding the grade to the customers?

DEFENDANT V. ROMANO: Yes.

THE COURT: And you knew the statements to the customers were false at the time they were made?

DEFENDANT V. ROMANO: Yes.

THE COURT: And you knew it would induce them, the false statements, to purchase the coins that were inflated, wrongly inflated values?

DEFENDANT V. ROMANO: Yes, sir.

THE COURT: And with respect to the use of the telephones, were you on Long Island and members of the conspiracy, they were using the telephones on Long Island?

DEFENDANT V. ROMANO: Yes.

THE COURT: Were some of those calls to customers who were out of state?

DEFENDANT V. ROMANO: Yes, sir.

THE COURT: You said the mail was used to ship the coins?

DEFENDANT V. ROMANO: Yes.

THE COURT: At the time you joined and participated in this conspiracy to defraud, did you know it was wrong and against the law?

DEFENDANT V. ROMANO: Yes.

THE COURT: Any other questions as to Vincent Romano?

MR. SULLIVAN: No, your Honor.

THE COURT: I'd ask the government at this time to summarize their proof with respect to each of the defendants if the defendants were to go to trial.

MS. GATZ: Your Honor, the government would prove at trial that the defendant Joseph Romano was the owner of the three coin companies, that he, in fact, supervised and trained the salesmen to make misrepresentations to the customers regarding the grade of the coins and the existence of a secondary purchaser for the coins.

The government would prove that through the testimony of some of the sales people, as well as the testimony of the victims who spoke with the sales people, in addition to some audiotapes procured by some of the victims, and the victims' own testimony.

The evidence would also prove that the defendant Salvatore Romano was, in fact, the sales manager of the salespeople at the subject companies, and he, in fact, made misrepresentations to victims over the phone using the alias Steve Anderson. The misrepresentations involved promises of a secondary purchaser for the coins once the victims purchased the coins. We would prove that through the testimony of the victims, in addition to audiotapes made by the victims of the defendant Salvatore Romano.

With respect to the defendant Vincent Romano, the evidence would prove that he was the office manager, and lead grader of the coins at the subject companies. The testimony would be that he purchased coins that were ungraded. They were just really uncirculated coins with a range and each and every coin he purchased he upgraded to an MS 64 plus which is a significantly higher grade and he, in fact, sold those coins to the customers through the salespeople at the falsely inflated grade and he was aware of the misrepresentations being made by the sales people regarding the existence of a secondary purchaser.

All of these allegations we have proven through the testimony as I stated of the victims. The victims have the paperwork to corroborate their stories, the salespeople, in addition to several office employees that worked at the subject companies.

THE COURT: And the government would be able to prove the use of the mails and the interstate wires to facilitate.

MS. GATZ: Yes. I apologize.

The government would prove this was a telemarketing operation where the calls were made from the Eastern District of New York to almost every other state of the United States, and through phone records, as well as testimony of the witnesses.

In addition, the government would prove through Federal Express records and mail records that coins were shipped out from subject companies from the office side where Vincent Romano worked and that often Federal Express or other mail carriers were sent by the subject companies to the victims' homes to pick up checks that were therein sent back to the Eastern District of New York.

THE COURT: And you would be able to prove this conspiracy took place from 2001 to 2008?

MS. GATZ: Yes, your Honor.

THE COURT: And each defendant committed an act within the statute of limitations?

MS. GATZ: Yes.

THE COURT: Okay. Thank you.

Mr. Joseph Romano, did the government accurately summarize your conduct in connection with the case?

DEFENDANT J. ROMANO: Well, except for one part which I disagree with --

THE COURT: Why don't you speak to Mr. Carnesi first.

(Whereupon, there was a pause in the proceedings.)

DEFENDANT J. ROMANO: Your Honor, I was aware of the investor pitch which the prosecutor speaks of.

But I didn't train people on an investor pitch.

THE COURT: Okay.

You didn't do the training yourself.

DEFENDANT J. ROMANO: I trained people how to sell, how to talk -- speak over the phone, but I didn't train them in the investor pitch.

THE COURT: But you knew the false investor pitch was being used, correct?

DEFENDANT J. ROMANO: Yes, sir.

THE COURT: And you approved of others doing the training?

DEFENDANT J. ROMANO: Yes, your Honor.

THE COURT: With that correction, you agree with what she said?

DEFENDANT J. ROMANO: Yes, I do.

THE COURT: And Salvatore Romano, did you hear what she summarized regarding the conduct, do you agree with what she said?

DEFENDANT S. ROMANO: Yes, your Honor.

THE COURT: Vincent Romano, did you hear what she said regarding your conduct and you agree with what she said?

DEFENDANT V. ROMANO: Yes, sir.

THE COURT: Joseph Romano, please stand.

How do you now plead to count one of superseding indictment S2-09-170, guilty or not guilty?