

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CAO                          *271 Cadman Plaza East*
F#2007R01682                 *Brooklyn, New York 11201*

April 29, 2016

<u>By ECF with Courtesy Copy by Interoffice Mail</u>

The Honorable Sterling Johnson, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    <u>United States v. Joseph Romano, et al.,</u>
                09CR170 (SJ)
                16CV893 (SJ)

Dear Judge Johnson:

        The government writes in response to the Court's April 15, 2016 order to show cause why the habeas petition of defendant/petitioner Joseph Romano ("Romano") should not be granted.  As the court is aware, Romano is currently serving a sentence both for his involvement in a $40 million fraud scheme that targeted the elderly and also, after his conviction and sentencing for the first scheme, for his plot to assassinate the judge and prosecutor who participated in Romano's first conviction.  For the first conviction, he received 180 months incarceration.  For the second conviction, Romano received a life sentence.  The instant petition solely concerns the 180 –month sentence.

        In this petition, Romano has made the following arguments: (1) prior counsel Charles Carnesi was constitutionally ineffective because he had a conflict of interest, Romano Petition, Attachment A, 1-4; (2) prior counsel Charles Carnesi was constitutionally ineffective because he "grossly misled and coerced" Romano into thinking that the charges to which he pleaded guilty only had a five-year maximum sentence, Romano Petition, Attachment B, 1-3; and (3) prior counsel Vincent Ansanelli was constitutionally ineffective because he failed to file a motion to set aside Romano's guilty plea, collected payments from Romano's wife, collected payments from Dejvid Mirkovic, recklessly overcharged and had no courtroom experience, Romano Petition, Attachment C, 1-4.  As discussed in more detail below, Romano's arguments are waived, legally insufficient and often factually impossible. For these reasons, the petition should be denied.

## Contents

STATEMENT OF FACTS ................................................................................................ 3

   I.    Romano's Coin Fraud ........................................................................................ 3

      A.   Investigation and Indictment ............................................................... 3

      B.   Change of Plea ..................................................................................... 4

   II.   The Murder Plot ............................................................................................... 4

      A.   The Confidential Informant and Romano's Plot to Kill Judge Bianco and AUSA Gatz ................................................................................... 4

      B.   Romano's Arrest and Post-Miranda Confession to the Murder Plot .................... 6

DISCUSSION .............................................................................................................. 7

   I.    Romano's Ineffective Assistance of Counsel Claims ....................................... 7

      A.   The Controlling Law ........................................................................... 7

      B.   Prior Counsel Charles Carnesi was not constitutionally ineffective because Romano expressly waived any conflict ..................................... 8

      C.   Prior counsel Charles Carnesi could not have "grossly misled and coerced" Romano into thinking that the charges to which he pleaded guilty only had a five-year maximum sentence ............................ 12

      D.   Prior counsel Vincent Ansanelli was not constitutionally ineffective ................. 23

   II.   Conclusion ..................................................................................................... 29

## STATEMENT OF FACTS

I.    Romano's Coin Fraud

Romano is currently serving a 180-month term of imprisonment for conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349. This conviction flowed from Romano's operation, from approximately August 2001 to November 2008, of companies based in Long Island, New York that engaged in the fraudulent telemarketing and sale of coins. (DE 1).[1] To induce unsuspecting customers to invest in coins, Romano and his coconspirators made a series of materially false promises regarding, among other things, the coins' grade, value and resale demand. (Id.). For example, Romano and his coconspirators sold the coins at fraudulently inflated prices, misrepresenting their value to victim customers by falsely claiming that the coins were of particular high grades, when they were actually of a much poorer quality. (Id.). Romano and his coconspirators also falsely claimed that there were investors waiting to purchase complete sets of the coins at higher prices, once the victim customers made sufficient purchases from the coin business to assemble complete sets. (Id.). In fact, however, there were no such investors. (Id.). The fraud generated over $40 million in revenue. (DE 392).

A.    Investigation and Indictment

In 2009, a grand jury in the Eastern District of New York returned an indictment charging Romano and others with conspiracy to commit mail and wire fraud in connection with this scheme. Romano was released on bail pending trial. (DE 1). The prosecution was handled by Assistant United States Attorney ("AUSA") Lara Treinis Gatz and presided over by the Honorable Joseph F. Bianco. (Id.).

While the case was awaiting trial and while Romano was on pretrial supervision, investigators discovered that Romano had continued his coin fraud business. (DE 143). He did so by opening a coin company in Florida and installing his friend Dejvid Mirkovic (who would later become his conspirator in the murder plot) as the nominal owner of the company. (Id.). Money earned from this company was later used to finance the murder plot charged in this case. As a result of those activities, Romano's bail was revoked, and he was housed in the custody of the United States Marshals Service at the Nassau County Correctional Center (the "NCCC"). (DE 148).

---

[1] "DE" refers to entries on the district court's docket.

3

After the bail revocation, on May 13, 2010, the government informed the sentencing court of a possible conflict between Romano and his attorney.  (DE 165.) After a multi-day hearing, Romano expressly waived any possible conflict. (DE 167, 168, 169, 173).

B.    Change of Plea

In September 2010, the coin fraud case proceeded to trial, and Romano pleaded guilty during jury selection.  (DE 227).   Romano pleaded guilty pursuant to signed plea agreement wherein he expressly acknowledged that he faced up to 20 years of imprisonment for pleading guilty to wire fraud and waived all appeals and collateral attacks upon his sentence, including the instant petition, for any sentence of 188 months or less. (September 28, 2010 Plea Agreement ¶4, Attached as Appendix A).  Judge Bianco only accepted Romano's  change of plea after a lengthy factual and legal colloquy.  (September 28, 2010 Change of Plea Hearing, Attached as Appendix B, Tr. 211-251).

On February 2012, Judge Bianco sentenced Romano to 180 months' imprisonment and ordered the forfeiture of approximately $7 million.  (DE 520).  (February 9, 2012 Sentencing Hearing, Attached as Appendix C).  Romano remained at the NCCC pending post-sentencing hearings regarding restitution, which took place in July 2014. Romano's petition states that he filed no appeal. Romano Petition at 2.  This is false. Romano currently has a pending direct appeal in this case.  (See United States v. Joseph Romano, 15-992 (2d Cir.)).

II.    The Murder Plot

A.    The Confidential Informant and Romano's Plot to Kill Judge Bianco and AUSA Gatz

In August 2012, law enforcement agents received information from Gerald Machacek, an inmate at the NCCC, that Romano was seeking to murder Judge Bianco and AUSA Gatz.[2]  On August 10, 2012, Machacek met with Romano in the holding pens of the United States District Court in Central Islip, New York.  Agents, with Machacek's knowledge, recorded the audio and video of this meeting.

---

[2] Unless otherwise noted, all facts in this section come directly from the trial transcript of Romano's murder trial and the appellate record submitted in connection with his appeal of that trial conviction.

4

Romano discussed with Machacek his desire to torture and kill Judge Bianco and AUSA Gatz, for their role in his 180 month sentence. Romano told Machacek that he planned to mutilate their bodies. During that conversation, Machacek purported to agree to assist Romano in locating a contract killer.

The government later engaged in an undercover operation, which was captured on audio and video recordings. In those undercover recordings, Romano expressed his desire to have and undercover Federal Bureau of Investigation ("FBI") special agent carry out acts of violence on Romano's behalf. Preliminarily, Romano provided the name of a car mechanic, Nick Pittas, with whom he was engaged in a financial dispute. Romano agreed to pay Strecker $3,000 to assault Pittas and indicated that he had contacts outside of jail who would make the payments. Romano further indicated that he had additional, more violent, assignments for Strecker once the assault was successfully completed. Mirkovic was Romano's main agent to secure these violent attacks.

During a September 14, 2012 meeting with Mirkovic, which was recorded, Mirkovic delivered a $1,500 down payment for the assault against Pittas. In response to Romano's request to have Pittas beaten, the FBI met with Pittas and told him about Romano's request. Pittas agreed to pose on the ground as if he had been assaulted for the FBI to photograph as "proof" of the assault. He also agreed to give the FBI his identification card to use as further proof. When Strecker and Mirkovic met on September 25, 2012, Strecker showed Mirkovic "proof" of the assault of Pittas, in the form of Pittas's identification card and a photograph of the staged assault. Mirkovic paid Strecker the $1,500 balance for the assault.

Mirkovic left this meeting and visited Romano at the NCCC for further instruction. Upon leaving the NCCC, Mirkovic requested another meeting with Strecker. During this second meeting, which was recorded, Mirkovic told Strecker that Romano wanted Judge Bianco and AUSA Gatz murdered. Mirkovic agreed that he and Romano would pay $40,000 for the murders, beginning with a $20,000 down payment. Additionally, Mirkovic transmitted requests from Romano regarding how the murders should take place, asking for AUSA Gatz's breasts to be cut off and for the heads of the victims to be preserved in formaldehyde as souvenirs. Mirkovic then paid Strecker $12,000 in cash for the murders.

On October 2, 2012, Mirkovic flew from Florida to New York and met with Strecker a third time. The meeting was recorded. During the meeting, Mirkovic delivered an additional $10,000 in cash for the murders. Further, Mirkovic promised to pay the remaining $18,000 upon confirmation of the murders' successful completion.

B.     <u>Romano's Arrest and Post-Miranda Confession to the Murder Plot</u>

On October 9, 2012, Romano and Mirkovic were arrested.  During a search of Mirkovic's home, law enforcement agents seized a loaded handgun and $18,000 in cash, the balance of the contract for the murders.

Following his arrest, Romano was transported from Queens Geo to the FBI field office in Melville, New York.  At the FBI offices, Romano was advised of his <u>Miranda</u> rights, which he waived orally and in writing.  During the interview that followed, Romano first "vented" for approximately ten minutes about his coin fraud case and how the government had "disassembled" his life.  He then confessed that he had instructed Strecker to assault Pittas and that he had used Mirkovic to make payments to Strecker for the assault.  He also acknowledged that he and Mirkovic had agreed to pay $40,000 for the murders of Judge Bianco and AUSA Gatz.  Romano stated more than once that he hated Judge Bianco and AUSA Gatz and wanted them killed.  Romano also admitted that the plan to murder Judge Bianco and AUSA Gatz was his idea.

Romano also informed the agents that he had previously approached three other inmates and sought to have them commit acts of violence on his behalf.   According to Romano, he had been venting in jail about Judge Bianco and AUSA Gatz and had been approached by inmates offering their help.  Specifically, Romano said he spoke to three inmates: Ishmel Cohen, Breon Forrestal and Bobby Brown.

Toward the end of the interview, Romano also signed a written statement in which he acknowledged that he had conspired to murder Judge Bianco and AUSA Gatz.  In the statement, Romano also agreed to provide information concerning other crimes about which he had information.  Romano was later indicted for his crimes.

On January 23, 2014, the jury returned a verdict of guilty on both counts of conspiracy to murder an employee of the United States.  On April 14, 2014, the district court sentenced Romano to two concurrent terms of life imprisonment, to run concurrently with the undischarged portion of his 180-month sentence for the coin fraud.

<u>DISCUSSION</u>

I.   <u>Romano's Ineffective Assistance of Counsel Claims</u>

A.   <u>The Controlling Law</u>

As stated by the Second Circuit, "because requests for habeas corpus relief are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." <u>Ciak v. U.S.</u>, 59 F.3d 296, 301 (2d Cir. 1995) (citing <u>United States v. Frady</u>, 456 U.S. 152, 165 (1982)). As a result, prisoners seeking habeas corpus relief pursuant to Section 2255 must show both a violation of their constitutional rights and "substantial prejudice" or a "fundamental miscarriage of justice." <u>Id</u>. at 301.

Further, in Section 2255 proceedings, the Supreme Court has recognized the rule of "procedural default: [that prisoners] cannot assert claims they failed to raise at trial or on direct appeal unless they can show 'cause' for the default and 'prejudice' resulting from it." <u>Id</u>. at 302 (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87 (1977)); <u>see also</u> <u>Reed v. Farley</u>, 512 U.S. 339, 353–355 (1994) ("the general rule is that the writ of habeas corpus will not be allowed to do service for an appeal.... Where the petitioner—whether a state or federal prisoner—failed properly to raise his claim on direct review, the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice from the alleged ... violation.' "). None of the claims raised in the instant petition were raised on appeal.

However, the traditional procedural default rule generally will not apply to ineffective assistance of counsel claims where a petitioner was represented by the same attorney at trial and on direct appeal and where such claims depend on matters outside the scope of the record on direct appeal. <u>Billy–Eko v. United States</u>, 8 F.3d 111, 114 (2d Cir. 1993). The resolution of ineffective assistance of counsel claims often requires evidence outside the record on appeal because such claims are often based on alleged errors of omission which are difficult to perceive from the record. <u>Id</u>. Examples of such errors include the failure to call a witness, introduce certain evidence or a conflict of interest. <u>Id</u>.

To establish ineffective assistance of counsel in the context of a guilty plea, a petitioner must demonstrate the following two elements:

(1)    that his attorney's performance fell below an objective standard of reasonableness; and

(2)     that there is a reasonable probability that, but for his counsel's errors, he would not have pled guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 57–59 (1985); Strickland v. Washington, 466 U.S. 668, 687–694 (1984).

In applying the above two-prong test, "judicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, supra, 466 U.S. at 689. The inquiry focuses "on the fundamental fairness of the proceeding whose results are being challenged." Id. at 696. "The court's central concern is not with 'grading counsel's performance' but with discerning 'whether despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.' " United States v. Aguirre, 912 F.2d 555, 560 (2d Cir.1990) (quoting Strickland, 466 U.S. at 696–697). The burden is on the petitioner to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Strickland, supra, 466 U.S. at 689. Indeed, as the Supreme Court has noted, "there are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id.

Finally, in engaging in the above analysis, the government is mindful that the petitioner is proceeding pro se and that his submissions must be liberally construed in favor of the petitioner. See Douglas v. United States, 13 F.3d 43, 47 (2d Cir.1993).

B.     Prior Counsel Charles Carnesi was not constitutionally ineffective because Romano expressly waived the possible conflict

On May 3, 2010, the government filed a lengthy submission notifying the Court of certain potential conflicts of interest of Romano's then counsel, Charles Carnesi, in his representation of Romano. (DE 165). Specifically, the government brought potential conflicts to the Court's attention that Carnesi was receiving payments from Mirkovic and his company CCI. (Id. at 3.). In that submission, the government requested that the court conduct an appropriate inquiry pursuant to United States v. Curcio, 680 F.2d 881, 888-90 (2d Cir. 1982). (Id. at 1, 3, 5). The government specifically noted that Romano could waive this potential conflict by consulting with separate, court-appointed Curcio counsel following the hearing. (Id. at 5.).

8

On May 18, 2010, upon a referral from the District Court, United States Magistrate Judge Kathleen Tomlinson began a <u>Curcio</u> inquiry regarding the first conflict of interest noted by the government.  (May 18, 2010, Curcio Hearing Transcript, attached as Appendix D).[3]   At that appearance, the district court first obtained additional information regarding the potential conflicts. (<u>Id.</u> at 4-7).  Carnesi agreed with the basic facts but stated that there was no conflict. (<u>Id.</u> at 7-8).  The Court disagreed, noting the payments and the potential that Carnesi could be called as a witness.  (<u>Id.</u> at 9).  The expressly stated that Romano needed time to evaluate the findings of the court before considering any waiver. (<u>Id.</u> at 10-11).  Romano expressly and repeatedly stated that he understood the issues. (<u>Id.</u> at 11). The Court also indicated that independent counsel, Paul Rinaldo, would be appointed to advise Romano on these issues.

> I am going to direct Mr. Rinaldo, who is here in the courtroom[,] to meet with you and to take whatever time is necessary to provide you with the information to answer your questions and to insure[,] as I said, that you have thought through this issue carefully and with the best information and advice that you can have available to you.

(<u>Id.</u> at 12).   Romano expressly stated that he understood. (<u>Id.</u>)  The second <u>Curcio</u> hearing was scheduled for May 26, 2010.

At the next hearing, the court again advised Romano of the nature of the conflict.  (May 26, 2010, Curcio Hearing Transcript, attached as Appendix D, 2-4). The Court confirmed that Rinaldo and Romano met and discussed the potential conflicts twice. (<u>Id.</u> at 4).   Mr. Rinaldo provided a detailed discussion of the meetings with Romano.  (Id. at 5-6).  Rinaldo stated: "I am confident, Judge, that [Romano] understands the issue, that he is making that waiver intelligently and voluntarily and knowingly . . . . [a]nd I believe that he has had the time to reflect on it." (<u>Id.</u> at 6).  Romano expressly stated that he agreed with all of Rinaldo's statements.  (<u>Id.</u>). Judge Tomlinson then inquired specifically about whether Romano understood each of the specific potential conflicts and whether Romano understood them. (<u>Id.</u> at 6-8).  Romano stated that he understood multiple times. (<u>Id.</u>).  Judge Tomlinson then stated: "You have a constitutional right under the Sixth Amendment to be represented by conflict free coun[s]el.  Do you understand that?"  (<u>Id.</u> at 8).  Romano answered: "Yes, I do  . . . . I understand that I should be able to have an attorney which has no conflict and gives me a fair chance to have a fair hearing or a trial for that matter." (<u>Id.</u> at 8-9).  Romano

---

[3] Both the May 18, 2010 and May 26, 2010 <u>Curcio</u> hearings are contained within Appendix D.

then confirmed the multiple meetings with Rinaldo and confirmed that he had no additional questions. (Id. at 9-10). After a lengthy additional series of questions by Judge Tomlinson, Romano stated that he wished to continue with Carnesi and that Romano expressly waived all potential conflicts regarding Carnesi's representation. (Id. at 11). The court then spent additional time confirming that Romano was making this waiver voluntarily and of his own free will. (Id. at 11-12). Upon this lengthy record, Judge Tomlinson stated:

> I find that all of the Curcio rights have been granted to Mr. Romano. That he understands the consequences of what he is undertaking here with having his present counsel, Mr. Carnesi, proceed as his counsel and that he is waiving any conflict here and that he is doing so freely and voluntarily, having been fully informed and having had an opportunity to have any of his questions answered in this regard.

(Id. at 12).

### 1.    Analysis

Reading the pro se petition broadly, Romano argues that he did not validly waive his trial counsel's potential conflict of interest  Romano argues that "Carnesi coerced [and] disingenuously misled" him, which led to the waiver. (Romano Petition, Attachment A, at 4). Romano also argues that no Curcio hearing was held. (Id.). For the reasons set forth below, Romano's arguments are without merit.

### a.    Legal Standards

A potential conflict of interest exists "if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." United States v. Kliti, 156 F.3d 150, 153 n.3 (2d Cir. 1998). In order to prove that a potential conflict of interest violated the defendant's Sixth Amendment right to counsel, the defendant must prove prejudice. Id. Once a potential conflict of interest is identified, the district court must "initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest." Strouse v. Leonardo, 928 F.2d 548, 555 (2d Cir. 1991). If the district court decides, after making such an inquiry, not to disqualify counsel based on the conflict of interest, the court must then secure the defendant's informed waiver pursuant to procedures set out in United States v. Curcio, 680 F.2d 881 (2d Cir. 1982). Curcio procedures include, prior to obtaining a waiver, that

> the trial court (1) advises the defendant of his right to representation by an attorney who has no conflict of interest, (2) instructs the defendant as to the dangers arising from

10

particular conflicts, (3) permits the defendant to confer with his chosen counsel, (4) encourages the defendant to seek advice from independent counsel, (5) allows a reasonable time for the defendant to make a decision, and (6) determines, preferably by means of questions that are likely to be answered in narrative form, whether the defendant understands the risks of representation by his present counsel and freely chooses to run them.

United States v. Perez, 325 F.3d 115, 119 (2d Cir. 2003).

While the dictates of Curcio appear strict, the Second Circuit has taken a flexible approach in evaluating the adequacy of Curcio waivers. Instead of focusing on whether "the judge recited any particular litany of questions," the Circuit has focused on "whether the defendant appreciated his predicament." United States v. Jenkins, 943 F.2d 167, 176 (2d Cir. 1991). For example, the Circuit has upheld a Curcio waiver when the defendant took no time to consider his representation options. United States v. Rodriguez, 968 F.2d 130, 138-39 (2d Cir. 1992). Even if a Curcio waiver is fatally flawed, the defendant must show that a potential conflict resulted in demonstrable prejudice to the defendant. United States v. Levy, 25 F.3d 146, 152 (2d Cir. 1994).

b.   Romano Has Waived Any *Curcio* Claim And Has Not Shown Prejudice From Proceeding With Carnesi

First, contrary to Romano's false representations in his petition, he actually received two Curcio hearings. At those hearings, Romano was represented by Rinaldo, not Carnesi. The court went to great lengths to confirm that Romano consulted extensively with independent counsel prior to making any decision. After confirming the consultation with independent counsel, Romano expressly and exhaustively stated that he understood risks in proceeding with Carnesi as his trial counsel. Throughout the inquiry, Romano made clear to the Court on multiple occasions that he understood the risks in waiving his right to unconflicted trial counsel and that he wanted to proceed with Carnesi as his attorney. (Id.). Additionally, when the Court asked Romano to explain those risks in narrative form, Romano did so.

Second, Romano now argues that he was coerced by Carnesi to waive these conflicts. However, at two separate hearings, and multiple times in between, Romano consulted with independent counsel Rinaldo. Romano also confirmed on the record at the hearings that he was not coerced and that he was waiving his rights knowingly. In short, given the record at the hearings, Romano's claims that he was coerced into waiving his rights are obviously false.

11

Third, Romano has not demonstrated how proceeding with Carnesi's potential conflicts of interest caused demonstrable prejudice to him.  See, e.g., United States v. Stantini, 85 F.3d 9, 16-19 (2d Cir. 1996).  Even assuming construing the pro se submission broadly to assume that Romano alleged prejudice, "[c]onclusory assertions" and "airy generalities," are insufficient to meet Romano's burden to warrant relief.  E.g., United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987).  Indeed, there is evidence contradicting Romano's vague assertion of prejudice.  Romano was represented at sentencing, appeal and in his murder conspiracy trial by different counsel whom Romano does not allege to have shared these conflicts.

In sum, Romano's arguments regarding his Curcio waiver are factually incorrect and legally insufficient.  Further, because Romano knowingly and intelligently waived any potential conflict possessed by Carnesi and, in any event, cannot show prejudice, trial and appellate counsel did not provide ineffective assistance in failing to raise a claim based upon Carnesi's potential conflict.

C.    Prior counsel Charles Carnesi could not have "grossly misled and coerced" Romano into thinking that the charges to which he pleaded guilty only had a five-year maximum sentence

Romano alleges that he was coerced and misled by his attorney at his change of plea hearing.  This allegation is directly contradicted at the change of plea hearing.

> THE COURT: So the record is clear, I'll say the full name of each defendant when I'm asking you to respond to the question so that the record is clear. Gentlemen, before I accept your guilty plea, I'm going to ask you certain questions so I can establish to my satisfaction that you wish to plead guilty because you are guilty and not for some other reason. I also need to establish that you know what you will be giving up by pleading guilty.  you don't understand any of my questions or you want to consult with your attorney at any time for any reason, just let me know and I'll give you as much time as you need to do that. Joseph Romano?
> DEFENDANT J. ROMANO: Yes.
> . . . .
> THE COURT: I'm going to ask you these questions as a set to each of you rather than going question by question because I

think it will make more sense that way. State your full name for the record, Joseph Romano.

DEFENDANT J. ROMANO: Joseph Romano.

THE COURT: How old are you?

DEFENDANT J. ROMANO: 47.

THE COURT: How far did you go in school?

DEFENDANT J. ROMANO: Two years of college.

THE COURT: Have you now or have you recently been under the care of a doctor or psychologist?

DEFENDANT J. ROMANO: No, sir.

THE COURT: Have you ever been hospitalized for any type of mental illness or any type of addiction including drug or alcohol addiction?

DEFENDANT J. ROMANO: No, sir.

THE COURT: Have you taken any drugs or medicine or pills or any alcoholic beverages in the past 48 hours?

DEFENDANT J. ROMANO: I had a glass of wine last night with my brother.

THE COURT: Is your mind clear today?

DEFENDANT J. ROMANO: Yes.

THE COURT: You understand what you are about to do?

DEFENDANT J. ROMANO: I understand.

THE COURT: Do counsel have any doubt as to Mr. Joseph Romano's competence to plead at this time? Mr. Carnesi?

MR. CARNESI: No, sir.

THE COURT: The government?

AUSA SULLIVAN: No, your Honor.

. . . .

THE COURT: On the basis of the defendants' responses to my questions, my observations of their demeanor, and the representations of counsel, I find that each of them are fully competent to enter an informed plea at this time. Have you had sufficient time to discuss this case with your attorney, including any possible defenses that you might have to the charge to which you are offering to plead guilty, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: I'm now going to describe to you certain rights that each of you have under the constitution and laws of the United States. You will be giving up these rights by pleading

13

guilty. So please listen carefully. I'm going to ask each of you as you go along whether you understand each of the rights you are giving up. Under the Constitution and laws of the United States, you are entitled to a speedy and public trial by a jury on the charges contained in the superseding indictment. Do you understand that, Joseph Romano?

DEFENDANT J. ROMANO: Yes, sir.

. . . .

THE COURT: At a trial you would be presumed to be innocent and the government would be required to prove you guilty by competent evidence beyond a reasonable doubt before you could be found guilty. Do you understand that, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: A jury of 12 people would have to agree unanimously that you were guilty and you will not have to prove you where are innocent if you went to trial. Do you understand that, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: At the trial and at every stage of the case you would be entitled to be represented by a lawyer and if you could not afford a lawyer, one would be appointed at public expense free of cost to represent you. Do you understand that, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: During the trial the witnesses for the government would have to come to court and testify in your presence. Your lawyer could cross-examine the witnesses for the government. Your lawyer could object to evidence offered by the government, and your lawyer could offer evidence on your own behalf, if you so desire.  You would also have the right to have subpoenas issued or other processes used to compel witnesses to testify in your defense. You understand that, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: At the trial, although you would have the constitutional right to testify if you chose to do so, you would also have the constitutional right not to testified, and if you

14

decided not to testify, no one, including the jury, could draw any adverse inference or suggestion of guilt from the fact that you did not testify. Do you understand that, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: Even now, as you are offering to enter into this guilty plea, you have the right to change your mind, continue in a plea of not guilty, and go to trial on the charges contained in the superseding indictment. Do you understand that, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: If you plead guilty and if I accept your plea, you would give up your right to a trial and the other rights I just discussed with you, other than your right to an attorney which you have regardless of whether or not you plead guilty. However, if you plead guilty, there will be no trial, and I will enter a judgment of guilty and sentence you on the basis of your plea after I considered the presentence report and the submissions and arguments that are made from both sides at the time of sentencing. There will be no appeal on the question of whether you did or did not commit this crime to which you are pleading guilty. Do you understand that, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: If you plead guilty, you also have to give up your right not to incriminate yourself because in a moment I'm going to ask you questions about what you did in order to satisfy myself that you are guilty as charged and you have to admit and acknowledge your guilt. Do you understand that, Joseph Romano?

DEFENDANT J. ROMANO: Yes.

. . . .

THE COURT: Are you willing to give up your right to a trial and the other rights I just discussed with you, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: Let me just summarize the charge in count one to which you are offering to plead guilty. As you know, count one charges a conspiracy to commit wire fraud and mail fraud. In

15

particular, and, again, this is just a summary, the details are contained in the indictment, charges a conspiracy to devise a scheme and artifice to defraud customers in connection with the coin companies that are specified in the indictment, and to obtain the money and property of these customers by means of materially false and fraudulent representations involving the offer and sale of coins. And it alleges the use of the interstate wires and the mail in order to further the fraudulent scheme which is laid out in some detail in the indictment. Do you understand that that is a summary of what count one charges you with, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

….

THE COURT: I want to review with you the maximum penalties as well as any mandatory minimum penalties with respect to count one, which you are offering to plead guilty. Count one carries a maximum term of imprisonment of 20 years. There is no minimum term of imprisonment. There is a maximum supervised release term of three years to follow any term of imprisonment. If a condition of release is violated there are terms of release attached to supervised release and if any of those terms or conditions violated, you may be sentenced to up to two years additional in jail without getting credit for prerelease imprisonment or time previously served on post-release supervision. There is a maximum fine of the greater of $250,000 or twice the pecuniary gain derived from the offense or two times the gross pecuniary loss to persons other than yourself resulting from the offense. You are also subject to restitution order to the victims in an amount to be determined by the court, and for this type of crime to which you are offering to plead guilty, the restitution is mandatory. There's also a $100 mandatory special assessment, and you are also subjecting yourselves to the criminal forfeiture as is outlined in your plea agreement. Do you understand that those are the maximum penalties, as well as the mandatory penalties for the crime to which you are offering to plead guilty, Joseph Romano?

DEFENDANT J. ROMANO: Yes, your Honor.

. . . .

THE COURT: I want to describe to you now some things about the sentencing process to make sure you understand how the

sentencing works. First, there is no such thing as parole in the federal system. So if you are sentenced to prison, you will not be released any earlier on parole. Second, the determination of what sentence you will receive is to be made by the court alone. Nothing that your lawyer may have told you, nothing that the government may have said, none of that is binding on the court. Sentencing is up to the court. As I said, I will sentence you based on the presentence report that the probation department prepares, and then I will hear the submissions and arguments that are made by both sides at the time of sentencing. Next, the current state of the law is that before imposing sentence I'm required by law to consider a number of factors about this case, including, among other things, your background, the nature of the crime, the need to impose a just sentence that accounts for the need to deter you and others from committing the type of crime for which you are convicted, and the need to account for your interests, including any rehabilitation. Another factor that the court is to consider is what is known as the sentencing guidelines. These sentencing guidelines are, as the name suggests, a set of guidelines that takes into account things like any criminal history that you might have, as well as the criminal conduct which you had committed and then it sets forth a range of imprisonment within which you could be sentenced. I want to emphasize to you that I'm only to consider these guidelines, which means that they are advisory. They are not mandatory, and I am not required to impose a sentence within whatever the applicable range may turn out to be. I can sentence you above or below the guidelines, depending upon how I weigh all the factors that I have to consider under the law. Finally, whatever sentence I impose in this case, and no matter how happy or unhappy you may be with that sentence, you may not withdraw or get back your guilty plea. In other words, while you may appeal the sentence itself, to the extent that you have not waived your right to do so in the plea agreement, you may not undo your being found guilty by virtue of your plea here today. Do you understand all those things about the sentencing process, Joseph Romano?

DEFENDANT J. ROMANO: Yes.

. . . .

17

THE COURT: Joseph Romano, with respect to court Exhibit 1, did you sign this today, sir, in the presence
of your attorney?

DEFENDANT J. ROMANO: Yes, your Honor.

THE COURT: Did you review it before you signed it?

DEFENDANT J. ROMANO: Yes, sir.

THE COURT: Did you fully discuss it with your attorney before you signed it?

DEFENDANT J. ROMANO: Yes.

THE COURT: I want to outline a couple of things with you with respect to the agreement just to make sure that you understand and then I'm going to ask the government to outline the forfeiture part of the agreement to make sure there's no misunderstanding with respect to that. First, let me emphasize what I said a moment ago, which is that I know the agreement contains an estimate of the guideline calculation. I want to emphasize what I said a moment ago. That's just an estimate. I'm not bound by that estimate. That estimate can turn out to be wrong. I have my own obligation in consultation with probation and the parties to determine what the calculation is and then, regardless of what the calculation turns out to be, as I said, I can sentence you above or below that range, whatever it turns out to be. Do you understand that?

DEFENDANT J. ROMANO: Yes, sir.

THE COURT: I want to focus your attention now on paragraph four. In paragraph four you are agreeing not to file an appeal or otherwise challenge by habeas petition under Section 2255, or any other provision, the conviction or sentence in this case in the event that the court imposes a term of imprisonment of 188 months or below. In other words, if I sentence you to 180 months imprisonment or anything less than 188 months in prison, you are agreeing that you will not appeal or otherwise challenge in any way that conviction or sentence. Do you understand that?

DEFENDANT J. ROMANO: Yes, sir, I do.

THE COURT: Are you waiving that right knowingly and voluntarily?

DEFENDANT J. ROMANO: Yes, I am.

….

18

THE COURT: At this point, gentlemen, I need you to tell me in your own words what it is that you did that makes you guilty of count one in the superseding indictment. We'll start with Joseph Romano. Tell me in your own words what it is you did.

DEFENDANT J. ROMANO: From 2001 through 2008 I conspired with others to commit wire fraud by using a telephone to contact potential customers and induce them into purchasing coins through false representations as to the value of the coins and the existence of an investor willing to repurchase the coins at a profit. These representations were made from the Eastern District of New York.

THE COURT: You knew at the time you made those representations that they were false?

DEFENDANT J. ROMANO: Yes, your Honor.

THE COURT: You said you used the telephone. Some of these customers, you were in the Eastern District of New York, were some of these customers out of state?

DEFENDANT J. ROMANO: Yes.

THE COURT: And at the time you participated in this agreement to defraud these customers, you knew it was wrong and against the law?

DEFENDANT J. ROMANO: Yes, your Honor.

THE COURT: Are there any other questions the government would like me to ask Joseph Romano?

MR. SULLIVAN: Your Honor, just about the use of the United States mails, either to ship coins or receive checks.

THE COURT: In addition to the interstate wires, did you use the mail to both ship coins and receive payments?

DEFENDANT J. ROMANO: Yes.

. . . .

THE COURT: I'd ask the government at this time to summarize their proof with respect to each of the defendants if the defendants were to go to trial.

MS. GATZ: Your Honor, the government would prove at trial that the defendant Joseph Romano was the owner of the three coin companies, that he, in fact, supervised and trained the salesmen to make misrepresentations to the customers regarding the grade of the coins and the existence of a secondary purchaser for the coins. The government would prove that through the testimony of some of the sales people, as well as the

19

testimony of the victims who spoke with the sales people, in addition to some audiotapes procured by some of the victims, and the victims' own testimony.

. . . .

All of these allegations we have proven through the testimony as I stated of the victims. The victims have the paperwork to corroborate their stories, the salespeople, in addition to several office employees that worked at the subject companies.

THE COURT: And the government would be able to prove the use of the mails and the interstate wires to facilitate.

MS. GATZ: Yes. I apologize. The government would prove this was a telemarketing operation where the calls were made from the Eastern District of New York to almost every other state of the United States, and through phone records, as well as testimony of the witnesses. In addition, the government would prove through Federal Express records and mail records that coins were shipped out from subject companies from the office side where Vincent Romano worked and that often Federal Express or other mail carriers were sent by the subject companies to the victims' homes to pick up checks that were therein sent back to the Eastern District of New York.

THE COURT: And you would be able to prove this conspiracy took place from 2001 to 2008?

MS. GATZ: Yes, your Honor.

THE COURT: And each defendant committed an act within the statute of limitations?

MS. GATZ: Yes.

THE COURT: Okay. Thank you. Mr. Joseph Romano, did the government accurately summarize your conduct in connection with the case?

DEFENDANT J. ROMANO: Well, except for one part which I disagree with --

THE COURT: Why don't you speak to Mr. Carnesi first.

(Whereupon, there was a pause in the proceedings.)

DEFENDANT J. ROMANO: Your Honor, I was aware of the investor pitch which the prosecutor speaks of. But I didn't train people on an investor pitch.

THE COURT: Okay.

You didn't do the training yourself.

20

DEFENDANT J. ROMANO: I trained people how to sell, how to talk -- speak over the phone, but I didn't train them in the investor pitch.

THE COURT: But you knew the false investor pitch was being used, correct?

DEFENDANT J. ROMANO: Yes, sir.

THE COURT: And you approved of others doing the training?

DEFENDANT J. ROMANO: Yes, your Honor.

THE COURT: With that correction, you agree with what she said?

DEFENDANT J. ROMANO: Yes, I do.

. . . .

THE COURT: Joseph Romano, please stand. How do you now plead to count one of superseding indictment S2-09-170, guilty or not guilty?

DEFENDANT J. ROMANO: Guilty, your Honor.

THE COURT: Did you do what you are charged with doing in count one?

DEFENDANT J. ROMANO: Yes, your Honor.

THE COURT: Are you pleading guilty because you are guilty?

DEFENDANT J. ROMANO: Yes, your Honor.

THE COURT: Are you pleading guilty voluntarily and of your own free will?

DEFENDANT J. ROMANO: Yes, your Honor.

….

THE COURT: . . . .Because each defendant acknowledged they are guilty as charged in count one of the superseding indictment, S2-09-170, because each of them know their rights and are waiving them, because the plea for each of them is entered knowingly and voluntarily and is supported by an independent basis in fact for each of the elements in the offense, I accept each of the defendants' guilty pleas and I adjudge Joseph Romano guilty of count one, superseding indictment S2,

(September 28, 2010 Change of Plea Hearing, Attached as Appendix B, Tr. 211-251).

Romano now claims that Carnesi falsely convinced him that he faced a maximum of 5 years in jail for his plea.  This claim is directly contradicted by the change of

plea colloquy, wherein Judge Bianco accurately informed Romano about the maximum possible sentence of 20 years and Romano's waiver of any appeal of sentence less than 188 months. (Id. at 225, 230-231). Romano expressly stated that he understood these possible sentences. (Id. at 225, 231).

Romano's claims are further contradicted by his signed plea agreement. Romano pleaded guilty pursuant to signed plea agreement wherein he expressly acknowledged that he faced up to 20 years of imprisonment for pleading guilty to wire fraud and waived all appeals and collateral attacks upon his sentence, including the instant petition, for any sentence of 188 months or less. (September 28, 2010 Plea Agreement, Attached as Appendix A, ¶ 4). Therefore, Romano already signed an agreement and presented it to his sentencing court that directly contradicts his contentions in the instant petition.

Similarly, Romano now states that he was coerced into pleading guilty by his attorney. However, during the colloquy, Romano expressly stated that he was pleading guilty of his own free will. (September 28, 2010 Change of Plea Hearing, Attached as Appendix B, Tr. 234). Romano similarly expressly stated that no one promised him any sentence. (Id.) Romano also guaranteed to knowing and voluntary change of plea in this plea agreement. (September 28, 2010 Plea Agreement, Attached as Appendix A, ¶ 10). Finally, Romano stated in the plea agreement that no other agreements or promises as to his sentence existed. (Id. ¶14).

The plea dialogue between the Court and Romano provides a factual basis for Romano's guilty pleas for conspiracy to commit wire fraud, fully informs Romano of the possible sentences and verifies that the petitioner entered the guilty plea knowingly and voluntarily. At the plea allocution, Romano unambiguously acknowledged that he understood the nature of the crimes with which he was charged. All of these facts are further supported by Romano's signed plea agreement. The petitioner cannot now belatedly claim to have suffered a confusion that is unsupported by the record. See United States v. Stevens, 19 F.3d 93, 95–96 (2d Cir. 1994) (defendant fully understood that he was pleading guilty to a charge of conspiracy to distribute controlled substance as opposed to the substantive offense, where a factual basis for the charge existed); Fama v. United States, 901 F.2d 1175, 1178 (2d Cir. 1990) (defendant's claim that he did not understand the offense charged fails when the record shows that the district court explained the elements of the charge and inquired into the factual basis for the plea).[4]

---

[4] Romano also states that his allocution did not include any admission by him that he directed callers to make false statements to customers. Romano Petition, Attachment B, 3. This statement is false. As shown in the plea colloquy, Romano both made a statement of his own factual guilt and adopted the summary by AUSA Gatz. (Appendix B, Tr. 248-249).

"Solemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977). Such statements are conclusive absent a credible reason for departing from them. United States v. Gonzalez, 970 F.2d 1095, 1101 (2d Cir. 1992). Romano has not provided any credible reason for departing from the statements he made at his plea allocution

D.    Prior counsel Vincent Ansanelli was not constitutionally ineffective

Romano was not represented by Carnesi for his sentencing. Instead, Romano retained new counsel Vincent Ansanelli on or about November 12, 2010. See DE 245. In addition to his arguments against Carnesi, Romano has also articulated five reasons why he feels that Ansanelli was constitutionally deficient. For the reasons discussed below, the purported errors described by Romano, both individually and collectively do not rise to the level of ineffective assistance of counsel.

1.    The proposed motion to set aside Romano's guilty plea was waived and would not have succeeded even if it was filed.

As expressly acknowledge by Romano in both his plea agreement and during the plea colloquy, Romano waived all collateral attacks upon any sentence of 188 months or less. Romano received a 180 month sentence. Therefore, as discussed below, Romano has expressly waived any collateral attack upon his guilty plea.

The Court of Appeals for the Second Circuit has repeatedly held that waivers of the right to appeal contained in plea agreements are valid and enforceable. See, e.g., United States v. Lee, 523 F.3d 104, 106 (2d Cir. 2008); United States v. Morgan, 406 F.3d 135, 137 (2d Cir. 2005); Garcia–Santos v. United States, 273 F.3d 506, 509 (2d Cir. 2001) (per curiam); United States v. Gomez–Perez, 215 F.3d 315, 318 (2d Cir. 2000); United States v. Salcido–Contreras, 990 F.2d 51, 51 (2d Cir. 1993) (per curiam). The Court of Appeals has also held that knowing and voluntary waivers of the right to litigate collateral attacks such as those pursuant to section 2255 are valid and enforceable. See Frederick v. Warden, Lewisburg Corr. Facility, 308 F.3d 192, 195 (2d Cir. 2002) ("There is no general bar to a waiver of collateral attack rights in a plea agreement.") (citation omitted); Garcia–Santos,

---

Romano did limit that adoption by stating that, although he trained the callers, was aware of their false statements to investors and approved the false statements, he did not actually train callers on the investor pitch. (Id.). Romano has failed to articulate any actual reason why this distinction makes any possible legal difference.

273 F.3d at 509 (dismissing section 2255 petition without reaching merits because waiver in plea agreement was valid and enforceable); Tremblay v. United States, No. 08 Civ. 7030, 2009 WL 1055007, at *8 (S.D.N.Y. Apr. 20, 2009) ("When a defendant signs a plea agreement containing a waiver of the right to file a habeas petition, the waiver is enforceable provided that the plea agreement was 'entered into knowingly and voluntarily, and with awareness of his waiver of ... collateral attack.' ") (quoting Garcia–Santos, 273 F.3d at 508).

The circumstances under which the Court of Appeals has declined to enforce waivers of appellate rights are very limited. As the Court of Appeals noted in Gomez–Perez, the exceptions include situations:

> when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or other prohibited biases, when the government breached the plea agreement, or when the sentencing court failed to enunciate any rationale for the defendant's sentence....

215 F.3d at 319 (internal citations omitted) (collecting cases). To the extent that a claim of ineffective assistance of counsel challenges the process by which the plea agreement was entered into, it can survive the waiver provision in a plea agreement. Parisi v. United States, 529 F.3d 134, 138 (2d Cir. 2008). However, "[t]o raise a claim despite a guilty plea or appeal waiver, the petitioner must show that the plea agreement was not knowing and voluntary, because the advice he received from counsel was not within acceptable standards." Id. (internal quotation marks and citations omitted).

In this case, there are no plausible bases to overcome the petitioner's waiver of the right to bring a 2255 motion for his ineffective assistance of counsel and prosecutorial misconduct claims. As part of the plea allocution, the petitioner specifically affirmed that he was aware of the waiver of the right to bring a 2255 petition. There is no showing on this motion that the waiver was not knowing and voluntary. Indeed, this claim only involves representation by an attorney who joined the case after the guilty.  Therefore, Romano's arguments regarding Ansanelli cannot possibly affect his knowing and voluntary waiver of appeal and collateral attack.

As discussed earlier, the court should treat this pro se argument broadly. However, even to the extent that this claim challenges the knowing and voluntary nature of the petitioner's plea, and is therefore not barred, it has no merit.

24

As mentioned above, any ineffective assistance of counsel claim must demonstrate actual prejudice. To evaluate this prejudice, the Court should examine whether he would prevail in his motion. Withdrawal of a guilty plea is permitted if the defendant "can show a fair and just reason for requesting the withdrawal," United States v. Adams, 448 F.3d 492, 498 (2d Cir. 2006) (quoting Fed.R.Crim.P. 11(d)(2)(B)) (internal quotation marks omitted), and the defendant carries the "burden of demonstrating valid grounds for withdrawal," id. When gauging whether the defendant has met this burden, it is appropriate to consider, inter alia,

> (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); ... (3) whether the government would be prejudiced by a withdrawal of the plea ... [and (4) ] whether the defendant has raised a significant question about the voluntariness of the original plea.

United States v. Schmidt, 373 F.3d 100, 102-03 (2d Cir. 2004) (internal quotation marks and alterations omitted). The district court may "rely upon the defendant's sworn statements, made in open court with the assistance of a translator, that he understood the consequences of his plea," in deciding whether to grant the defendant's motion to withdraw his guilty plea. United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001).

Romano has not asserted his innocence. This weighs against granting such a motion. Assuming the veracity of his petition, which is doubtful, Romano asked his attorney to file such a motion in October or November of 2010.[5] Therefore, we should assume that the motion would be made within two months of the plea, which weighs toward granting the motion. The government would be prejudiced by the withdrawal of the plea because the first plea occurred during jury selection. The government would therefore have to prepare for trial for a second time. The final question is whether Romano raised a significant question about the voluntariness of his plea. The district court may "rely upon the defendant's sworn statements, made in open court . . . that he understood the consequences of his plea," in deciding whether to grant the defendant's motion to withdraw his guilty plea. United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001). As discussed at great length above, the record

---

[5] Romano's Petition states October but his own statement in the November 18, 2010 motion to substitute counsel states that he retained Ansanelli on November 12, 2010.

clearly shows that Romano understood the consequences of the plea.  Therefore, the motion would not have been granted and there is no possible prejudice.[6]

        2.      <u>The allegation that Ansanelli collected payments from Romano's wife does not support a finding of ineffective assistance of counsel</u>

Again, this claim concerns post-plea conduct by an attorney who had not involvement in the plea.  Therefore, all such claims were waived by the plea agreement.  However, even assuming that these claims were not waived by Romano, which they were, they still fail.

---

[6] The record also clearly establishes that Romano had extensive access to the sentencing court and significant opportunity to communicate directly the judge.  Romano pleaded guilty on September 28, 2010.  During that period, Romano appeared personally before the court on: (1) May 4, 2011, when he argued that he should be released on bail; (2) June 23, 2011, to schedule his sentencing hearing; (3) September 28, 2011, in front of both District Judge Bianco and Magistrate Judge Kathleen Tomlinson to discuss possible sentencing conflict;  (4) January 17, 2012, to update the court on the status of his case; and (5) the February 9, 2012 sentencing hearing.  On June 22, 2011, Romano refused to be produced.  In response, on the same day, Judge Bianco issued an order authorizing the use of force to compel Romano's attendance at the next court hearing.  Romano also filed 21 motions through his counsel: (1) November 18, 2010 motion to substitute counsel; (2) December 15, 2010, request for further discovery;[6] (3) February 25, 2011 motion to adjourn sentencing; (4) March 2, 2011 motion for discovery about victims; (5) March 22, 2011, "demand for disclosure"; (6) April 12, 2011 request to adjourn the sentencing briefing; (7) April 21, 2011, motion for additional post-plea discovery; (8) April 28, 2011, motion to reverse detention and release Romano pending sentencing; (9) May 26, 2011, motion to adjourn sentencing; (10) June 8, 2011 motion by Ansanelli to withdraw as a Romano's counsel; (11) July 13, 2011, motion to adjourn the sentencing date; (12) July 28, 2011, objections to the presentence report; (13) September 2, 2011, regarding Romano's refusal to pay his attorneys; (14) September 22, 2011, again regarding the fee dispute; (15) November 22, 2011, motion for additional time to file sentencing submissions; (16) December 5, 2011, motion for additional time to file sentencing submissions; (17) December 15, 2011, sentencing memorandum; (18) December 15, 2011, objections to the presentence report; (19) December 16, 2011, additional sentencing memorandum; (20) January 13, 2012, motion for a status conference with Magistrate Judge Tomlinson regarding pre-sentence subpoenas; (21) February 2, 2012, additional sentencing submission. In addition, Romano's wife emailed messages to Judge Bianco's chambers on at least two occasions to discuss the case.  <u>See, e.g.</u>, DE 406.

No authority states that a conflict would arise where a non-party wife pays her husband's fees. Therefore, there can be no cognizable claim of ineffective assistance of counsel.

3. <u>The allegation that Ansanelli collected payments from collected payments from Dejvid Mirkovic does not support a finding of ineffective assistance of counsel</u>

As discussed above, this claim concerns post-plea conduct by an attorney who had not involvement in the plea. Therefore, all such claims were waived by the plea agreement. However, even assuming arguendo that these claims were not waived by Romano, they still fail.

"The Sixth Amendment requires automatic reversal only when a trial court fails to conduct an inquiry after either a timely conflict objection, <u>Holloway[ v. Arkansas</u>, 435 U.S. 475,] 488, or if the court 'knows or reasonably should know a particular conflict exists.' <u>Cuyler[ v. Sullivan</u>], 446 U.S. [335,] 347 [1980]." <u>United States v. Levy</u>, 25 F.3d 146, 154 (2d Cir. 1994) (citations omitted). Romano is complaining about a purported conflict that was never brought to the attention of the sentencing court. Therefore, Romano cannot prevail on this theory.

In addition, Romano's account is flatly contradicted by his own exhibits to this petition. Pages 20 through 23 of the Petition purport to be an affidavit from Mirkovic. This affidavit only mentions payments to Carnesi, not Ansanelli. As discussed earlier, Romano expressly waived conflicts based upon those Mirkovic payments to Ansanelli.

If these payments to Ansanelli existed, which Romano's own affidavit indicates that they did not, it is also unclear how this could possibly result in prejudice. As mentioned, Romano already waived any conflict with Carnesi for the same purported conduct. Finally, it is worth noting that Mirkovic was Romano's co-conspirator in the post-sentencing plot to kill Judge Bianco and AUSA Lara Gatz. Their interests were obviously aligned at the point that they attempted to kill both the prior sentencing judge and the prior prosecutor. Therefore, this allegation has no merit.

4. <u>The allegation that Ansanelli recklessly overcharged does not support a finding of ineffective assistance of counsel</u>

As discussed above, this claim concerns post-plea conduct by an attorney who had not involvement in the plea. Therefore, all such claims were waived by the plea

agreement. However, even assuming *arguendo* that these claims were not waived by Romano, they still fail. No legal authority supports the principle that "reckless overcharging" implicates the right to counsel under the Sixth Amendment.

> 5.  The allegation that Ansanelli and his associate attorneys had no courtroom experience does not support a finding of ineffective assistance of counsel

This claim is also barred for the reasons discussed above. However, the allegations are also easy to substantively disprove.

To begin, Romano's argument that Ansanelli is inexperienced is demonstrably false. As of 2010, Ansanelli had been admitted to the bar for more than 20 years.[7] However, even if he was inexperienced, the claim would still fail.

It is axiomatic that "inexperience alone does not constitute ineffective assistance absent specific instances of deficient conduct." United States v. O'Neil, 118 F.3d 65, 72 n. 2 (2d Cir. 1997); see also Arevalo v. Artus, 104 F.Supp.3d 257, 265 (E.D.N.Y. 2015); United States v. Chu, 11–CV–4752, 2012 WL 6051052, at *9 (S.D.N.Y. Dec. 5, 2012); United States v. Salameh, 54 F.Supp.2d 236, 250 (S.D.N.Y. 1999). Romano has cited no specific deficient conduct. Moreover, as discussed footnote 6 supra, Ansanelli filed more than 20 motions on Romano's behalf during the preparation for the sentencing. While many of these pertained to sentencing, Ansanelli also filed multiple discovery motions, multiple sentencing memoranda and multiple objections to the presentence report. It is clear from the record that Romano received Ansanelli's best efforts on his behalf.

> 6.  Even collectively, Romano has failed to identify erros that would constitute ineffective assistance of counsel

Mindful of Romano's pro se status, it is useful to also look at the collective effect of the errors Romano articulated. However, even taken collectively, Romano has waived all such errors. Moreover, even when considered collectively and presumed to be unwaived, Romano failed to articulate errors constituting ineffective assistance of counsel. In short, individually or collectively, Romano has not set forth adequate grounds for the grant of this petition.

---

[7] Attorney Mark Goidell also appeared on Romano's behalf at the sentencing. Goidell has been practicing law for more than 30 years.

II.    <u>Conclusion</u>

As discussed in more detail above, Romano's arguments are waived, legally insufficient and often factually impossible.  For these reasons, the petition should be denied.

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By:    ____/s_____
Christopher A. Ott
Assistant U.S. Attorney
(718) 254-6154

Attachments: Appendix A
Appendix B
Appendix C
Appendix D
Proof of Service Upon Joseph Romano

CC:    Joseph Romano 72247-053 (via first class mail)
ADX Florence Colorado
U.S. Penitentiary Max
P.O. Box 8500
Florence, CO 81226-8500