1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
                                 :
UNITED STATES OF AMERICA
                                         09-CR-00170

         -against-               :
                                         United States Courthouse
                                         Central Islip, New York
JOSEPH ROMANO,
                                         February 9, 2012
         Defendant.              :       2:30 p.m.

- - - - - - - - - - - - - - - - X
```

TRANSCRIPT OF SENTENCE
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:     LORETTA E. LYNCH
                        United States Attorney
                        100 Federal Plaza
                        Central Islip, New York 11722
                        BY:  THOMAS SULLIVAN
                             DIANE LEONARDO BECKMANN
                        Assistant United States Attorneys


For the Defendant:      MARK E. GOIDELL, ESQ.




Court Reporter:         Perry Auerbach
                        100 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6103


Proceedings recorded by mechanical stenography.
Transcript produced by computer.

                                                                 2

1            THE CLERK: Calling criminal case 09-170, United
2    States of America versus Joseph Romano. Please state your
3    appearance for the record.
4            MR. SULLIVAN: Good afternoon, your Honor,
5    Thomas Sullivan and Diane Beckmann from the US Attorney's
6    Office. Also seated at counsel table is William Hessell,
7    investigator.
8            THE COURT: Good afternoon.
9            MR. GOIDELL: For the defendant, Mark Goidell.
10           THE COURT: Good afternoon. And the defendant
11   is present as well. Good afternoon, Mr. Romano. As you
12   know, this is for sentencing. Are both sides ready to
13   proceed?
14           MR. SULLIVAN: The government is ready,
15   your Honor.
16           MR. GOIDELL: Defendant is ready.
17           THE COURT: There is the issue, I did receive
18   Mr. Sullivan's letter of February 3 with regard to the
19   restitution issue which is still unresolved. You reported
20   to the Court that you submitted some figures to probation
21   and I assume there still is not a resolution. But my
22   intention was, as permitted under the rules, to go forward
23   with the sentencing, we can address the restitution issue
24   open, and we have up to 90 days, but I think it can be
25   done sooner than that. I know Mr. Romano's intention is

**Page 3**

1  to get out of Nassau County jail and is hopeful to get out
2  of the Nassau County jail in the coming weeks. Is that
3  acceptable to both sides?
4      MR. SULLIVAN: That is acceptable to the
5  government.
6      MR. GOIDELL: It is, your Honor.
7      THE COURT: Let me review what I received in
8  connection with the sentencing and make sure that I have
9  received everything that you submitted and you have
10 everything that is before the Court. I received
11 Mr. Goidell's December 16th letter which has attached a
12 December 15 letter with numerous exhibits. I have
13 recently received the February 2nd letter from Mr. Goidell
14 that attaches additional letters supporting Mr. Romano. I
15 received today a letter from the jail which I had
16 distributed to you, an e-mail from Mrs. Romano
17 supplementing her other letters to the Court which I had
18 docketed. I have the two binders of victim letters,
19 affidavits, documents. I have random letters that I have
20 received from victims and also people in support of
21 Mr. Romano which have all been docketed, some dating back
22 a number of months. I have the government's January 17th
23 letter in response to the defense sentence submission, and
24 from probation I have the presentence report, the addendum
25 and the recommendation.

**Page 4**

1      Is there anything else that I should have in
2  connection with sentencing?
3      MR. SULLIVAN: No, your Honor, not from the
4  government.
5      MR. GOIDELL: Your Honor, I believe the Court
6  also received the objections that were filed by the
7  defendant, the affidavit of Mr. Romano, the affidavit from
8  his wife Karen Romano, and I believe we provided the Court
9  with courtesy copies of our submission that were made to
10 the Probation Department in preparation for the
11 presentence report.
12     THE COURT: Yes. I have all of those things.
13 Just so the record is clear, I made reference to your
14 December 16th letter, but the December 16th letter you
15 gave me the December 15th submission which had numerous
16 letters in support, as well as other things, the
17 objections, Mr. Romano's affidavit, Mrs. Romano's
18 affidavit, and your two objections to the Probation
19 Department. Okay.
20     MR. GOIDELL: Thank you.
21     THE COURT: Is there anything else?
22     MR. GOIDELL: That's it.
23     THE COURT: Mr. Goidell, have you and your
24 client received the presentence report, the addendum and
25 the recommendation and had sufficient time to discuss them

**Page 5**

1  with Mr. Romano.
2      MR. GOIDELL: Yes, I have.
3      THE COURT: Mr. Romano, have you received the
4  presentence report and the addendum and the recommendation
5  from probation?
6      THE DEFENDANT: Yes, your Honor.
7      THE COURT: Have you had time to read them,
8  discuss them with your attorney?
9      THE DEFENDANT: Yes, I did.
10     THE COURT: Let me go through what I think the
11 objections are, some of which I think, all of which I
12 think have been resolved but I'll ask Mr. Goidell to tell
13 me if there's any unresolved ones when I'm done speaking.
14     First, with respect to the guidelines
15 calculation as we had discussed at the last conference,
16 the Court intends on adopting the calculation contained in
17 the plea agreement between the parties, which is repeated
18 on pages four and five of the government's sentencing
19 letter in its entirety, which results in the level 34, and
20 advisory criminal history category one, advisory range of
21 151 to 188 months. Both sides agree other than the
22 departure that that's a proper calculation of the advisory
23 guideline range.
24     MR. SULLIVAN: The government agrees.
25     MR. GOIDELL: Your Honor, the defendant agrees

**Page 6**

1  with one exception. When I address the Court I will speak
2  to that, that concerns the applicability of the mass
3  marketing enhancement.
4      THE COURT: Do you have anything to add to your
5  papers on that? Why don't you do that now rather than
6  wait, because I want to deal with the calculation first.
7  I've read your papers on that. I don't really have any
8  questions.
9      MR. GOIDELL: Certainly, Judge. Can I use the
10 lectern?
11     THE COURT: Sure.
12     MR. GOIDELL: Judge, we submit that the
13 guidelines that are applied in this case require the two
14 point enhancement for mass marketing rather than the six
15 point enhancement that's contained in the plea agreement
16 for victims of 250 or more.
17     The government contends that the plain language
18 of the guideline, specifically the language "apply the
19 greater of," requires that the six point adjustment be
20 applied.
21     The primary difficulty with the government's
22 contention, your Honor, is that there is no plain
23 language. At best it's ambiguous. I'll try not to repeat
24 the contentions that are contained in the sentencing
25 memorandum but there's a couple of points that require

**Page 7**

emphasis.

The ambiguity arises, your Honor, from placing under one umbrella adjustments for the number of victims together with an adjustment that relates to the means by which a crime was committed. Specifically, mass marketing, in this case, telemarketing being one of the ways that mass marketing is accomplished. The "greater of" language is clear on its face when it's applied specifically to the number of victims. This section of the guidelines, however, alternatively demands that the Court also consider the methodology, whether by mass marketing, telemarketing or otherwise.

In our sentencing memorandum we recite the rather tortured history of this section of the guidelines, Section 2.1B1.B2, when the mass marketing provision was merged into the number of victims enhancement, the Sentencing Commission provided what remains the only insight into its reason, and what it said was the mass market alternative enhancement also will continue to apply in cases in which mass marketing has been used to target a large number of persons, regardless of the number of persons who have sustained an actual loss or injury. As I state, this remains the only insight provided by the commission whatsoever.

So in light of the ambiguity that's inherent in

**Page 8**

this unusual grouping, we respectfully request that the rule of lenity be applied and that the two point enhancement instead of the six point number of victim enhancement be applied.

THE COURT: You said the secondary argument is even if it does apply, the Court should downwardly depart because of double counting issues, between the victims and loss amount.

MR. GOIDELL: That is, your Honor, I'd like to reserve on that until we come to address the departure variance arguments.

THE COURT: Let me deal this issue first. That application is denied. I agree with the government, the provision 2B1.2 is absolutely clear, there is no ambiguity at all, the plain language clearly sets forth that you apply the greatest of either A, B, C, and they are clearly marked, they are separated. It is clear that the mass marketing enhancement only relates to subsection A, and here, because there are more than 250 victims, it is clear that subsection C applies. There's absolutely no question of that. In terms of the rationale behind it, I think it's clear what the rationale behind it is, what the Sentencing Commission was trying to do is if there was some offense that wasn't intended to hit a large number of victims through mass marketing but for whatever reason was

**Page 9**

unsuccessful, that -- so you can have a situation where it was less than 10 victims, because it was targeted in many victims but for whatever reasons was unsuccessful, they still wanted it to be a two level increase even though it was unsuccessful.

The application here because we have over 250 victims, six level enhancement clearly applies. Okay. Other than that, do you have any other objections to the calculation?

MR. GOIDELL: No, your Honor.

THE COURT: The government?

MR. SULLIVAN: We agree with the plea agreement, your Honor.

THE COURT: So I adopt the calculations in the plea agreement in its entirety. I'll just summarize it here for the record under 2B1.1A1, the base offense level is 7, I find that the loss amount is $3,818,000, which is arrived at based upon the gain to the defendant because the parties agree that trying to determine the loss to the victims cannot be tabulated because of issues regarding the value of the coins themselves and what the loss would have been, so they opted for purposes of sentencing, not for the purpose of restitution, but for purposes of sentencing, for the gain to this defendant $3.8 million, which results in 18 level increase under 2B1.1B1J. As I

**Page 10**

noted, although the government sets fourth there are over 1,700 victims, for purposes of the guidelines I'll make a finding it was over 250.

MR. SULLIVAN: I believe that the number we cited was 1,569, but we're only seeking an enhancement based upon the 250 victims.

THE COURT: So I'm not adopting the 1,500 victim number. I am simply making a finding that there were at least 250 victims as the enhancement is the same and wouldn't affect the Court's sentencing.

So I make a finding of 250 victims or more, which is the six level increase under 3B1.1B2C.

I find that the victims were vulnerable victims under guideline 3A1.1B1 under application note 2. The victims defined was unusually vulnerable due to age, physical or mental condition, or they are otherwise particularly susceptible to criminal conduct, the Second Circuit has made it clear that age alone of the victims is not enough for this enhancement to apply. However, that's set forth in United States versus O'Neil, O'- N-E-I-L, 118 F. 3d 65. Second Circuit 1997.

I find here that obviously many of the victims were elderly, but beyond that, the Court concludes that the process here that was routinely used by Mr. Romano's businesses, the so-called reloading process, where they

**11**

1. would target or call the victim, get the victim to invest
2. in coins for fraudulent purchases and then would hit them
3. again a second or third time by telling them that there
4. were some additional coins and they would have the buyer
5. on the other end that was fraudulent, that process of
6. reloading against people who were already identified as
7. vulnerable because of their first purchase is sufficient
8. for this enhancement to apply, in addition to the age and
9. other issues that some of these victims had, including
10. dementia and other mental issues, but the reloading
11. process that the Second Circuit made clear in O'Neil under
12. these circumstances is sufficient in and of itself to
13. warrant there was certainly evidence that that was exactly
14. what was going on here, and the defendant clearly knew
15. that that was the process that was being used.
16.       So I find that enhancement is applicable to two
17. level enhancement, I find that there's a four level
18. enhancement because the defendant, the owner of these
19. three businesses operated over time, is an organizer and
20. leader, was supervising five or more participants in this
21. fraudulent scheme and therefore a four level enhancement
22. is warranted under 3B1.1A.  He's entitled to a two level
23. reduction for acceptance of responsibility under 3E1.1A,
24. he does not receive a third point because it was not
25. timely, in terms of pleading guilty during the jury

**12**

1. selection process.
2.       However, pursuant to his plea agreement I am
3. going to give him one level additional point reduction
4. because it was a global plea that resulted in the
5. government saving the resources of trial.  That results in
6. the 34, offense level criminal history category one with
7. an advisory range of 151 to 188 months.
8.       Moving to the next dispute, Mr. Romano disputes
9. making an alleged threatening statement toward the
10. prosecutor to a third-party.  I'm going to delete that
11. reference, those references to the presentence report
12. because we would need a hearing if the Court were going to
13. consider that, and it was not my intention to conduct such
14. a hearing.
15.       I assume the government agrees with that.
16.       MR. SULLIVAN:  The government agrees,
17. your Honor.
18.       THE COURT:  Okay.  There is a dispute -- we
19. talked about this -- I'll just make clear -- about the
20. defendant being involved in telemarketing activity in
21. Florida while on bail.  He denies there was any fraud
22. involved in that activity.  Judge Tomlinson and I both
23. agree that he violated the conditions of his bail because
24. of his involvement in telemarketing, independent of
25. whether it was fraudulent or not.  It involved

**13**

1. telemarketing which clearly occurred, was a violation of
2. bail and that's why he was remanded.  However, as we
3. discussed, the government is not going to show any
4. engagement in fraud while out on bail and I stated at the
5. last conference while we were here, the fact that he
6. violated a bail condition is not something I'm going to --
7. is not something that's going to result in an enhancement
8. of his sentence in light of all the other factors,
9. although the defendant argued about it in his letter,
10. because of the surrounding circumstances of the at this
11. time, so I'm not considering the issue for purposes of
12. sentencing.
13.       Any other objections that you made, Mr. Goidell,
14. but I think the Probation Department in large part with
15. the clarification, it incorporated your supplemental
16. submissions on the family on that.  So I don't believe
17. there are any other factual or legal objections but do you
18. want me to move on?  I'm prepared to do that.  I think I
19. covered them.
20.       MR. GOIDELL:  Your Honor, I do believe that the
21. objections are otherwise resolved with the potential that
22. it may have some impact on the Court's determination.  I
23. just want to bring those up.  I don't think they do, but I
24. just want to confirm that.  They both appear to be
25. relevant only to the issue of whether or not there was an

**14**

1. acceptance of responsibility to invoke the two point
2. enhancement.  The first is whether the defendant authored
3. or crafted what's been known as the investor pitch.  And
4. there an objection that's unresolved with respect to that.
5. Again, the defendant denied that, he denied that under
6. oath during the time of the plea allocution, and the
7. government stood mute during that proceeding with respect
8. to that contention.  But nevertheless, it still has arisen
9. as an issue in the presentence report.  I don't believe
10. it's consequential to the Court's determination, I wanted
11. to clarify that.
12.       THE COURT:  The second issue is?
13.       MR. GOIDELL:  The second issue similarly,
14. your Honor, in terms of the extent of the defendant's
15. daily supervision of the activities of the criminal
16. enterprise for which he concededly remained the organizer
17. and the leader, following his move to Florida in 2004.
18.       We maintain, the defendant has maintained that
19. certainly his daily involvement decreased substantially
20. after his move to Florida.  That doesn't diminish in any
21. way, shape or form his culpability, nor was it designed in
22. any way that he was responsible for the criminal
23. activities of the enterprise after that move.
24. Nevertheless, there remains a dispute that's been
25. unresolved in the presentence report.

15

So again, I don't believe that that should be of any consequence to the Court's determination but I wanted to confirm that as well.

THE COURT: Okay. Do you want to be heard on this, Mr. Sullivan?

MR. SULLIVAN: Your Honor, I think based upon the fact that the Court has given the two level reduction of responsibility, the Court has resolved that issue already. So I can address it on the substantive, but I think we've already addressed that.

THE COURT: I understand. I want to make that clear. First of all, I did give him an acceptance of responsibility over probation's objection. I am sentencing him based upon the issues that you raised on his recitation of facts that are contained in paragraphs three and four of his affidavit. I accept his role, and that is why I gave him the acceptance of responsibility because he clearly states that he devised the scheme, knew the fraudulent misrepresentations about the value and origins, and paragraph four although obviously he moved to Florida in 2004, I understand that he did not create the investor pitch, and I will adopt that for purposes of the sentencing. But he does state that he was aware that the salesmen that he hired and oversaw were using the investor pitch in order to fraudulently obtain the money from the

16

customers, the investor pitch induced the customers to purchase coins based upon the false representation of the existence of an investor willing to repurchase the coins at a profit, and then his affidavit states: I did not train the salesmen on the investor pitch . I was aware of the investor pitch and approved of others doing the training.

And that's the version of the facts that I'm accepting. Okay.

MR. GOIDELL: Thank you.

THE COURT: Anything else?

MR. GOIDELL: Nothing else.

THE COURT: Does the government have any objections?

MR. SULLIVAN: No, your Honor.

THE COURT: So with those corrections, I adopt the remaining information in the presentence report and the addendum as factual findings by the Court.

As you know, pursuant to United States versus Booker and its progeny, the sentencing guidelines are advisory. The Second Circuit has decided there is one factor among all the statutory factors that the Court is to consider in its discretion. Mr. Goidell, in his extensive filings, asked for a downward departure under the guideline system as well as a variance of the

17

non-guideline sentence, and I will allow him to speak to those issues or anything else that he wishes to address in connection with the sentencing.

MR. GOIDELL: Thank you, your Honor. May I again use the lectern.

THE COURT: Yes.

MR. GOIDELL: Your Honor, I also just want to let the Court know of the other people that are present in the courtroom today. Mrs. Romano, the defendant's family, his children, his parents are here, Pastor Anthony Filiponi, as well as other members of his church. Several other family friends, family and friends are present as well. The Court has received dozens of letters in support from them, as well as many, many others. And I know that your Honor has carefully read and reviewed all of the submissions by all the parties in this case.

I know that there is, I think, one unresolved issue concerning whether or not Pastor Filiponi will be provided the opportunity to address the Court as well. We have requested that he do so on the defendant's behalf. And that request remains outstanding as I understand it.

THE COURT: I will allow him briefly to speak. Okay.

MR. GOIDELL: Thank you, Judge. He'll do so after the defendant addresses the Court if that's

18

acceptable.

Primarily, your Honor, with respect to the departure, the variance issues, it's our contention that the cumulative effects of the multiple enhancements in this case combined to overstate the seriousness of the offense. Separately, alternatively, they result in extremely unnecessarily harsh increases in the sentencing range that were not adequately considered by the Sentencing Commission. So they justify both a variance, as well as departure.

We're not contending that these multiple enhancements result in double counting. Instead we make an application for a departure under Lauersen, L-A-U-E-R-S-E-N, as well as a variance.

The bases for these applications was well articulated by the Second Circuit in United States versus Jackson which we quote extensively in our sentencing memorandum at page 19. I won't again take the time to quote from the Second Circuit Court of Appeals.

There's a number of components to these contentions, and I'd like to address each one individually but also submit that cumulatively they result in the gross overstatement of the seriousness of the offense.

First, Judge, although we do not quarrel whatsoever with the enhancements that have been

**Page 19**

1 articulated by the Court in making the guideline
2 calculations, these adjustments nevertheless are
3 synergistic. The amount of the loss is directly impacted
4 by virtually each one of the other enhancements. So that,
5 for example, the number of victims in this case, obviously
6 the greater the number of victims the greater the loss is
7 going to be, so the number of victims, to that extent
8 overlaps with the extent of the loss. The circumstances
9 under which the crime was committed contributes
10 substantially to the degree of the loss as well.
11     So the vulnerability of the victims, a
12 circumstance that is a circumstance that gives rise to the
13 amount of the loss. To that extent, they overlap as well.
14 The defendant as an organizer or leader is responsible for
15 all relevant conduct in this conspiracy, responsible for
16 the loss sustained by all of the victims in this case. So
17 there's an overlap not only with the amount of the loss
18 with that guideline section, but also, your Honor, with
19 the number of victims. So all of these enhancements
20 overlap to some extent.
21     The guidelines punish the defendant for the
22 large loss that he caused. But separately, it punishes
23 him for the facts that are necessary to create that large
24 loss, to have inflicted that large loss, that, your Honor,
25 is unfair.

**Page 20**

1     In addition to that, the injustice that's worked
2 here is quite obviously far substantial in the upper
3 ranges of the guidelines, as several courts have
4 addressed, the Court is extremely familiar with, and so as
5 a result a cumulative effect of all of these overlapping
6 enhancements is felt most severely at this upper range.
7 As a result of these circumstances, sentences below the
8 guidelines, far below the guidelines ranges were
9 authorized in Lauersen, in Adelson, in Jackson, in
10 Abiodun, all of which are discussed in pages 16 and 19
11 of -- A-B-I-O-D-U-N -- our sentencing submission. The
12 government's submission fails even to attempt to
13 distinguish these cases, your Honor.
14     Second, Judge, the seriousness of the offense is
15 overstated by the six point enhancement for 250 or more
16 victims. And this is separate and distinct, as we
17 discussed before, from our contentions that the two point
18 mass marketing enhancement should apply.
19     As the Court is well aware, the enhancement for
20 250 or more victims was the product of Sarbanes-Oxley and
21 specifically the corporate fraud liability act of 2002, it
22 was expressly directed to fraud relating to securities, to
23 accounting and to pensions, regulated industries. The
24 fraud here is coins, unregulated product in an unregulated
25 industry. It should have you no application to the facts

**Page 21**

1 of this case, yet by the plain terms of the guideline the
2 Court has found that it applies. So, because his conduct
3 is so far outside of the statute, Judge, which authorized
4 the enhancement in the first instance, the seriousness of
5 the offense is overstated to that extent.
6     Next, Judge, although the need to avoid
7 unwarranted sentence disparities is a separate component,
8 separate fact to be taken into consideration under Section
9 3553(a). It's important to realize that far less severe
10 sentences than that authorized before, previously to be
11 required by the guidelines had been imposed for similar
12 offenses. And to the extent that a guideline sentence is
13 imposed here, it far overstates the seriousness of the
14 offense when contrasted with these other sentences.
15     Now, we provided the Court with more than a
16 simple set of cases. We provided facts that contrast the
17 type of case, whether a regulated or unregulated, whether
18 the fraud involved industries involved the numismatic coin
19 industry, whether the fraud involved telemarketing schemes
20 or whether the fraud involved a regulated industry and we
21 have broken down those cases in terms of the amount of
22 loss, in terms of the type of case, and what's most
23 revealing is that in the unregulated industry cases, and
24 specifically in those cases involving frauds involving the
25 sale of coins, where the amount of loss is similar to that

**Page 22**

1 here, the sentences primarily are in the 36 to 60 month
2 range. The sentences in the telemarketing cases are
3 primarily in the 51 to 108 month range. The most glaring
4 disparities, your Honor, are those indeed in the
5 securities cases we analyzed and provided to the Court.
6     Now, these are cases that threaten the regulated
7 industries, and financial institutions. Nevertheless, the
8 sentences that were imposed were far, far less under
9 similar circumstances involving loss than what the
10 guidelines suggest here.
11     These comparative sentences, your Honor, provide
12 very strong evidence that the guidelines overstate the
13 seriousness of the offense.
14     We also provided the statistical information
15 packet published by the Commission for the year 2010, the
16 overwhelming majority of fraud cases resulted in below
17 guideline sentence, and I believe the average sentence for
18 frauds as reported in that statistical packet was in the
19 range of 36 months.
20     The Court also has discretion of course to
21 analyze sentences imposed in comparable state cases, state
22 prosecutions. And while we have not provided the Court
23 with many, there are some that come to mind. Most
24 recently in a case that I was directly involved in, the
25 bookkeeper for a law firm who was convicted of a five

### Page 23

million dollar theft from the law firm received a sentence of a minimum of two and a half years. That case is People versus Anthony Gallaso.

Now, again, the Court has the discretion of course to consider comparable state sentence. I submit to the Court that that is a representative sentence that's imposed for the kind of loss in state prosecutions. At least here on Long Island.

Finally, in respect, Judge, I want to also address the loss calculation. I submit that the loss calculation by itself in this case overstates the seriousness of the offense. Although loss here is calculated in terms of gain to the defendant, any gain rests to some extent on the gross revenue derived from the sales, which determine the extent of the loss.

I submit, your Honor, and I know that your Honor sat through an extensive trial concerning a business operated by the defendant's brother, a separate and distinct business, but I submit that there is great subjectivity of the valuation and the gradation of coins in the numismatic industry. Value is not readily determined, falls within a broad and uncertain range. The value also depends upon whether the purchaser is an investor or whether the purchaser is a collector. They have different values to different people. And I don't

### Page 24

mean to any extent to minimize the misrepresentations made by Mr. Romano and the other conspirators in this case. They are substantial. My point is that the loss may be overstated by the subjective and uncertain and far-ranging estimates of the value of the coins.

As a result of all of these factors, your Honor, we respectfully submit that the seriousness of the offense is overstated by the overlapping and synergistic effect of the multiple enhancements. Additionally, the severity and effect of these enhancements at the most upper range of the sentencing table as involved here, was not adequately taken into consideration by the Commission. These justify of course a sentence far below the advisory guidelines range.

The Court is also required of course to take into consideration the background, history and characteristics of the defendant in making its sentence determination. And I'd like to take the time now to address Mr. Romano and to present the facts and circumstances of Mr. Romano's life to the Court, and I won't belabor the points that have previously been made in our submission to the Court. And I'll do so in light of the purposes of sentencing, I think the ones that are triggered here that are most important said the sentence must reflect the seriousness of the offense, provide for

### Page 25

adequate deterrence and must be sufficient although not more than necessary to accomplish the goals of sentencing.

There's no question that the crimes of the defendant deserve punishment. His history, his character, deserve a far more favorable treatment. We provided the Court and the Probation Department before that with adopted history establishing the defendant's service not only to his country, but to his family, to his community. And we provided a rather extensive documented history of that.

The defendant is a veteran of the United States Navy where he served six years before being honorably discharged. We supplied the Court and the Probation Department before that with letters from his superiors, as well as his colleagues, demonstrating his sense of honor, his duty, and his willingness to sacrifice. That service, your Honor, merits favorable treatment.

We've submitted to the Court a psychological evaluation report as well as educational history of his children, as well as the defendant's unique role at home. And it's far more than a father in a typical setting, there are children at home who have significant disabilities as your Honor is now well aware of. This defendant has taken far more than merely, than a usual role in helping these children to overcome these

### Page 26

disabilities.

This defendant, your Honor, Mr. Romano has taken an extremely active role in helping these children out and I think that it's extremely important as well for the Court to consider what was opined by Dr. Eberlin, E-B-E-R-L-I-N in this regard, that without the continued intervention and active support of Mr. Romano.

These children are in great jeopardy. They are dependent upon his continued effort in that regard. We've also submitted letters, extensive documentation that's now on the docket concerning the defendant's efforts on behalf of others. His charitable efforts, not only monetarily on behalf of his children's former community school in Florida as well as Smile Train here on Long Island. But in taking the active assistance, in taking on the responsibility of providing active assistance to others, most importantly, Judge, Mr. Romano rather than just merely expressing remorse to the victims -- he'll tell you about that in his own words -- he is making what I'm going to characterize as living amends. He fully intends to make these victims whole and to provide full restitution to them. He's already done so, and taking considerable efforts in his consent to the forfeiture that's now I believe the subject of an order before the Court. Several million dollars apparently have already been the subject

**Page 27**

of forfeiture.

But his restitution, his desire to make restitution, that does not limit his living amends. They're quite more substantial, Judge, and again we provided documentation to the Court to demonstrate that. What Mr. Romano is doing at the jail is now for well over a year, has been to take an active role in helping others out, and it's what Pastor Filiponi will specifically be speaking to the Court about, the efforts that the defendant has made in this regard.

Remorse, your Honor, is an action word. It's not merely an expression by Mr. Romano of his apologies to the victims. He is taking action to make them whole and to try as best as he can to make society whole as well through his actions, through his conduct, through his active assistance of others in raising them up at the jail and otherwise. Letter after letter that's been submitted to the Court demonstrates these living amends. The most recent letter that was faxed today from a program coordinator at the Dart Program, demonstrates that Mr. Romano is not only undertaking efforts to assist himself, and is actively involved in a 12 step program to do so, but has taken an interest in helping others at the jail.

And the letter that was submitted today from the

**Page 28**

program director, Mr. Priboy, P-R-I-B-O-Y, the program coordinator of the Dart Program, provides evidence of that. He's accepted a leadership position about the program. He facilitates meetings, provides direction to others. There are very similar recommendations provided, provided in the letter submitted by Karen Liss, L-I-S-S, the program administrator of the Dart Program. His efforts are widespread, they're well documented. And the extent of those efforts place them beyond any issue whether or not they are genuine efforts or merely those that are designed to impress the Court temporarily for the purposes of sentencing.

Your Honor, in conclusion I want to submit to the Court that a sentence that's below, far below the guidelines advisory range would not depreciate in any way, shape or form the seriousness of the offense. It would promote respect for the law, and provide just punishment for the defendant.

A sentence far below the guideline range would be in line with those imposed in similar circumstances, and avoid unwarranted disparity. A sentence that's far below the guideline range, your Honor, would permit the defendant to continue to make restitution to the victims.

Obviously the length of the period of incarceration the more impaired the defendant's ability

**Page 29**

will be to provide continued restitution to these victims. If the sentence is imposed, your Honor, that is far below the guidelines range, the sooner the restitution will be made.

Finally, Judge, whatever since imposed we respectfully request that the Court issue a recommendation to the Bureau of Prisons that whatever time is imposed be served at a camp at a facility in the northeast region as close to the defendant's family as possible. Thank you, Judge.

THE COURT: Thank you, Mr. Goidell. Mr. Romano, you also have the right to speak on your own behalf in connection with sentencing. This is your opportunity to do that. You can remain seated. Just keep your voice up so that everybody can hear you. Okay.

THE DEFENDANT: Your Honor, I'm here before you and I'm guilty of fraud. I owned and operated coin companies with over-graded coins and charged exorbitant prices and misrepresented the value of the coins. I defrauded and I collected the profits. I witnessed salesmen making promises stating that customers would see returns on their money when they resold their coins to other investors.

As time went on, this became a criminal enterprise. When this business started, I had more honest

**Page 30**

ambition. However, through my selfishness and lack of concern the company spiraled out of control and people got ripped off. I believe the -- some of the victims are in the room, and I want to say that I'm sorry, I'm sorry about your losses, and I'm sorry about any of the suffering that I caused because of my selfishness.

I read all the letters that the victims wrote and how I affected their lives, and it broke my heart. I wish that I could take this back but I can't. My only recourse is that my restitution might make these people whole again, and at some level, through rehabilitation and my work in helping others in society, they will benefit and I can restore their confidence in me.

Although I believe that I was a good person before these crimes, I have changed my life around and it has taken a new direction. I've spent many hours talking with my pastor, and I expect to follow on the ideas of feeding and building shelters for the homeless. I've always involved my children in my charities and will continue to teach them and lead them in that direction. They know me as a good father, and that's the impression that I want to leave them with.

I have many talents and I have talked to my pastor about using them for good. I'm a carpenter, and I build houses, I've done many renovations, and I'm a

## Page 31

visionary as well as a hard worker. I've helped many people while incarcerated and have enjoyed teaching ground school classes to inmates who are interested in flying. This is something that I'd like to continue when I return home. I have been teaching my oldest son Joseph, who is here in the courtroom, how to fly, and I would like to continue to teach my other children and their friends that way of life. I have also discovered this 12 step program while incarcerated at the Nassau County jail in the Dart Program and have basically learned skills to maintain a balanced life. It's taught me that only people, the only people who are uncurable are ones that can't be honest. And that people are capable of good and failure and we must always be on guard against ourselves and our success and most important we have to try to hold on to a sense of perspective no matter how content or comfortable we become.

    I want only to live in peace with myself and with others. I pray today that you can see what's in my heart and realize that my intentions were never to create out comes of these victims. Again, I am sorry. I'm asking his Honor for a second chance as -- to make myself whole, as well as my victims whole.

    A little story. About two years ago my oldest son Joseph came to visit me at the jail and he said to me,

## Page 32

he said daddy, do you think that this happened to us because you stopped going to church? And you stopped with religion and the bible?

    And I really didn't know how to answer him. And I can answer him today and my answer is yeah, I think so. But this wasn't a punishment, this was an eye opener to me. And I want to continue in that direction in teaching my kids because I've always taught them well.

    Thanks, your Honor, that's my piece.

    THE COURT: Thanks, Mr. Romano.

    Does Pastor Filiponi wish to speak at this point?

    PASTOR FILIPONI: Thank you, your Honor. I met Joseph probably about 14 months ago. I was asked by someone, and when I go, I go and I look for repentance and biblical repentance is not I'm sorry. It's I'm going to walk a different way. That's what I look for. So in being with him for 14 months in my opinion the things that I've sign behind the scene, the letters that I've received, people that come to my church, one of the members of his family is a part of my church now, they clean the church every Saturday, other members have visited my children, his family and wife have visited my church, and I see a man that truly appears to me walking another way and really a couple of months ago was the

## Page 33

greatest eye opener for me, he's in charge of distributing the food and there's someone that's in charge of distributing the bread and he said I didn't like that man, and I don't know what it's like behind those walls, it's nothing that I've ever had to incur, but he said I told somebody I didn't like him but you know I prayed one night, I said Lord, I have no reason not to like him, I want to love him like you love him. So I want to buy things for him, just put them in his cell, because I wanted to love him.

    And this went on for a short period of time and then when we distributed the food, I didn't like him because he was never fair with the bread, he was unfair to the people, he would give everybody the bad stuff, keep the best for himself. And I'm watching him distribute it fairly and he comes to the end and there's two slices left, he can give it to someone else or keep it, and he gave it away, and he turned to me, he said Joe, did you see what I did, I said yeah, I was watching, you know why, Joe, because I know you've been doing things for me behind the scenes that no one knows about. That's what I wanted to begin to do.

    And I visited a young girl that's also incarcerated and is facing a real difficult time, and it's really hard for her back there, and I told her that story

## Page 34

Joe and she said there's a lot of people that treat me poorly and that story has changed her direction where she's walking with the Lord. I will respectfully thank you. I do believe we're in Haiti, we're in India, we have a desire to build on this island a food pantry, a soup kitchen and what we would call just a community center, and I do believe Joseph will help us with that. And certainly his family, his children I got to know, they're to me the biggest reason he needs to be out there with them.

    So I respectfully thank you for your time.

    THE COURT: Thank you, Pastor. Let me say to you and in response to Mr. Romano's comments, as well as to all of those who are here on his behalf. I've read every single one of those letters that were submitted. They're important in sentencing, the fact the pastor came in today is important because a judge needs as much information as possible when sentencing someone because there are a lot of factors that have to be considered. There is no question in my mind that you are doing good things in jail to show rehabilitation and that's important. Certainly something that goes in your favor. It's clear do me that you're a good father. Good to your family and to members of the community. And I understand the devastation that your incarceration has caused and

### Page 35

will continue to cause you are family. I live in the real world, I understand that. I've read Mrs. Romano's letters and her e-mail today, the letters from your children, and that's something that the Court has to consider. But at the same time that's not the only thing the Court has to consider.

For every letter that I got pointing out those things, I have as Mr. Romano noted, you read these letters, Mr. Romano, I have letters from victims, and these post-its representing each one is a victim's life was ruined by this, and I understand you may not have any thought it out and understood devastation that you were causing these people, but their lives were utterly ruined and continue to be ruined by this fraud, and I have to consider that too when I balance all of these things out.

I assure that the letters have all been read by me, and I've done my best to calculate them in balancing out all the factors.

Does the government -- are the victims that, I want to hear from the victims at this point. Maybe I'll take a break.

MR. SULLIVAN: I have two victims, your Honor, they're from out-of-state. One is in New Jersey, one is from North Carolina.

THE COURT: Why don't we hear those and I'll

### Page 36

take a short break before I hear from them.

MR. SULLIVAN: Thank you, your Honor. At the time if the Court would hear from Walter Sheppard.

THE COURT: Good afternoon, Mr. Sheppard.

MR. SHEPPARD: Your Honor, ladies and gentlemen of the court, I appreciate the opportunity that being here with you to today to explain some of the difficulties that I'm sure more people than myself has faced.

You know, I had a real good credit rating, I could get everything that I wanted, I could get a loan for anything I wanted. It was rather close to retirement. Now, I doubt I could borrow the money to buy a hamburger.

As far as my financial condition, it has destroyed my reputation, it has destroyed my life, and my health. I've been on drugs to try to keep the stress off and the pain, and the drugs themselves of course have an effect other than helping me.

Right now I suppose that I'm 50,000 some odd dollars in debt, unable to pay it, I try to do some if I can. You know, in reality, the thing that's the toughest on me is to not be able to do the things that I have promised this person, that person that I would do.

You know, older people are subject to these things because we're getting into the years where they're not capable of making the money they made when they were

### Page 37

younger. So it's a death below. Taxes on property, the IRS has taken out my Social Security for a small bill I owed back that I couldn't do anything with. I was promised a lot of things, a lot of times, and none of them came through.

I don't think there's anything worse that you can do is to deliberately destroy a person's life. Your life and your reputation is all you have. Again, I appreciate the opportunity, you know, I think that maybe if you consider what I have told you, that people destroy each other for money, for wealth, and the worst thing is the people who bear the brunt of that are those who have been destroyed. I appreciate the Court's time. I think that I have given you the message that I can tell you of how I was affected as an individual.

THE COURT: I want to thank you, Mr. Sheppard. Where are you from, Mr. Sheppard? What state are you from?

MR. SHEPPARD: Your Honor, I'm sorry, I didn't hear you. North Carolina.

THE COURT: I want to thank you for making the trip. I did read your letter as well, they were in the binders, and I can assure you just as I spoke to Mr. Romano and his family that I have read your letters and those of the victims, and I understand -- I agree with

### Page 38

everything that you said, I understand the devastation it has caused you and the other victims and I am fully considering it. I want to thank you for make the long trip and have a safe trip home. Thank you.

MR. SHEPPARD: Thank you very much, your Honor.

MR. SULLIVAN: Your Honor, the other victim is Robert Bentzinger.

THE COURT: Good afternoon, Mr. Bentzinger.

MR. BENTZINGER: Good afternoon, your Honor. Sitting here listening to everything, it still brings back a lot of bad memories. This whole thing has affected me both financially and emotionally. It's really strained my relationship with my wife that we have because every time a bill is due it can't be met. She constantly reminds me we can't do what we wanted to do. Just I look at all of that, I feel personally responsible, and I feel bad about it. A lot of things that happened to me as a result of this, things that I was promised by the defendant and other that if I bought certain coins that I would have an investor who would be able to buy them and things would be all resolved and it never happened. I used the money that I saved for my daughter's wedding, it was over six years ago, and I still have nothing except the bills for her wedding. I can't do things with my kids -- I have three kids and I'd like as a dad to be able to help my kids out

**Page 39**

and I can't. That makes me really sad and even my grand kids, they can't enjoy a lot of things that I want to give them, because there are no finances to be able to do this. And I've looked at things, and I have, I'm not going to be able to retire. I'm going to have to work until I die. And I'm resigned myself to that fact and that's the way I look at things. I try to give the kids the best thing. I paid my bills off, I borrowed a lot of money to buy these coins on the hopes I'd give my kids something in the future and I'll give them no debt and I would pay back what I owe. I took a second mortgage on my house and that's one of the reasons why I did this, everything will be taken care. Emotionally it stressed me out, and it's kind of hard to put anything that I accepted, I had a lot of sleepless nights wondering why did I do it, and the different things like that that has caused a real strain. My wives is under medication because of the stress involved, when the bills come in I try to pay them before she sees them, because she says it's your fault. It is a sad situation, but I'm trying do deal with it as best I can.

I can't change it and it's just one of those unfortunate situations I look at the fact that things that were robbed from me by the fact that I grew up trusting people, you know, and I'm an honest person, I can trust, I

**Page 40**

am trustworthy and if I say something my word means something, and I've lost that ability to take people at face value now, I don't trust them, which is a sad state of affairs for me and I look at these things as I was prayed upon, I was a victim, and there's other people who were involved in this also and as a group it's something that there's some comfort knowing I'm not alone but yet upset that this has to occur.

I realize he's trying to do the proper things with his comments as such, Mr. Romano said, but there's something that I'm going to have to deal with for the rest of my life, too. Thank you very much, your Honor.

THE COURT: Where are you from?

MR. BENTZINGER: West New Jersey, almost in Pennsylvania.

THE COURT: Approximately how much money did you lose?

MR. BENTZINGER: Approximately $250,000.

THE COURT: I want to thank you for being here today. You understand I have these letters representative of the victims here today, many of the things that you have said to me today I read over and over and over again because as you eloquently stated it's not just the financial devastation, the bankruptcies, the foreclosures, people that go back to work who retired because of the

**Page 41**

fraud, but it is the emotional and the psychological impact that you described, so many of them described, physical ailments from the stress that you have described to the families, ruined by the stress.

So I appreciate your coming in and you have my assurance that I understand that it's more than just money, it will all be considered.

MR. BENTZINGER: Thank you.

THE COURT: Why don't we take a short break. We're going for an hour now. We'll take a ten-minute break.

(Recess taken at this point.)

(After recess.)

THE COURT: I'll now hear from the government. Go ahead, Mr. Sullivan.

MR. SULLIVAN: Thank you, your Honor. I want to confirm that the Court has the forfeiture order.

THE COURT: I'm a little confused because there's an amended preliminary order and the final forfeiture order. You asked me to sign both.

MR. SULLIVAN: The reason for the amended preliminary order is there was something that was omitted from that order that the defense is consenting to that. I would ask the Court to sign the amended final order which is consistent with the final order.

**Page 42**

THE COURT: I assume, Mr. Goidell, you have no objection to that?

MR. GOIDELL: No objection.

THE COURT: Is that correct, Mr. Romano.

THE DEFENDANT: Yes.

THE COURT: Go ahead, Mr. Sullivan.

MR. SULLIVAN: Thank you, your Honor. Your Honor, as you heard from Mr. Bentzinger and Mr. Sheppard, part of the American dream is for people to make things better for their family and for their future families. The defendant for eight years prayed on these people in all 50 states, lied to them about the values of these coins, trying to help them and trying to convince them that this was going to help them make better lives for themselves and for their families. And for Mr. Bentzinger and Mr. Sheppard, there are hundreds of other people that have filled this courtroom numerous times with similar stories. As was pointed out, these victims have been sentenced and their families to a lifetime of financial and emotional ruin.

In terms of the nature of the offense, this defendant organized and led the subject companies, he personally profited to the tune of $3.8 million. With respect to Mr. Goidell's comment about the loss amount, this defendant has only been charged and allocated for the

### Page 43

loss that again he, the gain he personally received. He's not charged or not been asked to account for the loss and the gain of the other defendants.

The defendants, the lies that he coached his co-conspirators to say were blatant. Every day this defendant went to work, his goal was to take money out of innocent victims pockets. This defendant knew that the more money he took, whether it was $250,000 to Mr. Bentzinger or up to $1.8 million in the case of one victim, he knew that he was sentencing these victims to a lifetime of financial ruin.

I would ask the Court to take into account that the true measure of the defendant's character is not what he does when everybody is looking but what he does when he knows nobody is looking.

While this defendant was out on bail with the opportunity to face these charges out of custody, this defendant chose to engage in telemarketing activity, a condition that was explicitly prohibited by Judge Tomlinson.

A guideline sentence in this case would serve as an adequate deterrence for this defendant. It would show that organizing a scheme of this breath, covering all 50 states, hundreds of victims, every single day people being defrauded at his direction, that that crime be dealt with

### Page 44

severely.

And the Court -- we ask the Court to look at the general deterrence that this sentence will impose. As the Court is aware, this was a large scale investigation. It's -- by the nature of the fraud, it's a fraud that most local and state prosecutors could not handle. They wouldn't have jurisdictional and the proper venue to do that. It takes the federal government to come in and try to take all of the fraud together and this sentence will send a message to other people who are engaging in this fraud if you commit this crime you will be dealt with appropriately.

The defendant is a smart individual. He incorporated these companies. He recruited people to commit this fraud. And at this point when he is released he will be in the exact same position to commit this crime again.

Notwithstanding the defendant's recent activities, this defendant when he's released he will still be an economic danger to the community. The defendant has ruined lives, he's ruined generations of families. The government asks the Court to impose a guideline sentence to show this defendant and to show others that this type of fraud is a serious crime and will be dealt with appropriately. Thank you.

### Page 45

THE COURT: Thank you, Mr. Sullivan.

I'll now describe the sentence I intend to impose, but I'll give the attorneys the final opportunity to make any legal objections before sentence is finally imposed. I'll say up front this is a difficult sentencing. There are a number of factors, as I noted, that have to be considered to get the number the Court arrives at, but I can assure you that I have carefully analyzed and reanalyzed every bit of information that I have had before me to make sure that I'm balancing them in a fair and just manner.

In imposing this sentence I have carefully considered, as I must, certain factors set forth by Congress in Section 3553(a). These factors included the nature and circumstance of the offense and the history and characteristics of Mr. Romano, the need for the sentence imposed to reflect seriousness of the offense, to promote respect for the law and to provide a just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational and vocational training, medical care or other correctional treatment in the effective manner. With respect to that factor the Court is aware of the United States versus Tapia, T-A-P-I-A, decision by the Supreme

### Page 46

Court last year, that correctional treatment and rehabilitation, that imprisonment cannot be used to promote rehabilitation or correctional treatment.

The Court has also considered as we have discussed the advisory sentencing guidelines issued by the Sentencing Commission, as well as the advisory range and the applicable policy statements issued by the Sentencing Commission, I have considered, as Mr. Goidell has urged me to, the factors of avoiding unwarranted sentencing disparities amongst similarly situated defendants and the final factor is restitution, which we will deal with at another conference.

Having considered all of the 3553(a) factors, I find in the exercise of my discretion that a sentence of 180 months, 15 years, is the appropriate sentence. Let me explain the reasons for that now.

First, I want to address the downward departure motions made by Mr. Goidell under the advisory system. First, I acknowledge that I have the discretion to depart on all of the grounds that he has raised, as well as on the disagreement with the policy statements behind the guidelines, and I reject the arguments for the following reasons.

First, with respect to any downward departure for -- he said it wasn't double counting but it is a

47

double counting argument, the cumulative effect of enhancement, whatever you want to refer to it as, as has been discussed in some of the cases that he cited, Lauersen being one of them, I disagree with the idea that those enhancement double counts in general, and I certainly disagree that the double count has some unjust or unanticipated cumulative effect as it relates to this defendant. The different enhancements, including the loss amount, the number of victims, vulnerable victims, organizer/leader, they all measure different things, and the policies behind them are clear. It makes sense to have separate enhancements for each and every aspect of these frauds in order to appropriately reflect the nature of the crime.

For example, the number of victims addresses the scope of the fraudulent scheme. However, the loss amount measures the financial harm or impact of the scheme because you have many victims while they are financially in debt, they are intended to measure separate things as well as the nature of the victims who are hurt by the fraudulent activity, and I do not believe that there's any unwarranted double counting by the existence of those enhancements and certainly in this case they do not result in any such unwarranted or unreasonably high guideline range. I rely on United States versus O'Neil, 118 F. 3d

48

65 which I cited before, the Second Circuit in that case came to the same conclusion that the loss amount and number of victims did not result in any type of double counting, and that were designed to address different things. The Ninth Circuit in United States versus Kentz, K-E-N-T-Z, 251 F. 3d 835, Ninth Circuit 2001 said "enhancing for the amount of monetary loss, degree of planning, mass marketing, victimizing vulnerable victims during telemarketing, and impacting a large number of vulnerable victims, as the court did here, accounts for different aspects of harm" that the defendant's conduct caused.

I agree with that analysis in its entirety. I agree with Mr. Sullivan as it relates to the loss amount in this case. If anything, Mr. Romano has gotten every benefit of the doubt on the loss amount by utilizing only his personal gain as opposed to the gain of all the people who were working in his business on this fraud or the amount of the fraud to the victims, both of which would have been much higher amounts. So in addition, the loss amount in this case understates the seriousness of the offense.

With respect to the downward departure motion for extraordinary family circumstances. The Second Circuit in United States versus Huerta, H-U-E-R-T-A, 371

49

F. 3d 88, Second Circuit 2004, has made clear, the guidelines have stated that family ties and responsibilities ordinarily are not something that would result -- should result in a departure. However, in extraordinary circumstances they can be the basis of a downward departure under the advisory guideline system.

And I want to say up front, as tragic as the family circumstances are here, and I don't question, as I said, the devastating impact that this is having on Mrs. Romano and the children, they are certainly not unique or extraordinary even given the special needs of the children. The situations like this are extremely common. I can't tell you how many sentencings that I've had with similar issues, and it requires the extended family and friends, and Mr. Romano had more letters here than probably any defendant that I've had. So it is clear there is a support group out there for him, hopefully for Mrs. Romano and the children. I certainly understand it does not replace the father, but it is not the type of situation that would warrant a departure under the advisory guideline system. I do not believe that either individually or collectively any of these issues warrant a departure under the advisory guideline system.

However, the Court has to consider all of these things again under the Section 3553(a) factors because

50

even though they are not a departure basis, they can be the basis for a non-guideline sentence that Mr. Goidell has urged. I do not believe when you balance all of these factors that a non-guideline sentence is warranted. In fact, I believe as I indicated, 180, which is the high end, higher end of the advisory range is warranted for the following reasons.

This is an extremely serious offense. I don't have to say that. I think everyone in the courtroom realizes that. In particular, the defendant owned and operated three businesses, over seven years, that were engaged in massive telemarketing fraud every single day. He was the owner. He knew his companies were built on fraud. It doesn't matter whether he's in Florida or in New York, he was the owner of these businesses. He knew that they were, at their core, fraudulent every day, and the salespeople got people to buy these coins by telling them that there are buyers ready and willing to buy them back at much higher prices. He knew when he created these pictures or not, he knew this was the core of the business, and the reason it generated millions of dollars for him -- and he made over $3.8 million as a result. In the wake of that, he left over 250 victims. To make matters worse, his scheme preyed on the vulnerable, elderly, out-of-state customers, some suffering from

### Page 51

1  dementia and other disabilities. They rely on the fact
2  that these people are trusting and often alone, and they
3  were victimized, as I noted earlier, over and over again
4  by getting them to buy more coins on the idea that a buyer
5  would turn up, that a complete set, is lie upon lie and
6  destroyed the financial security of these people and their
7  sense of trust.
8      At the bottom was a massive fraud that was
9  motivated by pure greed with devastating financial and
10 emotional impact on the victims as has been noted and is
11 based on a callous and evil exploitation of some of the
12 most vulnerable members of our society, the elderly, many
13 of whom were veterans. I understand obviously Mr. Romano
14 is a veteran himself, and it's particularly sad that his
15 businesses, his fraudulent businesses were defrauding
16 elderly veterans of their hard earned, life-sustaining
17 retirement money. I cannot emphasize the impact that that
18 has had.
19     We've heard from a couple of victims today, but
20 I'm going to pick three particular letters that I read
21 because some of these people indicated they cannot be here
22 today because they cannot afford to be here and I want
23 their voices to be heard as well.
24     Ms. Poore, who's 90 year old father Ernest
25 Poore, a World War II vet, earned no more than $15,000 per

### Page 52

1  year as a bookkeeper for 40 years, retired to Minnesota
2  with a nest egg of $100,000 to live out his life farming
3  vegetables in Minnesota, he invested $100,000 in the
4  American Coin Company, he lost it. Obviously, she writes
5  to me addressing Mr. Romano, she asked that I videotape
6  this and post it on You Tube, so she can see the
7  sentencing, she writes, "you robbed my father of his pride
8  and dignity, you took advantage of his farm boy trusting
9  nature and his pressure induced as the great depression
10 induced inclination to purchase coins as a "safe"
11 investment. Even if you pay my father and your hundreds
12 of other victims 100 percent of their money, you could
13 never compensate them for the anxiety, anguish, hardship
14 and humiliation you inflicted. You defrauded the greatest
15 generation, whose toil, honesty and heroism built and
16 protected America.
17     I can't say it any better than Winston Lowe,
18 Miami Florida, defrauded of over $600,000, his life
19 savings. He's incurred enormous credit card, personal
20 debt. He writes because of this scam, my mortgage lender
21 foreclosed on my real estate property here in Florida. My
22 wife was forced to return to work to help pay my debts and
23 get out adequate health insurance coverage. I am now
24 underweight from the emotional and physical toll this coin
25 scam has caused me. Emotionally, I should probably seek

### Page 53

1  counseling. I suffer from depression, insomnia, and fits
2  of anger. It has been difficult to sleep and feel good
3  for four years. I am angry that I carry this enormous
4  debt and I cannot retire. Burdening my family with this
5  financial nightmare and losing their trust and respect has
6  been the hardest part. It has caused me so much pain,
7  strife, and suffering to those I love. I have failed
8  them, especially my wife, to whom I have been married to
9  for over 40 years. She feels hurt, betrayed has suffered
10 enormously from this financial catastrophe.
11     Debbie Cullinan described she took $70,000 for
12 her granddaughter's college education and lost it.
13     Ms. Berry, 85 year old widow with Parkinson's,
14 two strokes, in a wheelchair, invested her entire life
15 savings of $900,000, with losses of over $770,000. She
16 writes the loss of all of my retirement money has been
17 devastating to me and my family. The $772,000 that I was
18 scammed out of was to be used for my medical expenses and
19 care. I have COPD, Parkinson's. I've had two strokes and
20 two broken backs. I'm bound to a wheelchair, have limited
21 speech and reduced fine motor skills. I believed that
22 this investment opportunity would benefit my family and
23 ended up causing me a horrible rift, and division between
24 my children. My health continues to deteriorate and my
25 monthly expenses continue to rise. I never envisioned

### Page 54

1  myself living out my remaining years in poverty and with a
2  broken heart.
3      Two more. Jack Lambrecht of Plano, Texas, a
4  93-year-old decorated World War II combat pilot, retired
5  colonel, saved his whole life for retirement and to
6  provide a financial legacy for his family. He lost over
7  one million dollars, $250,000 in cash, he opened up
8  $20,000 credit line, he sold real estate and used the
9  proceeds to purchase coins, he tapped out his annuity. He
10 lost everything, and moved to retirement facility with his
11 government pension and Social Security to rely upon.
12     His son writes my father was left devastated and
13 broke. Being sucked into a fraudulent scheme was
14 embarrassing enough, but losing his fortune to crooks was
15 the ultimate humiliation.
16     And finally, Gus Collatz of Panama City, Florida
17 89, with dementia, invested $80,000 in these coins, he has
18 since passed away, but his 90 year old widow describes the
19 devastation to her and her disabled 63-year-old son, and I
20 can go on and on, the letters are all of that nature.
21     A substantial sentence is needed to reflect how
22 serious these schemes are and to provide a just punishment
23 for this crime. I need not only to deter Mr. Romano, but
24 others who are involved in or may be thinking about being
25 involved in these types of vicious telemarketing frauds,

55

whether they be salespeople, managers or owners, the general message of deterrence is to be sent that they are going to jail for substantial periods of time because society must be protected from these horrific, fraudulent schemes that prey on the vulnerable.

If these were the only factors that I would consider I would sentence you above the guidelines, I can easily justify a statutory maximum of 20 years based upon those factors. However, I have considered that you accepted responsibility, I have considered the efforts you have made in jail as you've outlined and Pastor Filiponi outlined, and I have considered the letters, but -- obviously I have to consider whether something else is appropriate, as Mr. Goidell urged, but it would not adequately balance all the factors to give a sentence less than that. This is sufficient and no greater than is necessary to achieve all the factors of sentencing, including respect for the law, the seriousness of the offense and the need for the specific and general deterrence.

The last factor I want to address is the issue of sentencing disparities. I looked at a very detailed chart that Mr. Goidell gave the Court, and obviously I have a number of codefendants that have not been sentenced yet. I do not believe that the sentence will reflect any

56

unwarranted sentencing disparities among defendants who are before me or among similarly situated defendants nationwide whether it be federal or state. Many of the cases that were cited were ones where the guidelines were much lower than they were here. The number of victims much lower, the loss amounts lower, they do not have the series of aggravating factors that we have here, and when I look down the line there are telemarketing cases the Seventh Circuit where the defendant went to trial and had some other cases where the defendant had 280 months in jail. So there are other cases out there that are, given the range, are higher than the one that I have just imposed.

These are obviously case specific determinations, but I have considered the need to avoid any unwarranted sentencing disparities, and I do not believe that this sentence is disproportionate in light of the factors that I have pointed to.

Some of these corporate fraud schemes as serious as they are, the losses, having looted over a number of stockholders, they don't have in every situation the devastating personal impact that these schemes have on the individuals that are the victims here.

So again it's hard to compare sometimes these various cases but I've done my best to do so. I believe

57

this is the appropriate sentence -- the law firm case -- a secretary steals $4 million, $5 million from the law firm it is not similarity situated to this type of fraud with the number of victims, the national fraud that went on for years. It's just not. It's like comparing apples and oranges.

I have also want to note that if the advisory range were different, it would not affect my calculation under the 3553 factors, it would be the appropriate sentence even if the calculations were different. 15 years, as I said, properly balances the factors that is sufficient and no greater than necessary to achieve the 3553(a) factors.

I intend to impose three years of supervised release, with the standard conditions and special conditions 1, 2, 3, 4 and 6, the probation department's recommendation, I do not intend to impose a fine given the forfeiture, $7 million forfeiture order, as well as the restitution order that the Court has set, given obviously the financial circumstances of the defendant's family while he's incarcerated. I will impose the $100 mandatory special assessment. I will order forfeiture as I indicated as set forth in the forfeiture agreement, the forfeiture order, and that will be final as to this defendant. It will allow for the parties to make any

58

objections.

I will recommend that to the extent he's eligible he be designated to the northeast area to a camp facility if he's eligible for that under the Bureau of Prisons regulations.

I believe that covers everything with the exception of restitution which we'll set the date for. Is there any legal reason why I cannot impose that sentence, Mr. Sullivan?

MR. SULLIVAN: No, your Honor, there isn't.

THE COURT: Mr. Goidell?

MR. GOIDELL: Your Honor, obviously we take exception to the severity of the sentence, but there's no legal reason why the sentence cannot be imposed.

THE COURT: The objection is noted and preserved for the record.

Mr. Romano, please rise.

After considering the 3553(a) factors, it is the judgment of this court in its discretion that you be sentenced to the sentenced to the custody of the Attorney General, through the Bureau of Prisons for a term of imprisonment of 180 months. I impose three years of supervised release to follow that term of imprisonment with the following standard conditions and the following special conditions: One, you shall not possess a firearm,

**Page 59**

1 ammunition or destructive device; two, you shall
2 participate in any mental health evaluation and treatment
3 program as approved by the U.S. Probation Department, you
4 shall contribute to the cost of such services rendered
5 and/or any psychotropic medications prescribed via
6 co-payment or full payment in an amount to be determined
7 by the Probation Department, based upon your ability to
8 pay and/or the availability of third-party payment. You
9 shall disclose all financial information and documents to
10 the Probation Department to assess your ability to pay.
11     Three, you are prohibited from engaging in the
12 telemarketing business. You are to assist the U.S.
13 Probation Department in verifying the job description on
14 any employment you secure while under supervision.
15     Four, you shall comply with the forfeiture as
16 ordered by the Court to special condition 4.
17     Special condition five, you shall make full
18 financial disclosure as directed by the Probation
19 Department.
20     I am imposing a $100 mandatory special
21 assessment. I do not impose a fine as I stated, and I
22 order forfeiture money judgment in the sum of $7 million
23 as indicated in the final order of forfeiture, including
24 the various bank accounts and real property that is listed
25 in the order which I will not repeat here but attach to

**Page 60**

1 the judgment of conviction. And I do intend to order
2 restitution in the amount to be determined at a future
3 hearing.
4     Mr. Romano, to the extent that you have not
5 waived your right to do so in the plea agreement, you have
6 the right to appeal your sentence of conviction. If you
7 are unable to pay the cost of appeal you may apply for
8 leave to apply in forma pauperis. If you cannot afford an
9 attorney on appeal, one will be appointed to you free of
10 cost. The notice of appeal must be filed within 10 days
11 of the judgement of conviction, although I may hold up the
12 judgment until restitution order is issued.
13     Does the government move to dismiss the open
14 counts?
15     MR. SULLIVAN: We do, your Honor.
16     THE COURT: That application granted. All open
17 counts are dismissed.
18     As I said, I will recommend in the judgment that
19 he be designated to a Bureau of Prisons camp, to the
20 extent he's eligible, in the northeast region.
21     Do you have a proposed date for the restitution
22 hearing? Maybe two weeks. You think that will be
23 sufficient time?
24     MR. SULLIVAN: Two weeks will be fine,
25 your Honor.

**Page 61**

1     THE COURT: Mr. Goidell, do you think two weeks
2 will be sufficient? Have you received the calculations,
3 Mr. Goidell?
4     MR. SULLIVAN: I provided them to probation, I
5 have not yet provided them to Mr. Goidell. I will provide
6 them today.
7     THE COURT: Why don't you provide them to him.
8 If there can be agreement on some aspect of it, it will be
9 helpful. If it is not, it will be helpful to know what
10 the areas of disagreement are. I would encourage dialogue
11 on that.
12     MR. GOIDELL: Two weeks is fine, Judge.
13 Actually the 24th would be perfect.
14     THE COURT: The 24th.
15     THE CLERK: 1:30.
16     THE COURT: 1:30 on the 24th.
17     MR. SULLIVAN: That's fine with the government,
18 your Honor. Thank you.
19     MR. GOIDELL: Yes.
20     THE COURT: If you submit a letter to plea
21 Mr. Sullivan by the 22nd indicating there's any agreement
22 with the parties or what the areas of disagreement are so
23 I can prepare in advance so is there won't be any further
24 adjournments.
25     MR. SULLIVAN: Absolutely.

```
 1          THE COURT:  Is there anything further from the
 2   government?
 3          MR. SULLIVAN:  No, your Honor.
 4          THE COURT:  Anything further from the defense?
 5          MR. GOIDELL:  No, your Honor.
 6          THE COURT:  Thank you.
 7          (Matter concluded.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```