UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X Docket#
UNITED STATES OF AMERICA,     : 09-cr-170(JFB)(AKT)
                              :
     - versus -               : U.S. Courthouse
                              : Central Islip, New York
JOSEPH ROMANO,                :
              Defendant       : May 18, 2010
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR CURCIO HEARING
BEFORE THE HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE

A   P   P   E   A   R   A   N   C   E   S:


**For the Government:**        **Benton Campbell, Esq.**
                               United States Attorney

                          BY:  **Lara Treinis-Gatz, Esq.**
                               **Thomas Sullivan, Esq.**
                               Assistant U.S. Attorney
                               100 Federal Plaza
                               Central Islip, NY 11722


**For the Defendant:**         **Charles Carnesi, Esq.**
                               1225 Franklin Avenue
                               Garden City, New York 11530

                               **Paul Rinaldo, Esq.**
                               Grossman Levine & Rinaldo
                               108-18 Queens Blvd.
                               Kew Gardens, NY 11375


**Official Transcriber:**      **Rosalie Lombardi**
                               **L.F.**


**Transcription Service:**     **Transcription Plus II**
                               3859 Tiana Street
                               Seaford, NY  11783
                               (516) 358-7352


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

**Proceedings**

1           THE CLERK:  Criminal Cause for Curcio Hearing,

2    United States of America v. Joseph Romano, under docket

3    number 09-cr-170.

4           Counsel, appearances?

5           MS. TREINIS-GATZ:  Good morning, your Honor.

6           Lara Treinis-Gatz for the United States.

7           MR. SULLIVAN:  Good morning, your Honor.

8           Thomas Sullivan for the United States.

9           THE COURT:  Good morning.

10          MR. CARNESI:  Good morning, your Honor.

11          Charles Carnesi appearing for Mr. Romano.

12          THE COURT:  Good morning.  Let me just correct

13   something if I can.  This is really not yet a Curcio

14   hearing even though it was pronounced and introduced that

15   way.  I do have a referral order here from Judge Bianco

16   saying that this matter is referred to me for purposes of

17   conducting a Curcio hearing and this case was essentially

18   set down this morning for purposes of the bail revocation

19   proceeding.  However, some other issues have arisen here

20   which means prior to my being able to conduct the bail

21   revocation hearing, we have to resolve these other issues

22   in the first instance.

23          So I see that the referral order for purposes

24   of today has been signed or appears to be signed by the

25   defendant, by Mr. Carnesi and by Mr. Sullivan, the

Transcription Plus II        Rosalie Lombardi

3

**Proceedings**

1  Assistant United States Attorney and I just want to

2  confirm on the record that these are the signatures of

3  the defendant and Mr. Carnesi; is that accurate?

4          MR. CARNESI:  Yes, your Honor, they are.

5          THE COURT:  All right.  Thank you.  I am going

6  to go ahead and sign that order, as well.  All right.

7          The government has brought to my attention the

8  fact that there may be a conflict of interest here with

9  regard to Mr. Carnesi and his representation of

10  Mr. Romano in this case.  I have throughly reviewed the

11  submission that the government made on May 13.  I will

12  give Ms. Gatz an opportunity now if you wish to highlight

13  further any of this or bring any other additional

14  information to my attention.

15          MS. TREINIS-GATZ:  Thank you, your Honor.  Just

16  between the last time we were -- we wrote the submission,

17  excuse me, and today, we discovered three more checks.

18  So there are actually a total of six checks made out to

19  Charles Carnesi from Collectible Coins.  There's an issue

20  about whether all were cashed or not but there are six

21  checks which we have provided to Mr. Carnesi today from

22  Collectible Coins in the amount of $5,000 each.

23          THE COURT:  All right.  Anything else you want

24  to add?

25          MS. TREINIS-GATZ:  On the Curcio issue?  No,

Transcription Plus II        Rosalie Lombardi

4

**Proceedings**

1   your Honor.

2          THE COURT:  No, all right.

3          MS. TREINIS-GATZ:  Thank you.

4          THE COURT:  And Mr. Curcio (sic), I am

5   certainly -- I am sorry, Mr. Carnesi, I am going to give

6   you an opportunity to address this in a moment.  Let me

7   just go over what I intend to do today.

8          According to the case law that has followed

9   upon Curcio, there are obviously three potential forms of

10  a conflict here.  The government seems to take the

11  position that it's the third form here of a potential

12  conflict under Levy as opposed to the per se conflict or

13  the actual conflict.  And obviously whether it's any of

14  these three depends on the facts and circumstances of

15  this case.

16         With regard to the existing case law, my

17  research has directed me or put me in the direction of

18  understanding that my first step here is really to

19  conduct a proper inquiry and that inquiry obligation is

20  actually outlined in a case called United States of

21  America v. Chaim Levy.  The citation is 25 F.3d 146 (2d.

22  Cir. 1994).  And in that case, the Second Circuit in

23  outlining the district court's obligations in this regard

24  said first of all that when a district court is

25  sufficiently apprised of even the possibility of a

**Proceedings**

1  conflict of interest, the Court first has an inquiry

2  obligation.  The Court must investigate the facts and

3  details of the attorney's interest to determine whether

4  the attorney, in fact, suffers from an actual conflict, a

5  potential conflict or no genuine conflict at all.  And it

6  cites a case called <u>Strauss v. Leonardo</u> at 928 F.3d 548

7  at 555, as follows; "In order to protect a defendant's

8  right to conflict free counsel, the trial court must

9  initiate an inquiry when it knows or reasonably should

10  know of the possibility of a conflict of interest."

11        Based upon the information that has been

12  provided by the government here and in particular, I

13  raise all of this for your benefit, Mr. Romano, because

14  at some point I am going to have to make a further

15  inquiry of you, but the government's raised an issue that

16  -- and in fact as it -- attachments to the ex parte

17  application for revocation of bail, the government

18  attached copies of a number of checks drawn on a CCI

19  account in Florida and the payee on those checks is

20  Charles Carnesi, your counsel.

21        The government's indicated in its submission

22  that during the investigation into Mr. Romano's violation

23  of the terms of his bond, the government discovered a

24  direct financial connection between Mr. Carnesi and CCI.

25  Specifically, Mr. Carnesi received three $5,000 checks

6

**Proceedings**

1  from CCI dated November 20, 2009, December 1, 2009 and

2  December 15, 2009, each payable to Charles Carnesi.

3          Moreover, telephone records revealed that

4  between December 8, 2009 and February 3, 2010, 24

5  telephone calls were placed from a cellular phone

6  registered to CCI to Mr. Carnesi's cellular phone.

7  Similarly, telephone records reveal that on August 5,

8  2009, three telephone calls were placed from CCI's office

9  to Mr. Carnesi's office.

10          Mr. Romano through Mr. Carnesi has now

11  requested a bail revocation hearing purportedly to

12  challenge the government's contention that he violated

13  his bond.  And the government states that the potential

14  conflict of interest arises as from the government's

15  perspective, Mr. Carnesi as a potential witness who may

16  be asked to answer at a minimum, the following questions.

17  First of all, who sent Mr. Carnesi the checks from CCI's

18  bank account, (2) what were the checks payment for, (3)

19  who called Mr. Carnesi from CCI's cellular telephone and

20  (4) who was called -- who called Mr. Carnesi from CCI's

21  office.

22          Alternatively, the government states the

23  defendant may wish to call Mr. Carnesi as a witness at

24  the hearing to answer these or other questions in order

25  to prove that he did not violate his bond and hence, the

Transcription Plus II          Rosalie Lombardi

7

**Proceedings**

1   grounds for the contention of the conflict of interest

2   here.

3           So I think based on my duty inquiry first,

4   Mr. Carnesi I am going to give you an opportunity to

5   respond to the government's submissions since I know you

6   haven't had an opportunity to do that yet.

7           MR. CARNESI:  Thank you, Judge. Judge, it's my

8   recollection that there were five checks, not six.  I am

9   not aware of a sixth check.  Just so the record is clear,

10  none of the checks were cashed.  All of the checks were

11  made out to me and were deposited into my account and

12  that's how they were negotiated.

13          In terms of the number of telephone calls and

14  the origin of those phone calls, frankly I would have no

15  idea.  I received phone calls from time to time from

16  Mr. Romano on a cell phone.  I have no knowledge as to

17  who that cell phone was registered to, nor do I have any

18  knowledge of that land line itself.  It's possible that I

19  would have spoken to Mr. Romano if he called; I certainly

20  would have answered the phone but I have never called

21  that number, so I couldn't tell you what number that was.

22  I have never called the number that was answered by a

23  coin company in Florida.

24          As far as the -- and I believe this is the

25  basis of the government's application and I can

8

**Proceedings**

1  understand that it requires further inquiry, certainly

2  but frankly in terms of the attorney witness conflict,

3  it's my position, Judge, that the telephone records speak

4  for themselves.  If there's a number that is registered

5  to that company, and there's a record that shows that

6  that telephone was used to call me or to call my office,

7  that's it.  There's really nothing more that I could

8  contribute as a witness.

9       Similarly, with regard to the checks, the

10  checks are made out to me.  The checks speak for

11  themselves.  They were deposited into my account.  My

12  knowledge of how those checks came into certain

13  individual's hands and what they were used for, as we

14  represented to me, to my understanding of the law would

15  be hearsay.  And I wouldn't be allowed to testify to that

16  in terms of what would be favorable to Mr. Romano.

17       So although I appreciate the need for further

18  inquiry and I recognize that there is independent counsel

19  here to advise Mr. Romano on those issues, frankly I

20  don't believe that there is much of an issue with regard

21  to my value as a witness.  Thank you, Judge.

22       THE COURT:  All right.  I am going to let the

23  government respond but let me tell you what my concerns

24  are, Mr. Carnesi and looking at this as the information

25  has been presented to me, when the bond was initially

9

### Proceedings

1  issued for Mr. Romano, I made it clear that he was not to

2  engage in any telemarketing activity of any kind.  We

3  haven't yet had our hearing on the revocation of his bail

4  and that issue will be determined as we go forward.

5          But what I do have in front of me are checks

6  drawn on a Florida account of a coin business which

7  raises my radar at a minimum as to what was going on

8  here.  And the fact that your name appears as the payee

9  on various checks drawn on that account raises the radar

10  again.  And so I have an obligation here, I believe, to

11  make sure that Mr. Romano is aware particularly since we

12  are going to have a hearing here, that his counsel of his

13  choosing at this point, Mr. Carnesi, may well have a

14  potential conflict here because Mr. Carnesi may be called

15  as a witness in this revocation hearing by the

16  government, let alone whether or not Mr. Carnesi decides

17  that it's in your best interest, Mr. Romano, for him to

18  testify in your behalf at the bail hearing.  Do you

19  understand that?

20          THE DEFENDANT:  Yes, I do.

21          THE COURT:  All right.  Ms. Gatz, is there

22  anything else you want to add on the record at this

23  point?

24          MS. TREINIS-GATZ:  No, your Honor.  Thank you.

25          THE COURT:  All right.  As far as I am

10

**Proceedings**

1 concerned, the potential conflict of interest here has

2 been clearly raised by the government and the

3 documentation that's been provided to me supports that

4 assertion by the government.

5          As far as a Curcio hearing is concerned, and we

6 will have one, I am not going to do that today because

7 one of the key things that I need to make sure of is that

8 Mr. Romano has had an adequate opportunity to understand

9 what the implications are from this potential conflict of

10 interest.  And so that he can make an informed and

11 reasoned judgment and determination, whether or not he

12 wishes to proceed with Mr. Carnesi as his counsel,

13 understanding all of the ramifications here with regard

14 to this potential conflict of interest having been

15 raised.

16          And if the case law tells us nothing else from

17 the Second Circuit, it says very clearly that you need to

18 be given some time to digest this information and to make

19 an informed decision.  This conflict may be waivable .

20 You have a Sixth Amendment right to counsel of your

21 choosing but I need to be sure that if indeed you are

22 considering a waiver of the conflict here in order to

23 have Mr. Carnesi continue as your counsel, that that

24 waiver is well-informed, well-reasoned and with the

25 understanding of all of the ramifications that could

**Proceedings**

1   occur here.  Do you understand what I am saying?

2   　　　　THE DEFENDANT:  Yes, I do, your Honor.

3   　　　　THE COURT:  All right.  And I am going to ask

4   you about this when you come back for the hearing and

5   you're going to have to me in your own words what it is

6   you want to do and why.  Do you understand?

7   　　　　THE DEFENDANT:  Yes.

8   　　　　THE COURT:  All right.  Under Curcio and the

9   cases that have followed from it, if I discover that the

10  attorney suffers from a potential conflict such that a

11  rational defendant could knowingly and intelligently

12  desire the conflicted lawyer's representation, then I am

13  to follow the procedures that are set out in United

14  States v. Curcio in order to obtain directly from

15  Mr. Romano here a valid waiver of his right if he chooses

16  to waive that right to a non-conflicted lawyer.

17  　　　　So my concern here, of course, Mr. Romano, is

18  that you understand the potential danger arising from

19  this conflict and that is the government could call your

20  attorney as a witness at the hearing -- at the bail

21  hearing; do you understand that?

22  　　　　THE DEFENDANT:  Yes, ma'am, I do.

23  　　　　THE COURT:  All right.  And when you come back

24  here for the actual Curcio hearing, I am going to ask you

25  a number of questions but I am also going to ask you to

12

### Proceedings

1  tell me in your own words how you wish to proceed and to

2  be sure myself if you do intend to go forward with

3  Mr. Carnesi as your counsel to satisfy myself that your

4  decision is a well-informed and well reasoned one; do you

5  understand?

6          THE DEFENDANT:  Yes, I do.

7          THE COURT:  I am going to give you time,

8  obviously, to think this through and I am going to also

9  appoint independent counsel for you or what we refer to

10  as Curcio counsel to insure that you have been given full

11  information with regard to what this conflict can

12  potentially mean in terms of ramifications for you and

13  this application.  Do you understand that?

14          THE DEFENDANT:  Yes.

15          THE COURT:  All right.  I have requested that

16  Mr. Paul Rinaldo, who I am appointing today as Curcio

17  counsel for you, I am going to direct Mr. Rinaldo, who is

18  here in the courtroom to meet with you and to take

19  whatever time is necessary to provide you with the

20  information to answer your questions and to insure as I

21  said, that you have thought through this issue carefully

22  and with the best information and advice that you can

23  have available to you.  Do you understand?

24          THE DEFENDANT:  Yes.

25          THE COURT:  All right.

**Proceedings**

1          And Mr. Rinaldo, I just want to put on the

2    record that you have accepted the Court's appointment in

3    that regard.

4          MR. RINALDO:  Yes, your Honor.

5          THE COURT:  All right.  Once I know that

6    Mr. Romano's had an opportunity to meet with Mr. Rinaldo

7    and had an opportunity further to assess how he wishes to

8    proceed in this matter, I want to set this down for a

9    Curcio hearing which I would like to do now and get a

10   time frame for this, so that I realize that the

11   underlying impetus here is the bail revocation hearing

12   and I don't want to delay that any longer than necessary.

13          So Mr. Rinaldo, I will ask you how long you

14   think it might take to do this?

15          MR. RINALDO:  Well, Judge, I can -- I believe

16   the defendant is in the Nassau County jail.  I can see

17   him one day this week and you could probably put it on

18   next week.

19          THE COURT:  All right.

20          MR. RINALDO:  The 26th maybe or --

21          THE COURT:  Let's see.

22          MR. RINALDO:  I am available the 26th, the

23   28th, June 1 if it has to go into the next week.

24          MS. TREINIS-GATZ:  The 26th is fine.  I'm

25   unavailable the 28th, your Honor.

**Proceedings**

1        THE COURT:  The 26th is fine.  Hold on just one

2    second.  All right.  Let's put it on for 11 o'clock.

3    Does that work for everybody on the 26th?

4        MR. CARNESI:  That's fine.

5        MS. TREINIS-GATZ:  Yes, Judge.  Thank you.

6        THE COURT:  All right.

7        MS. TREINIS-GATZ:  Your Honor, do you

8    contemplate if we resolve the Curcio issue on the 26th to

9    go forward to the hearing on that date or are we

10   selecting a second date for the hearing -- the bail

11   revocation hearing?

12       THE COURT:  No, it's my intention that once

13   Mr. Rinaldo has had the opportunity to confer with

14   Mr. Romano and Mr. Romano then will certainly have a few

15   days to think that through after he has seen Mr. Rinaldo

16   that we would proceed with the hearing on the 26th.

17       MS. TREINIS-GATZ:  Okay.

18       THE COURT:  All right?

19       MR. CARNESI:  Yes, Judge.  That's fine.  Thank

20   you.

21       THE COURT:  All right.  And Mr. Rinaldo, I

22   might ask you if you can get here that morning and just

23   speak to Mr. Romano one last time before we begin the

24   proceedings; all right?

25       MR. RINALDO:  Certainly.

15

## Proceedings

1          THE COURT:  All right.  Is there anything

2   further from the government?

3          MS. TREINIS-GATZ:  No, your Honor.  Oh, I am

4   sorry, Mr. Sullivan has something.

5          MR. SULLIVAN:  Your Honor, we just in

6   anticipation of the hearing, we've provided cellular

7   phone records from CCI and also land line records and

8   also a letter pursuant to Brady whether there's some

9   witnesses who may be helpful at the hearing.

10         THE COURT:  Very well.  All right.  And that's

11  been given to counsel?

12         MR. CARNESI:  Yes, Judge.

13         THE COURT:  All right.  Any further from the

14  defense, Mr. Carnesi?

15         MR. CARNESI:  No, your Honor.  Thank you.

16         THE COURT:  All right.  Thank you, all.  We'll

17  see you on the 26th.

18              (Matter concluded)

19                   -o0o-

20

21

22

23

24

25

16

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **1st** day of **June**, 2010.



Rosalie Lombardi
Transcription Plus II

Transcription Plus II        Rosalie Lombardi

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-----------------------------X  Docket#
UNITED STATES OF AMERICA,      : 09-cr-170(JFB)(AKT)
                               :
    - versus -                 : U.S. Courthouse
                               : Central Islip, New York
JOSEPH ROMANO,                 :
                Defendant      : May 26, 2010
-----------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR CURCIO HEARING
AND BAIL REVOCATION HEARING
BEFORE THE HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE

A   P   P   E   A   R   A   N   C   E   S:


**For the Government**:          **Benton Campbell, Esq.**
                                 United States Attorney

                        BY:     **Lara Treinis-Gatz, Esq.**
                                **Thomas Sullivan, Esq.**
                                Assistant U.S. Attorney
                                100 Federal Plaza
                                Central Islip, NY 11722


**For the Defendant**:           **Charles Carnesi, Esq.**
                                 1225 Franklin Avenue
                                 Garden City, New York 11530

                                 **Paul Rinaldo, Esq.**
                                 Grossman Levine & Rinaldo
                                 108-18 Queens Blvd.
                                 Kew Gardens, NY 11375

**Official Transcriber**:        **Rosalie Lombardi**
                                     **L.F.**

**Transcription Service**:       **Transcription Plus II**
                                 3859 Tiana Street
                                 Seaford, NY  11783
                                 (516) 358-7352


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

### Proceedings

1          THE CLERK:  Criminal Cause for Curcio Hearing,

2   United States of America v. Joseph Romano, under docket

3   number 09-cr-170.

4          Counsel, appearances?

5          MS. TREINIS-GATZ:  Good morning, your Honor.

6          Lara Treinis-Gatz for the United States.

7          THE COURT:  Good morning.

8          MR. SULLIVAN:  Thomas Sullivan for the United

9   States.

10          Good morning, your Honor.

11          THE COURT:  Good morning.

12          MR. CARNESI:  Good morning, your Honor.

13          Charles Carnesi appearing for Mr. Romano.

14          THE COURT:  Good morning.

15          MR. RINALDO:  Good morning, Judge.  Paul

16   Rinaldo, appointed by the Court as Curcio counsel.

17          THE COURT:  Good morning.  I just need one

18   moment before we begin here.

19          (Pause.)

20          THE COURT:  All right.  Initially here the

21   government supplied information to the Court regarding "a

22   direct financial connection between Attorney Carnesi and

23   CCI, Collectible Coins, Inc., a Florida company engaged

24   in the business of telemarketing coins."

25          The government also provided copies of three

3

**Proceedings**

1   $5,000 checks drawn on CCI's account and made payable to

2   Charles Carnesi, the defendant's attorney here.  The

3   government also provided telephone records showing 24

4   telephone calls placed from the cellular phone registered

5   to CCI and those calls were placed to attorney Carnesi's

6   cell phone between December 8, 2009 and February 9, 2010.

7        The government says that attorney Carnesi,

8   therefore, is a potential witness in the bail revocation

9   hearing which we are going to commence.  During our last

10  proceeding here, I stated that the type of conflict

11  raised by the government appeared to fall into the third

12  category of the types set forth in United States v.

13  Williams 372 F.3d 96 at 102 (2d. Cir. 2004) case.

14        Therefore, thus far, to the Court this appears

15  to be a potential conflict case.  As a result, I

16  initiated the procedures set out in United States v.

17  Curcio and appointed Curcio counsel, attorney Paul

18  Rinaldo, who is here this morning to act as Curcio

19  counsel for defendant Romano.

20        I also advised Mr. Romano during our last

21  proceeding of the dangers arising from the particular

22  conflict or potential conflict here and raised a number

23  of questions with him that I asked him to answer

24  regarding his understanding of the risks and coming to

25  some conclusion as to whether or not he wishes to

Transcription Plus II        Rosalie Lombardi

**Proceedings**

1  essentially undergo those risks.  And I gave him time to

2  digest this information with regard to the risks after

3  appointing Mr. Rinaldo here as his Curcio counsel.

4           Mr. Carnesi, I at least wanted to give you an

5  opportunity first here to address this issue of the

6  potential conflict if you wished to do so at this time.

7           MR. CARNESI:  Your Honor, I have nothing

8  further to add other than my statement previously.

9           THE COURT:  All right.  Mr. Romano --

10  Mr. Rinaldo, excuse me, have you had the opportunity  to

11  meet with the defendant Joseph Romano?

12           MR. RINALDO:  I have, Judge.  We met on two

13  separate occasions.

14           THE COURT:  All right.  And without violating

15  any obligations you had with regard to an attorney/client

16  privilege, could you please put on the record if you

17  would, you've said you've met with him twice, if you

18  would just tell us the procedural steps you took as

19  Curcio counsel to Mr. Romano?

20           MR. RINALDO:  Well --

21           MS. TREINIS-GATZ:  Judge -- excuse me.  Should

22  he speak into the microphone?  I know we're recording

23  these proceedings.

24           THE COURT:  Yes.

25           MS. TREINIS-GATZ:  I am sorry.

5

**Proceedings**

1          THE COURT:  And you can actually remain seated,
2   Mr. Rinaldo.  It's more important for me that we have you
3   on the mic.

4          MR. RINALDO:  Okay.  Thank you, Judge.

5          THE COURT:  Is that green light on at the
6   bottom?

7          MR. RINALDO:  It is, Judge.

8          THE COURT:  All right.  So just bring it as
9   close to you as you can.

10          MR. RINALDO:  Judge, I did meet with Mr. Romano
11   on two separate occasions.  We spent a substantial amount
12   of time together discussing this issue.  I did discuss
13   with him specifically the potential conflict that is
14   being raised in this particular matter indicating the
15   potential of his attorney being called as a witness.

16          We discussed specifically the fact that he
17   would have the right to cross-examine his attorney which
18   could be a potential conflict and a danger.  And also the
19   fact that he may want to call him as a witness.  And I
20   can report to the Court that I am confident that he does
21   understand the potential conflict here.  He understands
22   the risk that he would be taking.  I can also report that
23   I feel like he has weighed the potential risk against
24   also his right to have counsel of his choosing.

25          He has decided, Judge, to waive any potential

Transcription Plus II          Rosalie Lombardi

6

**Proceedings**

1   conflict.  I am confident, Judge, that he understands the

2   issue, that he is making that waiver intelligently and

3   voluntarily and knowingly.  And I don't -- I think that's

4   all I can say at this point, Judge.

5           THE COURT:  All right.

6           MR. RINALDO:  And I believe that he has had the

7   time as well to reflect on it.  I asked him to do that

8   when I first met with him.  That was approximately five

9   days -- six days ago and I asked him again today if he

10  took that time.  And I don't think there's any problem

11  with an intelligent and knowing waiver by the defendant.

12          THE COURT:  All right.  Mr. Romano, let me ask

13  you first of all, and I am going to have to ask you a

14  number of questions, but let me ask you first of all --

15  and if you can slide the mic over, Mr. Carnesi -- first

16  of all, do you concur with what Mr. Rinaldo just put on

17  the record?

18          THE DEFENDANT:  Yes, your Honor, I do.

19          THE COURT:  All right.  Mr. Romano, you

20  understand that the government is seeking to revoke your

21  bail here.  Do you understand that?

22          THE DEFENDANT:  Yes, I do understand.

23          THE COURT:  and the government has pointed to

24  checks issued from CCI and made payable to Mr. Carnesi,

25  your counsel.  They also point to a significant number of

Transcription Plus II        Rosalie Lombardi

**Proceedings**

1   telephone calls made to Mr. Carnesi from a cell phone

2   belonging to CCI.  And Mr. Carnesi, therefore, as

3   Mr. Rinaldo has just mentioned, could be called as a

4   witness here and you could be put in the position of

5   having your attorney cross-examined or you could be in

6   the position of calling your attorney as your own

7   witness.

8           Do you understand that?

9           THE DEFENDANT:  Yes, ma'am, I do.

10          THE COURT:  So the government has raised the

11  issue of a potential conflict of interest here with your

12  counsel, Mr. Carnesi, and I would like you, if you would

13  please for the record, to describe to me in your own

14  words what you understand this potential conflict of

15  interest to be with regard to your legal representation

16  here.

17          THE DEFENDANT:  Well, your Honor, my

18  understanding of it is that I lose the right to cross-

19  examine my attorney if he is put on the stand as a

20  witness for the prosecution and I really feel that there

21  is nothing that I need to concern myself with in that

22  respect.  Therefore, I would like to, you know, keep

23  Mr. Carnesi as my attorney.

24          THE COURT:  Well let's just clarify something

25  here.  You say you lose the right to cross-examine your

8

## Proceedings

1  attorney.  You really don't lose that right.  Do you

2  understand that?  You still have the right to cross-

3  examine your attorney.  You may not want to do that but

4  nonetheless, you don't lose the right to do that.  Do you

5  understand that?

6          THE DEFENDANT:  Yes, I never had any intention

7  of cross-examining my attorney to begin with anyway.

8          THE COURT:  Now let me ask you a couple of

9  other things here.  I need to insure, first of all or I

10  guess secondly in this instance, that you really do have

11  a full understanding of the risk to you if you choose to

12  proceed with Mr. Carnesi as your counsel.  And I want to

13  make sure that I understand and it's on the record what

14  your understanding is.

15          You have a constitutional right under the Sixth

16  Amendment to be represented by conflict free counel.  Do

17  you understand that?

18          THE DEFENDANT:  Yes, I do.

19          THE COURT:  Okay.  What do you understand that

20  to mean?

21          THE DEFENDANT:  I understand that I should be

22  able to have an attorney which has no conflict and gives

23  me a fair chance to have a fair hearing or a trial for

24  that matter.

25          THE COURT:  All right.  And by conflict free,

Transcription Plus II          Rosalie Lombardi

9

**Proceedings**

1  we mean somebody whose interests are not ultimately in

2  any way impacting your interests.  Do you understand

3  that?

4          THE DEFENDANT:  Yes, I do.

5          THE COURT:  All right.  I am satisfied with

6  what I have heard from Mr. Rinaldo that he has spent

7  ample time with you going over this information.  You've

8  met with counsel.  I would like you, if you would for me,

9  to tell me how much time you spent with Mr. Rinaldo

10  discussing the potential conflict issue, approximately.

11          THE DEFENDANT:  Approximately I believe I spent

12  about 45 minutes to an hour with him last week.  And our

13  last meeting was this morning, roughly about a half hour

14  to 45 minutes regarding it.

15          THE COURT:  All right.  Have you had an

16  opportunity in those meetings to ask any questions that

17  you might have regarding the potential conflict here?

18          THE DEFENDANT:  No, your Honor, I didn't ask

19  that many questions. I  pretty much sat and listened and,

20  you know, if there was something that wasn't clear to me,

21  Mr. Rinaldo made it clear to me.

22          THE COURT:  All right.  What I am asking you,

23  actually my question was, have you had an opportunity to

24  -- if you had questions, have you had an opportunity to

25  have them answered if you had any questions?

Transcription Plus II          Rosalie Lombardi

## Proceedings

1          THE DEFENDANT: Yes, ma'am, I have.

2          THE COURT: Okay. Are you satisfied with the

3    services that Mr. Rinaldo has rendered to you with regard

4    to this issue?

5          THE DEFENDANT: Yes.

6          THE COURT: And have you had an opportunity and

7    time to consider what Mr. Rinaldo told you?

8          THE DEFENDANT: Yes, I have had plenty of time.

9          THE COURT: All right. So you have had

10   sufficient time, if I understand you correctly, to weigh

11   the risk that you may be undertaking potentially here if

12   you proceed with Mr. Carnesi as your counsel?

13         THE DEFENDANT: Yes, I have had sufficient

14   time.

15         THE COURT: All right. And Mr. Romano, do you

16   feel that you're fully informed of the risks that we have

17   been focusing on here in these discussions in this

18   proceeding, in your discussions with Mr. Rinaldo and in

19   the last proceeding before the Court?

20         THE DEFENDANT: Yes, I am fully informed.

21         THE COURT: And do you understand that you have

22   the right to waive the potential conflict here if you

23   chose to exercise that right and have Mr. Carnesi

24   continue as your attorney in this matter?

25         THE DEFENDANT: Yes, I do understand that.

Transcription Plus II        Rosalie Lombardi

11

## Proceedings

1        THE COURT:  And knowing all of the risks that
2    have been laid out for you, are you telling the Court
3    that you nonetheless wish to proceed with Mr. Carnesi as
4    your counsel?
5        THE DEFENDANT:  Yes, I wish to proceed with
6    him.
7        THE COURT:  Are you, therefore, Mr. Romano,
8    waiving any potential conflict regarding Mr. Carnesi's
9    representation of you in the criminal proceedings?
10       THE DEFENDANT:  No.  I'm sorry, can you repeat
11   the question?
12       THE COURT:  I'll repeat the question.  Are you,
13   therefore waiving any potential conflict regarding
14   Mr. Carnesi's representing you in these criminal
15   proceedings?
16       THE DEFENDANT:  Yes, I am waiving them.
17       THE COURT:  And are you making this decision to
18   waive the conflict or the potential conflict voluntarily
19   and of your own free will?
20       THE DEFENDANT:  Yes, ma'am, I am.
21       THE COURT:  Has anybody forced you or
22   threatened you with regard to making this waiver?
23       THE DEFENDANT:  No, they haven't.
24       THE COURT:  Mr. Romano, do you understand that
25   even if you are waiving the potential conflict at this

12

**Proceedings**

1  time, depending on what happens here and what may develop

2  here, if as the proceedings move forward, I find or

3  Judge Bianco finds that there is an actual conflict

4  rather than just a potential conflict, that this issue

5  will be revisited.  Do you understand that?

6          THE DEFENDANT:  Yes, I do.

7          THE COURT:  All right.  I find that all of the

8  Curcio rights have been granted to Mr. Romano.  That he

9  understands the consequences of what he is undertaking

10  here with having his present counsel, Mr. Carnesi,

11  proceed as his counsel and that he is waiving any

12  conflict here and that he is doing so freely and

13  voluntarily, having been fully informed and having had an

14  opportunity to have any of his questions answered in this

15  regard.

16          On the Curcio issue, is there anything further

17  from the government?

18          MS. TREINIS-GATZ:  No, your Honor.  Thank you.

19          THE COURT:  Anything further from the defense?

20          MR. CARNESI:  No, your Honor.

21          THE COURT:  All right.  Mr. Rinaldo, the Court

22  appreciates your services.

23          MR. RINALDO:  (inaudible).

24          THE COURT:  Are we ready to proceed?

25          MS. TREINIS-GATZ:  Yes, Judge.

Transcription Plus II      Rosalie Lombardi

13

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1      THE COURT:  All right.  Thank you.

2      THE COURT:  Go ahead.

3      MS. TREINIS-GATZ:  Your Honor, yes, the

4  government calls William Hessle, for the bail revocation

5  hearing, your Honor.

6      THE COURT:  All right.

7  **W I L L I A M   H E S S L E ,**

8      **called as a witness, having been first duly sworn,**

9      **was examined and testified as follows:**

10      THE CLERK:  Please be seated.  State your name.

11      THE WITNESS:  William Hessle.

12      THE COURT:  Mr. Hessle, the acoustics in the

13  room are not the best.  So I am going to ask you if you

14  would and I know there's a tendency to look at counsel

15  because she is going to be asking the questions but if

16  you can try to keep your voice up and keep that mic as

17  close as you can.  All right?

18      THE WITNESS:  Yes, your Honor.

19      THE COURT:  Thank you.

20      MS. TREINIS-GATZ:  May I inquire, your Honor?

21      THE COURT:  Yes, you may.

22      MS. TREINIS-GATZ:  Thank you.

23  DIRECT EXAMINATION

24  BY MS. TREINIS-GATZ:

25  Q.   Mr. Hessle, by whom are you employed?

14

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1    A.    The Department of Justice.

2    Q.    In what capacity?

3    A.    I'm an investigator.

4    Q.    Prior to your employment as an investigator with the

5    Department of Justice, for whom did you work?

6    A.    I worked for the United States Postal Inspection

7    Service as a postal inspector.

8    Q.    For how long were you a postal inspector?

9    A.    About 24 and a half years.

10   Q.    During your tenure at the postal inspection service,

11   did you investigation allegations of fraud in connection

12   with the corporations Last Quarter Coin, American Coin

13   and All American Coin?

14   A.    I did.

15   Q.    Let's refer to these as the subject companies; okay?

16   A.    Okay.

17   Q.    The subject companies, were they located on Long

18   Island?

19   A.    Yes.

20   Q.    And were they involved in the telemarketing of coins

21   between 2001 and 2008?

22   A.    They were.

23   Q.    During your investigation, did you have occasion to

24   learn the name of the owner of the subject companies?

25   A.    I did.

15

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1    Q.    And who was that?

2    A.    Joseph Romano.

3    Q.    Do you see Joseph Romano here in the courtroom?

4    A.    I do.

5    Q.    Can you please point to him in and describe something

6    he is wearing for the Judge?

7    A.    He is sitting at defense table in the orange garb.

8              MS. TREINIS-GATZ:  Your Honor may the record

9    reflect that the witness has identified the defendant

10   Joseph Romano.

11             THE COURT:  Yes, the record will so reflect.

12             MS. TREINIS-GATZ:  Thank you.

13   Q.    During the course of your investigation, did you

14   ascertain if the three subject companies ran their

15   operations in similar fashion?

16   A.    I did.

17   Q.    And did they run in similar fashion?

18   A.    Yes, they did.

19   Q.    Please describe how the subject companies ran their

20   operations generally?

21   A.    In general, they would -- well new salespersons, they

22   would contact based upon lists or leads, as they call

23   them, potential clients to purchase initially rolls of

24   Benjamin Franklin half dollars.  There were twenty coins

25   in a roll.  What they would do once they established a

Transcription Plus II        Rosalie Lombardi

16

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  new client, which was called the openings, they would

2  turn over the new clients to more experienced salesmen

3  who would attempt to sell more expensive coins and also

4  initiate an investor pitch which was followed by a

5  closing for each of the transactions.

6  Q.   So there was an opener and a closer; is that right?

7  A.   That's correct.

8  Q.   And the opener's used a pitch?

9  A.   Yes, the pitch that was used primarily in those cases

10  involved statements made by the sales persons to the

11  potential clients which would say that they had just

12  returned from a Las Vegas show and they had purchased a

13  huge horde of rolls of these Benjamin Franklin half

14  dollars which hadn't seen the light of day in many, many

15  years.  And that these coins were stored in a vault which

16  was downstairs from the establishment and that they would

17  personally select these coins and things of that nature.

18  Q.   And that was the opening used for all of the subject

19  companies; is that right?

20  A.   Yes.

21  Q.   And again, you indicated there was closing pitches;

22  is that right?

23  A.   Yes.

24  Q.   And with respect to these three companies, the fraud

25  involved with respect to the investor pitch and the

17

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  complete roll set pitch; is that right?  And again, we're

2  just talking about the subject companies.

3  A.   That's correct.

4  Q.   And just briefly describe what the complete roll set

5  fraud is and the complete rules -- the investor fraud

6  pitch; those two pitches.

7  A.   In reference to the complete set, once the more

8  experienced salesman came on board to talk with the newly

9  established clients, they would impress upon the clients

10  the need to establish a complete roll set meaning one

11  roll of Benjamin Franklin half dollars that was minted

12  from each year during the mintage of the entire series.

13  So for Benjamin Franklin half dollars, it would be from

14  1948 through 1963.  And it was impressed upon the client

15  the need that if you had this entire set, that it would

16  increase in value far greater than if they just had a few

17  individual rolls.

18      The second part of the investor scheme involved the

19  telling by the sales persons that they had investors

20  lined up for the clients.  That once they completed these

21  sets of rolls of coins, that they had investors that were

22  going to purchase the coins back from them at a

23  significant profit.

24  Q.   So the pitches involving selling as many coins as

25  possible, telling the investor that it's -- their

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  collection is worth a lot more and by the way, we have

2  people that are scheduled to buy it once you complete the

3  roll set?

4  A.   That's correct.

5  Q.   Okay.  Now did the companies use the same source of

6  supply for coins, the three subject companies?

7  A.   Yes.

8  Q.   And was Arizona Coin Exchange one of those suppliers?

9  A.   Yes, it was.

10 Q.   And were the methods of shipping coins and receiving

11 checks the same for the three subject companies?

12 A.   Yes.

13 Q.   Now I direct your attention to November 25, 2008.

14 Were you involved in the arrest of Joseph Romano?

15 A.   I was.

16 Q.   And were you present in court when Joseph Romano was

17 arraigned by Judge Tomlinson on a complaint charging him

18 with mail fraud?

19 A.   I was.

20 Q.   Do you recall that there was a condition of

21 Mr. Romano's bond regarding telemarketing?

22 A.   Yes, ma'am.

23        MS. TREINIS-GATZ:  Your Honor, may I approach

24 the witness?

25        THE COURT:  Yes.

Transcription Plus II      Rosalie Lombardi

19

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1    Q.    I show you Government Exhibit 1 for identification.

2    Do you recognize Government Exhibit 1 for identification?

3    A.    I do.

4    Q.    And what is that?

5    A.    This is the bond agreement between the United States

6    and Joseph Romano.

7            MS. TREINIS-GATZ:   Your Honor, I offer

8    Government Exhibit 1 in evidnecen.

9            MR. CARNESI:   No objection.

10           THE COURT:   All right.  Government Exhibit 1 is

11    in evidence.

12    (Government Exhibit 1 is marked in evidence.)

13    Q.    Investigator Hessle, can you read into the record

14    condition number 6, please?

15    A.    Condition number 6 states that, "refrain from

16    telemarketing activity of any kind."

17    Q.    Thank you.  Now I direct your attention to January

18    12, 2010.  Did you have occasion to speak to a

19    cooperating witness who we will refer to as cooperating

20    witness 1?

21    A.    I did.

22    Q.    And is he a former sales person of the subject

23    companies?

24    A.    Yes.

25    Q.    And what did cooperating witness 1 tell you?

Transcription Plus II        Rosalie Lombardi

Mr. Hessle - Direct - Ms. Treinis-Gatz

1  A.    He said that in late 2008 or early 2009, December of

2  January, to be exact, he was approached by Mr. Romano and

3  told by Mr. Romano that he was going to open a

4  telemarketing coin operation in Florida and asked if the

5  cooperating witness would like to work for him in

6  Florida.

7  Q.    Now did the cooperating witness go to Florida to work

8  for Joseph Romano as a telemarketer?

9  A.    No.

10 Q.    I direct your attention to late December 2009 into

11 early January 2010.  Did you have occasion to speak with

12 a second cooperating witness, cooperating witness 2?

13 A.    I did.

14 Q.    And what did he tell you about Joseph Romano?

15 A.    That during the course of a business transaction in

16 the fall of 2009, he at the request of Mr. Romano, went

17 to Collectible Coins and had a discussion with him about

18 a business transaction.

19 Q.    And did the cooperating witness tell you that he went

20 to 1300 Northwest 17th Avenue, Suite 218 in Del Ray

21 Beach, Florida?

22 A.    Yes.

23 Q.    And that that was the business called Collectible

24 Coins?

25 A.    That is correct.

21

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.    And did the cooperating witness 2 describe for you

2  the inside of Collectible Coins?

3  A.    He described the interior of Collectible Coins as

4  having been set up for a telemarketing operation having

5  phones and a number of tables inside.

6  Q.    Did the cooperating witness tell you that he had

7  occasion -- did he meet with Joseph Romano on that day in

8  the fall of 2009?

9  A.    He did.

10 Q.    That's cooperating witness 2?

11 A.    Yes, ma'am.

12 Q.

13 And did he tell you that he returned to Collectible

14 Coins, Inc. at a later date?

15 A.    He did.

16 Q.    And what did he tell you he observed at the later

17 date?

18 A.    That there were telemarketers on the phone while he

19 was there.

20 Q.    Now did the cooperating witness 2 tell you if Joseph

21 Romano discussed his roll in Collectible Coins, Inc. or

22 CCI with cooperating witness 2?

23 A.    He did.

24 Q.    And what did the cooperating witness 2 tell you?

25 A.    That Mr. Romano said it was his company.

Transcription Plus II        Rosalie Lombardi

22

Mr. Hessle - Direct - Ms. Treinis-Gatz

1  Q.    Now did you check with the Florida Department of

2  Corporations to see to whom the business CCI was

3  registered?

4  A.    I did.

5  Q.    And who was it registered to?

6  A.    To Dejuid, D-e-j-u-i-d  M-i-r-k-o-v-i-c.

7  Q.    Now when was the corporation registered with Florida

8  Department of Corporations?

9  A.    In February of 2009.

10 Q.    Did you have occasion to ascertain if there's a

11 connection between Dejuid Mirkovic and Joseph Romano?

12 A.    Yes, I did.

13 Q.    And what is their relationship, if any?

14 A.    They happen to be very good friends and Mr. Mirkovic

15 resides next door to a property that Mr. Romano owns.

16 Q.    Now were you able to ascertain Mr. Mirkovic's prior

17 employment before opening this -- excuse me, before

18 registering this coin company?

19 A.    I did.

20 Q.    What did Mr. Mirkovic do before registering this coin

21 company?

22 A.    He sold automobiles for Mulroney Ford (ph.) in

23 Florida.

24 Q.    Were you able to locate any information about Mr.

25 Mirkovic having any experience in the coin business prior

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  to opening this business?

2  A.   No.

3  Q.   Excuse me, prior to registering this business with

4  the Florida Department of Corporations?

5  A.   No, I didn't.

6  Q.   Now when you spoke with cooperating witness 2, did he

7  provide you with a cell phone number that Joseph Romano

8  gave him?

9  A.   He did.

10  Q.   And what was that number?

11  A.   Area code 954-254-6418.

12  Q.   Now I show you Government Exhibit 85 for

13  identification and ask you if you recognize it and what

14  you recognize it to be.

15  A.   This is the subscriber information from AT&T for cell

16  phone number 954-254-6418.

17       MS. TREINIS-GATZ:  I offer it in evidence, your

18  Honor.

19       MR. CARNESI:  No objection.

20       THE COURT:  All right.  Government Exhibit 85

21  is in evidence.

22  (Government Exhibit 85 is marked in evidence.)

23  Q.   Now Government Exhibit 85 indicates the subscriber

24  information for 954-254-6418; does it not?

25  A.   Yes, it does.

24

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.   And who is that phone registered to?

2  A.   To Dejuid Mirkovic.

3  Q.   And what address is the phone registered to?

4  A.   1300 N.W. 17th Avenue, Del Ray Beach, Florida.

5  Q.   And that's Collectible Coins, Inc. address?

6  A.   That's the address of Collectible Coins, Inc.  That's

7  (inaudible).

8  Q.   Now when was the cell phone number that was just

9  discussed in Government Exhibit 85 registered to

10 Mr. Mirkovic?

11 A.   November 10, 2009.

12 Q.   Now did you analyze the phone records of what we'll

13 refer to as the Mirkovic cell phone?  Did you analyze the

14 records of this phone?

15 A.   I did.

16 Q.   I am going to hand you Government Exhibit 18, 20, 21,

17 22, 23, 24, 25, 26 and 27 and ask you to look at these

18 records collectively and tell me what they are, please.

19 A.   These exhibits are all extrapolations of the records

20 received from AT&T for phone number 954-254-6418.

21        MS. TREINIS-GATZ:  Your Honor, I offer these in

22 evidence as Government Exhibits 18, 20 through 27.

23        MR. CARNESI:  No objection.

24        THE COURT:  All right.  Government Exhibit 18

25 and Government Exhibits 20 through 27 are in evidence.)

Transcription Plus II        Rosalie Lombardi

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  (Government Exhibits 18, 20 through 27 are marked in

2  evidence.)

3          MS. TREINIS-GATZ:  Thank you.

4  Q.   I ask you to look first at Government Exhibit 18.

5  Now can you tell me what the spreadsheet of phone calls

6  represents?

7  A.   That's the --

8  Q.   It's a two paged document; is it not?

9  A.   Yes, ma'am.

10 Q.   Okay.

11 A.   These are calls made between Joseph Romano's CCI cell

12 phone and Mr. Charles Carnesi's cell phone.

13 Q.   Now when we're talking about the cell phone, we're

14 talking about cell phone number 954-254-6418 registered

15 to Mr. Mirkovic; is that right?

16 A.   Yes, it is.

17 Q.   Okay.  And there's multiple calls between this cell

18 phone and Mr. Carnesi's cell phone?

19 A.   Yes.

20 Q.   Okay.  Directing your attention to Government Exhibit

21 20, can you describe for the Judge what these cell phone

22 numbers represent?

23 A.   These are calls between Mr. Romano's cell phone and

24 the Arizona Coin Exchange.

25 Q.   And that's as you testified earlier, a wholesale coin

26

Mr. Hessle - Direct - Ms. Treinis-Gatz

1  distributor?

2  A.    That's correct.

3  Q.    And they were one of the distributors for the subject

4  companies that we mentioned earlier?

5  A.    Yes.

6  Q.    Directing your attention to Government Exhibit 21.

7  What do these phone calls represent?

8  A.    These are calls between Mr. Romano's cell phone and

9  an individual named Russell Barnes.

10  Q.    Is Russell Barnes a co-defendant of Mr. Romano?

11  A.    He is.

12  Q.    Directing your attention to Government Exhibit 22,

13  what do these phone calls represent?

14  A.    These are calls between Mr. Romano's cell phone and

15  Mr. Romano's brother, Vincent.

16  Q.    And is he a co-defendant of Mr. Joseph Romano's,

17  Vincent Romano?

18  A.    He is.

19  Q.    Government Exhibit 23, what is this a record of?

20  A.    These are records of calls between Mr. Romano's cell

21  phone and Mr. Romano's brother Salvatore.

22  Q.    Salvatore Romano is a co-defendant of Joseph Romano?

23  A.    That's correct.

24  Q.    And there are five pages of phone calls; is that

25  right -- excuse me, more than that.  There are multiple

27

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1   pages of phone calls?

2   A.   There are more than five. I count 13.

3   Q.   okay.  Directing your attention to Government Exhibit

4   25, what do these calls represent?

5   A.   24?

6   Q.   I'm sorry, 24; yes.  I'm sorry, Government Exhibit

7   24.

8   A.   Exhibit 24 is a record of cell calls made between

9   Mr. Romano's cell phone and Mr. Romano's sister, Ceila

10  Wells.

11  Q.   Government Exhibit 25, what do these represent?

12  A.   These are calls made between Mr. Romano's cell phone

13  and Mr. Romano's parents on Long Island.

14  Q.   And Government Exhibit 26?

15  A.   Calls between Mr. Romano's cell phone and a tenant of

16  Mr. Romano's, Stacey Lane (ph.).

17  Q.   And is that -- is she renting a property from

18  Mr. Romano on Long Island?

19  A.   Yes.

20  Q.   Government Exhibit 27, please; what does that

21  represent?

22  A.   These are calls between Mr. Romano's cell phone and

23  his residence in Florida.

24  Q.   And how many pages -- are the calls to his home from

25  his cell phone?

28

Mr. Hessle - Direct - Ms. Treinis-Gatz

1  A.    I believe there are two.

2  Q.    Now all of the calls that we have just discussed in

3  Government Exhibits 18 and 20 through 27 are calls from

4  the cell phone registered to David Mirkovic at CCI and

5  between all of the individuals that you've jut discussed;

6  is that right?

7  A.    That's correct.

8  Q.    Now after reviewing the records, what did you

9  conclude about this cell phone?

10  A.    That it was used by Joseph Romano.

11  Q.    Now during your investigation into CCI, did you have

12  occasion to speak with the owner or landlord of the

13  premises where CCI is located, 1300 N.W. 17th Avenue,

14  Suite 218 in Del Ray Beach, Florida?

15  A.    I did.

16  Q.    And what is the name of the management company?

17  A.    Del Ray --

18  Q.    I'm sorry, the name of the landlord management

19  company?

20  A.    It's Del Ray Management, I think or --

21  Q.    Is it the Newman Group (ph.)?

22  A.    The Newman Group is the name of the company that is

23  affiliated with the landlord.  The name of the building

24  itself, that 1300 is -- I'm sorry, ask the question

25  again.

29

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1   Q.   The building -- is the building name the Del Ray

2   Professional Center?

3   A.   Yes, it is.

4   Q.   And the management company is the Newman Group?

5   A.   That's correct.

6   Q.   Okay.  Thank you.

7        Now did the landlord provide you with two leases for

8   Suite 218?

9   A.   He did.

10  Q.   I'm going to show you Government Exhibits 2 and 3.

11  Do you recognize what's depicted in those exhibits?

12  A.   Yes, these are the leases that were provided.

13  Q.   By Mr. Newman?

14  A.   That's correct.

15  Q.   Now directing your attention --

16          MS. TREINIS-GATZ:  May I move these into

17  evidence, your Honor, as Government Exhibit 2 and 3,

18  please?

19          THE COURT:  Any objection?

20          MR. CARNESI:  No, your Honor.  I am sorry.

21          THE COURT:  All right.  Governments Exhibit 2

22  and 3 are in evidence.

23  (Government Exhibits 2 and 3 are marked in evidence.)

24  Q.   Now specifically looking at Government Exhibit 2,

25  what is the lease date and for what period does this

Transcription Plus II       Rosalie Lombardi

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  lease cover?

2  A.    The date of the lease is January 16, 2009 for a

3  period of February 1, 2009 with an expiration date of

4  July 31, 2009.

5  Q.    And I direct your attention to page 2 of the exhibit,

6  the top of the exhibit.  Who does it indicate that the

7  lessee or tenant for this building is, this offices

8  (sic)?

9  A.    Joseph Romano.

10  Q.    Now I direct your attention to pages 4 and 30 of this

11  exhibit, Government Exhibit 2.  Whose signature is on

12  pages 4 and 30?

13  A.    Joseph Romano.

14  Q.    During the course of the investigation into the

15  subject companies, did you become familiar with Joseph

16  Romano's signature and handwriting?

17  A.    I did.

18  Q.    Did you review -- can you give an estimate of the

19  amount of documents you reviewed with his handwriting or

20  his signature?

21  A.    Well it has to be several thousand.

22  Q.    Now I direct your attention back to Government

23  Exhibit 2.  On every page of this 30 paged document,

24  there are initials at the bottom right corner.  What are

25  the initials?

31

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1    A.    JR, for Joseph Romano.

2    Q.    Now did you speak with the landlord about this lease?

3    A.    I did.

4    Q.    And did he tell you the name of the tenant for Suite

5    218?

6    A.    Yes.

7    Q.    And who did he say was the tenant?

8    A.    Joseph Romano.

9    Q.    Now directing your attention to Government Exhibit 3,

10   is this the second lease?  Is this the second lease?

11   A.    Yes, ma'am.

12   Q.    And what is the lease date and for what time period

13   does it cover?

14   A.    The date of the lease is August 1, 2009 for a period

15   commencing August 1, 2009 through July 31, 2012.  It's a

16   three year lease.

17   Q.    Now I direct your attention to page 2, who is listed

18   as a tenant for this building?

19   A.    The tenant is listed as Collectible Coins, Inc..

20   Q.    I direct your attention to page 2, section 4 which

21   discusses the security deposit.  Who does it indicate put

22   down the security deposit?

23   A.    Joseph Romano.

24   Q.    Does it indicate it was transferred from the first

25   lease to this lease?

32

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  A.    That's correct.

2  Q.    And does Joseph Romano's signature appear beneath

3  section 4?

4  A.    It is.

5  Q.    Directing your attention to page 3 of this document,

6  section 42, who does it indicate that the guarantor on

7  the lease is?

8  A.    Joseph Romano.

9  Q.    Now going -- directing your attention to page 4,

10  whose name is crossed out as the tenant?

11  A.    Joseph Romano.

12  Q.    And whose name is written below that?

13  A.    Dave Mirkovic.

14  Q.    And does it say Collectible Coins above?

15  A.    Yes, it does.

16  Q.    Now did you have occasion to ascertain whether or not

17  this signature on this document at page 4 is a signature

18  on a stamp.

19  A.    It's a stamp.

20  Q.    And how did you learn that?

21  A.    You could tell from the ink that was left behind, in

22  addition to the signature itself.

23  Q.    It's like a square box around the signature?

24  A.    The darkened area; yes.

25  Q.    Now did the landlord provide you with any other

33

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  documentation regarding Joseph Romano and suite 218?

2  A.    He did.

3  Q.    I'm showing you Government Exhibit 4 and 5 for

4  identification and ask you to state for the record what

5  these are.

6  A.    These are emails between the landlord and Joseph

7  Romano.

8  Q.    I direct your attention --

9          MS. TREINIS-GATZ:  May I move these into

10  evidence, your Honor, as Government Exhibit 4 and 5,

11  please?

12          THE COURT:  Any --

13          MR. CARNESI:  No objection.

14          THE COURT:  All right.  Government Exhibit 4

15  and 5 are in evidence.

16  (Government Exhibits 4 and 5 are marked in evidence.)

17  Q.    I direct your attention to Government Exhibit 4, is

18  this an email from Steven Newman the owner of the suite

19  218 and Joseph Romano?

20  A.    It is.

21  Q.    And is it dated Tuesday, June (sic) 5, 2010?

22  A.    It is -- no, January 5.

23  Q.    I'm sorry, January 5, 2010.  Can you describe

24  basically what this email requests?

25  A.    It's a rent reminder.

34

Mr. Hessle - Direct - Ms. Treinis-Gatz

1  Q.   From the landlord to Joseph Romano?

2  A.   That's correct.

3  Q.   And what does Joseph Romano say in response to the

4  request for the rent?

5  A.   "I just got back and I am leaving again tomorrow but

6  writing the check now.  I will see you when I get back.

7  Joe."

8  Q.   Now directing your attention to Government Exhibit 5.

9  Is this also an email from Steve Newman to Joseph Romano?

10  A.   It is.

11  Q.   Also requesting the February rent?

12  A.   That's correct.

13  Q.   And is that February 2010?

14  A.   Yes, ma'am.

15  Q.   And the prior exhibit is January 2010; is that right?

16  A.   Yes.

17  Q.   Exhibit 4?

18  A.   Yes, ma'am.

19  Q.   Now what email address is used for Joseph Romano in

20  Exhibits 4 and 5?

21  A.   JosephRomano117@MSN.com.

22  Q.   Did you contact MSN to determine who's registered the

23  email, JosephRomano117@MSN.com?

24  A.   I did.

25  Q.   And did you receive a reply to the subpoena?

Transcription Plus II        Rosalie Lombardi

35

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  A.    Yes.

2  Q.    I'm showing you Government Exhibit 6.  Is that what

3  you were sent by MSN?

4  A.    It is.

5         MS. TREINIS-GATZ:  And I offer that into

6  evidence, your Honor, as Government Exhibit 7 -- excuse

7  me, 6.

8         MR. CARNESI:  No objection.

9         THE COURT:  All right.  Government Exhibit 6 is

10  in evidence.

11  (Government Exhibit 6 is marked in evidence.)

12  Q.    And the , JosephRomano117@MSN.com is registered to

13  whom?

14  A.    To Joseph Romano who lives in the state of Florida at

15  zip code 33467.

16  Q.    Now when it Joseph Romano's date of birth?

17  A.    1-17-63.

18  Q.    Now did you have occasion to review a check written

19  on CCI's bank account to pay the January 2010 rent?

20  A.    I did.

21  Q.    I'm showing you Government Exhibit 7 for

22  identification and ask you if you recognize that.

23  A.    I do.

24  Q.    What is Government Exhibit 7?

25  A.    It's a series of three checks drafted on the account

36

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  of Collectible Coins.

2          MS. TREINIS-GATZ:  Your Honor, I offer this

3  exhibit into evidence as Government Exhibit 7.

4          MR. CARNESI:  No objection.

5          THE COURT:  All right.  Government Exhibit 7 is

6  in evidence.

7  (Government Exhibit 7 is marked in evidence.)

8  Q.    Now directing your attention to check number 1126, is

9  that a check written on Collectible Coins' bank account

10  to pay the rent and it's dated January 5, 2010?

11  A.    It is.

12  Q.    And is that the same day that Mr. Romano emailed the

13  landlord that I am going to send you a check?

14  A.    It is.

15  Q.    Who appears to have signed check number 1126?

16  A.    It appears to be the stamp of Dejuid Mirkovic.

17  Q.    Now did you have occasion to speak with the landlord

18  specifically regarding to whom he dealt with regarding

19  that property between January 2009 and February 2010 for

20  collecting rent and other issues?

21  A.    I did.

22  Q.    And who did he say he dealt with?

23  A.    Joseph Romano.

24  Q.    Now did you also ask the landlord if this space,

25  suite 218, was sublet by Joseph Romano to anyone else?

37

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1   A.   I did.

2   Q.   And what did the landlord tell you?

3   A.   NO.

4   Q.   NO, it was not sublet?

5   A.   It was not sublet.

6   Q.   Now did you have occasion to do a web search to

7   determine if Collectible Coins, Inc. or CCI had a

8   website?

9   A.   I did.

10  Q.   What did discover?

11  A.   I discovered that they had a website called

12  Collectible Coins.

13  Q.   Showing you Government Exhibit 8 for identification

14  and asking you if you recognize this.

15  A.   I recognize this.

16  Q.   And what is Government Exhibit 8?

17  A.   This is a snapshot of the website for Collectible

18  Coins, Inc.

19  Q.   Taken from the web?

20  A.   Taken from the web.

21          MS. TREINIS-GATZ:  I offer Government Exhibit 8

22  in evidence.

23          MR. CARNESI:  That's fine.

24          THE COURT:  I'm having -- your voice is

25  trailing off.  I am sorry.

Transcription Plus II          Rosalie Lombardi

38

Mr. Hessle - Direct - Ms. Treinis-Gatz

1      THE WITNESS:  It's a --

2      THE COURT:  It's a snapshot of what?

3      THE WITNESS:  Of the website for Collectible

4  Coins.

5      THE COURT:  Thank you.

6  Q.  Of the home page; is that right?

7  A.  Yes, ma'am.

8      MS. TREINIS-GATZ:  Your Honor, I offer this

9  into evidence as Government Exhibit 8.

10      MR. CARNESI:  No objection.

11      THE COURT:  All right.  Government Exhibit 8 is

12  in evidence.

13  (Government Exhibit 8 is marked in evidence.)

14  Q.  What is the number that CCI advertises on their

15  website as a contact number for potential customers?

16  A.  Area code 561-272-2721.

17  Q.  Is that a land line?

18  A.  Yes, ma'am.

19  Q.  And did you subpoena the phone records for that

20  phone?

21  A.  I did.

22  Q.  I'm showing you Government Exhibit 19 for

23  identification and I ask you if you recognize what this

24  is.

25  A.  I recognize this.

Transcription Plus II        Rosalie Lombardi

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.    What is that exhibit, Government Exhibit 19?

2  A.    This is a record of calls made between Collectible

3  Coins' office phone and Mr. Charles Carnesi's law office.

4         MS. TREINIS-GATZ:  Your Honor, I offer this in

5  evidence as Government Exhibit 19.

6         MR. CARNESI:  No objection.

7         THE COURT:  All right.  Government Exhibit 19

8  is in evidence.

9  (Government Exhibit 19 is marked in evidence.)

10 Q.    Now I direct your attention to February 2, 2010.  Did

11 a postal inspector set up surveillance of CCI's office at

12 1300 N.W. 17th Avenue in Del Ray Beach?

13 A.    Yes, ma'am.

14 Q.    What did the postal inspector observe?

15 A.    On two occasions, he observed Mr. Romano at the

16 location coming out of the building.

17 Q.    CCI's offices?

18 A.    At the location of CCI; yes.

19 Q.    And did the inspector take photographs of Joseph

20 Romano at Collectible Coins?

21 A.    He did.

22 Q.    I'm showing you Government Exhibits 9 through 17.  I

23 ask you if you recognize these and what they are.

24 A.    With the exception of Government Exhibit 9 which is a

25 photograph of the building at 1300 N.W. 17th Avenue, the

40

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1    remaining photographs contain pictures of Mr. Romano and

2    Mr. Mirkovic exiting 1300 N.W. 17th Avenue.

3              MS. TREINIS-GATZ:  I offer these in evidnece,

4    your Honor, as Government Exhibits 9 through --

5              THE COURT:  17.

6              MS. TREINIS-GATZ:  --17.  Thank you.

7              MR. CARNESI:  I have no objection, Judge, but I

8    am sorry, I missed the date that the photographs were

9    taken.

10   Q.    I'm sorry, what date were the photographs taken?

11   A.    February 2.

12             MR. CARNESI:  February 2.

13   Q.    2010?

14   A.    2010.

15             THE COURT:  All right.  Government Exhibits 9

16   through 17 are in evidence.

17   (Government Exhibits 9 through 17 are marked in

18   evidence.)

19   Q.    Do you recognize Mr. Mirkovic and Mr. Romano in the

20   photographs; is that right?

21   A.    I do.

22   Q.    Now did you also have occasion to review the bank

23   records of CCI?  Specifically, the checks written on

24   CCI's Region's bank account and CCI's Bank of America

25   bank accounts?

Transcription Plus II          Rosalie Lombardi

41

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1   A.    Yes, I did.

2   Q.    I'm showing you Government Exhibits 28 through 36 and

3   ask you if you recognize these.

4   A.    I do.

5   Q.    Are those all checks written from CCI's bank

6   accounts?

7   A.    Yes, ma'am.

8          MS. TREINIS-GATZ:  Your Honor, I offer those

9   into evidence please as Government Exhibits -- give me

10  the range again please.

11         THE WITNESS:  28 through 36.

12         MS. TREINIS-GATZ:  Thank you.

13         MR. CARNESI:  No objection.

14         THE COURT:  All right.  Government Exhibits 28

15  through 36 are in evidence.

16  (Government Exhibits 28 through 36 are marked in

17  evidence.)

18  Q.    I'm going to also show you Government Exhibits 41

19  through 70 and 86 and ask you if these are also checks

20  written on Collectible Coins, Inc. accounts to various

21  individuals.

22  A.    They are all drawn on Collectible Coins' accounts.

23         MS. TREINIS-GATZ:  Your Honor, I offer

24  Government Exhibits 41 through 70 and 86 in evidence.

25         MR. CARNESI:  No objection.

Transcription Plus II        Rosalie Lombardi

42

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1    THE COURT:  All right.  Government Exhibits 41

2   through 70 and 86 are in evidence.

3   (Government Exhibits 41 through 70 and 86 are marked in

4   evidence.)

5   Q.    Now directing you back to Government Exhibit 28

6   through 33, what are those checks written on Collectible

7   Coins, Inc.'s account?  Who were those checks written to?

8   A.    Charles Carnesi.

9   Q.    Directing your attention to check number 34, who is

10  that written to?

11  A.    Exhibit 34?

12  Q.    Yes.

13  A.    That's written to Amendola's Fence Company (ph.).

14  Q.    Whose name is noted at the top in handwritten form?

15  A.    Joe Romano and it's annotated balance.

16  Q.    Directing you to Exhibit -- your attention to

17  Government Exhibit 35, Collectible Coins, Inc. check, who

18  is that check written to?

19  A.    This is written to Boca Ballet Theater.

20  Q.    And whose name is annotated on the bottom?

21  A.    Romano.

22  Q.    And check number 36, who was that check written to?

23  A.    Consolidated Edison Company for $100.

24  Q.    ConEd?

25  A.    ConEd.

Transcription Plus II        Rosalie Lombardi

43

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.   In New York?  Yes?

2  A.   It --

3  Q.   ConEd of New York?

4  A.   Consolidated Edison Company of New York, Inc.

5  Q.   And now jumping to check number 41.  Check number 41

6  through 45, these are all checks written to Chase Home

7  Finance; is that right?

8  A.   That's correct.

9  Q.   On the Collectible Coins, Inc. account?

10  A.   Yes, ma'am.

11  Q.   Paying Joseph Romano's mortgage?

12  A.   It's not annotated as paying Joseph Romano's office

13  -- mortgage but it was confirmed with Chase that that's

14  the purpose or that's what these checks were used for.

15  Q.   And they're all in the Collectible Coins, Inc.

16  account?

17  A.   Yes, ma'am.

18  Q.   Check number 46 written to Russell Barnes?

19  A.   Yes, ma'am.

20  Q.   Is that right?

21  A.   That's correct.

22  Q.   Now directing your attention check number 47 and 48,

23  who were these checks written to on the Collectible

24  Coins, Inc. account?

25  A.   And 49?

Transcription Plus II        Rosalie Lombardi

44

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1   Q.   Yes, sorry, 47, 48 and 49.

2   A.   47, 48 and 49 are payable to Palm Beach Flight

3   Training.

4   Q.   Did the investigation reveal who these checks --

5   whose flight training these checks paid for?

6   A.   Yes, Joseph Romano's.

7   Q.   Directing your attention to Exhibit 50, check written

8   to Stacy Lane; is that right?

9   A.   Yes, ma'am.

10  Q.   And who is she?

11  A.   She is a renter of a house that Mr. Romano owns.

12  Q.   Check number 51 through 54, checks written to --

13  you'll have to say the name and spell it, please.

14  A.   It's Jimmy, first name, last name is Bartheleus -- it

15  looks like B-a-r-t-h-e-l-e-u-s.

16  Q.   And did the investigation reveal that he did work for

17  Mr. Romano?

18  A.   He did.

19  Q.   In fact, these checks were payment for furniture

20  frames that Mr. Romano ordered?

21  A.   That's correct.

22  Q.   For his personal use?

23  A.   Yes, ma'am.

24  Q.   Directing your attention to Government Exhibit 55

25  through 63 to Millennium Custom Auto written on the

45

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Collectible Coins, Inc. account?

2  A.    Yes.

3  Q.    Did the investigation reveal whose car was being

4  customized at Millennium?

5  A.    Yes, the owner of the company said that they were Joe

6  Romano's vehicles.

7  Q.    Directing your attention to Government Exhibit 64.

8  Were you able to verify the Collectible Coins, Inc. check

9  to Roman Upholstery, whose chairs were being upholstered?

10  A.    Yes, ma'am, Mr. Romano's.

11  Q.    I direct your attention to Government Exhibit 65,

12  Creative Furniture Restorations.  Did the owner verify

13  who that check was payment for whose work on whose

14  furniture?

15  A.    I'm sorry which exhibit were you talking about?

16  Q.    65.

17  A.    65.

18  Q.    I'm sorry, hold on one second please.  I'm sorry,

19  Keith Classic Restorations.  That's check number 65.

20  A.    Yes, ma'am.

21  Q.    Were you able to verify with the owner whose car was

22  being worked on for this --

23  A.    Yes, it was for Joseph Romano.

24  Q.    Payable on a Collectible Coins, Inc. check?

25  A.    Yes.

46

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.   Now 66 is Creative Furniture Restorations?

2  A.   Yes, ma'am.

3  Q.   Government Exhibit 66 and to whom -- did you speak

4  with the -- did someone speak with the owner of that

5  company?

6  A.   Yes, ma'am.

7  Q.   And who did he indicate this check was payment for?

8  A.   Mr. Romano.

9  Q.   Directing your attention to Government Exhibit 67,

10  68, 69 and 70, to the Elizabeth Condo Association, were

11  you able to verify with the Condo Association who these

12  checks came from?  I'm sorry, 67, 68 and 69 all on

13  Collectible Coins, Inc. accounts.

14  A.   Okay.  What's the question?

15  Q.   Were you able to speak with the Condo Association and

16  verify whose maintenance payments --

17  A.   Yes, they were Joseph Romano's payments.

18  Q.   -- were made with these checks?

19  A.   Yes, ma'am.

20  Q.   Okay.  And going to Government Exhibit 71, what is

21  Government Exhibit -- let me show you Government Exhibit

22  71 for identification and ask you what this is.

23  A.   Exhibit 71 is an analysis of withdrawals from the

24  account of Joseph Romano -- I'm sorry, from the account

25  of Collectible Coins, Inc. for a period of February of

47

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  '09 through January of 2010.

2        MS. TREINIS-GATZ:  Your Honor, I offer this

3  summary chart in evidence as Government Exhibit 71.

4        THE COURT:  Any objection?

5        MR. CARNESI:  Just a moment, Judge.

6        THE COURT:  Sure.

7        MR. CARNESI:  I have no objection, Judge.

8        THE COURT:  All right.  Government Exhibit 71

9  is in evidence.

10 (Government Exhibit 71 is marked in evidence.)

11 Q.   And were you able to verify with American Express

12 whether or not two $3,500 payments were made from

13 Collectible Coins, Inc. to pay Joseph Romano's American

14 Express card?

15 A.   Yes, ma'am.

16 Q.   So in sum, Government Exhibit 71 is all checks

17 payable out of the Collectible Coins, Inc. accounts to

18 Joseph Romano's personal debts?

19        MR. CARNESI:  Objection.

20        THE COURT:  Well why don't we try doing that in

21 a --

22        MS. TREINIS-GATZ:  Sure.

23        THE COURT:  -- revised fashion.

24        MS. TREINIS-GATZ:  Yes.

25 Q.   Could you testify after doing the analysis and

48

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  speaking to all of the payees, whose debts were being

2  paid by the Collectible Coins, Inc. checks listed in

3  Government Exhibit 71?

4  A.   Joseph Romano.

5        MR. CARNESI:  Objection.

6        THE COURT:  Well you're a little later there

7  but I am going to overrule the objection.  You can

8  certainly take care of that on cross-examination.

9        MR. CARNESI:  Thank you.

10 Q.   What's the total amount payable out of the

11 Collectible Coins, Inc. to these individuals?

12 A.   $158,281.

13 Q.   And you've testified that you've contacted these

14 payees to verify that these checks were produced by

15 Joseph Romano; is that right?

16 A.   Well with the exception of Mr. Carnesi's $30,000.

17 Q.   Yes, we understand that.  Thank you.

18      My next question was for checks 28 through 33 were

19 you -- did you ever speak to Mr. Carnesi about whether or

20 not those checks were legal fees or other debts of Joseph

21 Romano?

22 A.   No, but all of the owners of these companies have

23 been spoken with or as annotated on the check, they

24 reflect Joseph Romano's name.

25 Q.   Now were you able to establish any other link to

49

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Collectible Coins, Inc. and Charles Carnesi except Joseph

2  Romano?

3  A.   No, ma'am.

4  Q.   During your investigation, did you learn of the

5  existence of a corporation called Mirk Consulting?

6  A.   Yes.

7  Q.   Who is the registered owner of Mirk Consulting?

8  A.   Dejuid Mirkovic.

9  Q.   Now is there a connection between Mirk Consulting,

10  the company and CCI, the company?

11  A.   Yes, there seems to be based upon the analysis of

12  records, a financial relationship.

13  Q.   Is the registered owner obviously the same for both

14  corporations, Dejuid Mirkovic?

15  A.   Yes, ma'am.

16  Q.   Now is there a financial link between Mirk Consulting

17  and Joseph Romano based on your investigation?

18  A.   Yes.

19  Q.   Did you have occasion to review checks written on

20  Mirk's Consulting Bank of America account?

21  A.   I did.

22  Q.   I show you Government Exhibit 72, 75, 76, 77 and 78.

23  I ask you if you recognize these documents and what they

24  are.

25  A.   I recognize these documents.

50

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.   What are they?

2  A.   These are checks drawn on the account of Mirk

3  Consulting.

4        MS. TREINIS-GATZ:  Your Honor, I offer these

5  into evidence as Government Exhibit 72, 75, 76, 77 and

6  78.

7        MR. CARNESI:  No objection.

8        THE COURT:  All right.  Government Exhibits 72

9  and 75 through 78 are in evidence.

10 (Government Exhibits 72 and 75 through 78 are marked in

11 evidence.)

12 Q.   Who are all of these checks written to from the Mirk

13 Consulting account; that's 72, and 75 through 78?

14 A.   72, 5, 6, 7 and 8 are payable to Unity School.  And

15 each one is annotated in the memo portion as such; Romano

16 -- J. Romano, Romano, Romano and Romano.

17 Q.   Is the Unity School a private school in Florida where

18 Joseph Romano's children attend?

19 A.   I am assuming that it is.  I don't know for sure.

20 Q.   Well you know they attend a private school in

21 Florida; do you not?

22 A.   Yes.

23 Q.   And you know all of these checks say Romano on them;

24 do you not?

25 A.   Yes, they do.

Transcription Plus II        Rosalie Lombardi

Mr. Hessle - Direct - Ms. Treinis-Gatz

1    Q.    Now showing you Government Exhibit 73 and 74 for

2    identification and ask you if you recognize these.    I

3    think I may have given you 74 already. Government Exhibit

4    73 and 74, what are those?

5    A.    These are also two checks drawn on the account of

6    Mirk Consulting.

7            MS. TREINIS-GATZ:  Your Honor, I offer

8    Government Exhibits 74 and 73 in evidence.

9            MR. CARNESI:  No objection.

10            THE COURT:  All right.  Government Exhibit's 73

11    and 74 are in evidence.

12    (Government Exhibits 73 and 74 are marked in evidence.)

13    Q.    Did you have occasion to speak to Mr. Dwyer (ph.)?

14    A.    I did.

15    Q.    Did he tell you that these checks payable to him on

16    the Mirk Consulting account were payments for work done

17    for Joseph Romano?

18    A.    Yes, ma'am.

19    Q.    I'm showing you Government Exhibit 79 for

20    identification and ask you if you recognize it.

21    A.    I do.

22    Q.    And what is that?

23    A.    This is a check drawn on the personal account at Bank

24    of America of Joseph Romano.

25    Q.    And who is that check made out to?

52

## Mr. Hessle - Direct - Ms. Treinis-Gatz

1   A.    The check is made out to Mirk Consulting.

2           MS. TREINIS-GATZ:  Your Honor, I offer

3   Government Exhibit 79 in evidence.

4           MR. CARNESI:  No objection.

5           THE COURT:  All right.  Government Exhibit 79

6   is in evidence.

7   (Government Exhibit 79 is marked in evidence.)

8   Q.    Showing you Government Exhibit 80 and 81 and ask you

9   if you recognize these.

10  A.    I do.

11  Q.    What are those exhibits?

12  A.    They are two checks drawn on account of Collectible

13  Coins, Inc. and they're payable each fo Mirk Consulting.

14          MS. TREINIS-GATZ:  Your Honor, I offer

15  Government Exhibits 80 and 81 in evidence.

16          MR. CARNESI:  No objection.

17          THE COURT:  All right.  Government Exhibits 80

18  and 81 are in evidence.

19  (Government Exhibits 80 and 81 are marked in evidence.)

20  Q.    Showing you Government Exhibit 82 and ask you if you

21  recognize this exhibit.

22  A.    Yes, I do.

23  Q.    And what is that?

24  A.    This is a summary of the activity of the Mirk

25  Consulting account between May 16 of 2009 and January 29,

Transcription Plus II        Rosalie Lombardi

53

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  2010.

2       MS. TREINIS-GATZ:  Your Honor, I offer the

3  chart in evidence as Government Exhibit 82.

4       MR. CARNESI:  No objection.

5       THE COURT:  All right.  Exhibit 82 is in

6  evidence.

7  (Government Exhibit 82 is marked in evidence.)

8  Q.   Now could you just testify as to the depositors into

9  Mirk Consulting account?

10  A.   Yes, there were three depositors.

11  Q.   And who deposited funds into the Mirk Consulting

12  account?

13  A.   Collectible Coins, David Mirkovic and Joseph Romano.

14  Q.   And the total deposit --

15       THE COURT:  I'm sorry, counsel, could we just

16  -- who prepared this, if we could just get that on the

17  record.

18       MS. TREINIS-GATZ:  Sure.

19       THE COURT:  All right.

20  Q.   Did you prepare this?

21  A.   I prepared this, your Honor.

22       THE COURT:  Very good.  Thank you.

23  Q.   And what is the total sum of the depositions into the

24  Mirk Consulting account?

25  A.   $102,950.

54

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.    Now were you able to go through these disbursements

2  from this account --

3  A.    Yes, ma'am.

4  Q.    -- by reviewing the checks.  How much money came out

5  of this account to pay Joseph Romano's personal expenses?

6  A.    $37, 262,

7  Q.    And how much were used to pay non-Joseph Romano

8  expenses?

9  A.    $11,116.21.

10  Q.    And what were the total disbursements out of this

11  account?

12  A.    $48,378.21.

13  Q.    So of the money that came into this account, how much

14  were used to pay Joseph Romano's personal expenses with

15  respect to disbursements?

16  A.    About 75 percent.

17  Q.    I'll show you Government Exhibit 83 for

18  identification and ask you if you recognize it.  What is

19  Government Exhibit 83 and do you recognize it?

20  A.    Yes, I do.  It's a spreadsheet that I created,

21  depicting the deposits into Mr. Romano's Bank of America

22  account.

23         MS. TREINIS-GATZ:  Your Honor, I offer this in

24  evidence as Government Exhibit 83.

25         MR. CARNESI:  No objection.

Transcription Plus II       Rosalie Lombardi

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1    THE COURT:  All right.  Government Exhibit 83

2  is in evidence.

3  (Government Exhibit 83 is marked in evidence.)

4  Q.    Between June of 2009 and February of 2010, how much

5  cash was deposited into Joseph Romano's personal Bank of

6  America account?

7  A.    $61,085.

8  Q.    And the balance of the deposits in his account are

9  for what -- from where?

10  A.    It's -- the balance of the deposits is $10,000

11  representing two $5,000 payments from a property he owns

12  in Manhattan.

13  Q.    And the rest of the payments are rental payments from

14  his various properties?

15  A.    Yes, ma'am.  Except for -- I see there's a rebate

16  check from Florida Power and Light, a rebate check from

17  ConEd and a deposit of $14,000 from ReMax Services in

18  Florida.

19  Q.    Now I direct your attention to Government Exhibit 84

20  and ask you if you recognize this.

21  A.    I do.

22  Q.    What is Government Exhibit 84?

23  A.    This is a spreadsheet or actually it's two

24  spreadsheets that I developed, the first reflecting the

25  withdrawals of the -- I'm sorry, the checks issued from

Transcription Plus II        Rosalie Lombardi

56

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1   the Collectible Coins, Inc. accounts made out to cash and

2   a chart reflecting deposits into other accounts on the

3   second part of the spreadsheet.

4   Q.   But this is all Government Exhibit 84; is it not?

5   A.   It is.

6          MS. TREINIS-GATZ:  Your Honor, I offer this

7   into evidence as Government Exhibit 84.

8          MR. CARNESI:  No objection.

9          THE COURT:  All right.  Government Exhibit 84

10  is in evidence.

11  (Government Exhibit 84 is marked in evidence.)

12  Q.   Now did you have a chance during your investigation

13  to ascertain how much -- how many checks were written on

14  the Collectible Coins, Inc. account to cash?

15  A.   Yes, the amount is $133,048.

16  Q.   Were you also able to ascertain who cashed these

17  checks?

18  A.   All with the exception of perhaps a handful, maybe

19  12, all of them had been cashed by Dejuid Mirkovic.

20  Q.   And how do you know that?

21  A.   In the endorsement section on the reverse of the

22  check, the State of Florida requires a driver's license

23  be presented and the last four digits of the driver's

24  license are recorded on the check.  On each of these

25  checks, the last three (sic) digits are 3030 which

57

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  represents Mr. Dirkovic's (sic) --

2  Q.   Mirkovic?

3  A.   Mirkovic's driver's license.

4  Q.   Now were you able to trace the checks written to cash

5  by Mr. Mirkovic and cashed by Mr. Mirkovic?

6  A.   I was.

7  Q.   Were you -- and where did that money go, some of that

8  money, can you explain to the Judge as set forth in the

9  second part of the exhibit?

10  A.   Yes.  Of the checks that were cashed by Mr. Mirkovic,

11  approximately $55,485 was deposited into Mr. Romano's

12  Bank of America account.

13  Q.   As reflected in Government Exhibit --

14  A.   83.

15  Q.   -- 83.

16  A.   Yes.

17  Q.   And how were you able to match up Mr. Mirkovic's

18  writing these checks to cash, cashing them and the money

19  going into Mr. Romano's account?

20  A.   Well, for example, often if a check for argument's

21  sake as an example, December 26, 2009 a check was written

22  in the amount of $3,000 payable to cash, that same day

23  that $3,000 -- that same day, $3,000 in cash was

24  deposited into Mr. Romano's account at Bank of America.

25  Q.   And how often did the dates match up from the time

Transcription Plus II      Rosalie Lombardi

58

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  that Mr. Mirkovic would cash checks written to cash on

2  Collectible Coins, Inc. and then were deposited in

3  Mr. Romano's personal Bank of America account?

4  A.   With very little exception, the deposits are made

5  into the account within, if not the same day, but within

6  a day or so of the issuance of the check.

7  Q.   And these deposits, this is separate and apart from

8  all of the checks written on Collectible Coins, Inc.

9  account that you've testified were to pay Joseph Romano's

10  personal debts?

11  A.   That's correct.

12          MS. TREINIS-GATZ:  I hvae Government Exhibit 86

13  -- your Honor, I have Government Exhibit 86 in evidence

14  but I just want to make sure the Court does.  If not, I

15  need to -- I think I gave that over when I gave 41

16  through 70 and 86.

17          THE COURT:  Let me just check here.

18          (Pause.)

19          THE COURT:  Yes, 86 is in evidence.

20          MS. TREINIS-GATZ:  Okay.  Thank you.

21  Q.   Between the checks written that you were able to

22  verify were for Joseph Romano's personal expenses from

23  Collectible Coins, Inc. and the cash deposits,

24  approximately how much money did Mr. Romano over about a

25  year period take out of Collectible Coins, Inc.?

59

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1   A.   About $250,000.

2   Q.   Did you have occasion to speak with Joe Romano's

3   pretrial services officer in Florida about this matter?

4   A.   Yes.

5   Q.   What did he -- I'm sorry?

6   A.   Yes.

7   Q.   What did his pretrial services officer tell you that

8   Mr. Romano reported about his employment status?

9   A.   He was unemployed.

10   Q.   Now did your investigation reveal that Russell Barnes

11   was acting as a telemarketer for Collectible Coins, Inc.

12   over the time period while he was on bond?

13   A.   Yes, ma'am.

14   Q.   And what is Joseph Romano's relationship with Russell

15   Barnes?

16   A.   I think they have been close friends since their days

17   in the Navy back in the late '80s.

18   Q.   Did Mr. Barnes meet Mr. Mirkovic through

19   Mr. Romano?

20   A.   Yes, ma'am.

21   Q.   And was Mr. Barnes hired to work at CCI through

22   Mr. Romano?

23        MR. CARNESI:   Objection.

24   A.   Yes.

25        MR. CARNESI:   Objection.

Transcription Plus II         Rosalie Lombardi

60

Mr. Hessle - Direct - Ms. Treinis-Gatz

1      THE COURT:  You asked if he was hired

2  through --

3      MS. TREINIS-GATZ:  Mr. Romano.

4      THE COURT:  Mr. Romano?

5      MS. TREINIS-GATZ:  Yes.

6      THE COURT:  Well I think if you stopped and

7  back up a second and give us a little more foundation for

8  that --

9      MS. TREINIS-GATZ:  Okay.

10      THE COURT:  All right.  I will sustain it for

11  now.  Let's try it again.

12      MS. TREINIS-GATZ:  Can I have a moment.

13      (Pause.)

14  Q.   Did you have occasion to speak to Mr. Mirkovic

15  regarding Collectible Coins, Inc. and his relationship

16  with Mr. Barnes?

17  A.   I did.

18  Q.   And who did Mr. Mirkovic tell you was the person who

19  connected Mr. Barnes with Mr. Mirkovic?

20      MR. CARNESI:  Objection.

21      THE COURT:  I'm going to overrule that.

22      MR. CARNESI:  Judge, just so I am clear, the

23  objection was to the leading.  If he wants to testify as

24  to what Mr. Mirkovic, I have no objection.

25      THE COURT:  All right.  That's fair enough.

61

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.   Did you discuss with Mr. Mirkovic, Mr. Barnes?

2  A.   I did.

3  Q.   And what did he tell you about Mr. Barnes?

4  A.   That he met Mr. Barnes through his social visit with

5  Mr. Romano when he bought a car from him as a car

6  salesman. Later on, Mr. Barnes was hired by Collectible

7  Coins through Mr. Romano.

8  Q.   And Mr. Mirkovic told you that?

9  A.   And that Mr. Romano also arranged for Mr. Barnes to

10  have phones installed at a property in Copiague so that

11  Mr. Barnes could work from Long Island marketing for CCI.

12  Q.   Now did you have occasion to interview a telemarketer

13  who worked at Collectible Coins, Inc. during the time

14  period 2010?

15  A.   I did.

16  Q.   And did he tell you that he personally made

17  misrepresentations to potential clients?

18  A.   Yes, ma'am.

19  Q.   Did he also indicate whether or not he heard other

20  telemarketers making misrepresentations to potential

21  clients?

22  A.   (inaudible).

23  Q.   What specifically did Mr. -- excuse me, what

24  specifically did this telemarketer tell you the misreps

25  were in reference to?

### Mr. Hessle - Direct - Ms. Treinis-Gatz

1   A.   They were in reference to the buying back of the

2   coins from the client after they had purchased a number

3   of them.

4   Q.   On completing a roll set?

5   A.   Yes, ma'am.

6   Q.   Now did the telemarketer indicate that he knew Joseph

7   Romano?

8   A.   Yes, he did.

9   Q.   And what did he say about Joseph Romano?

10  A.   That Joseph Romano maintained an office at CCI and

11  that Mr. Romano would speak with the telemarketers about

12  the way to telemarket.

13  Q.   Did he also tell you that Mr. Romano was at the

14  offices of CCI?

15  A.   Yes, ma'am.  That's where the office was.

16  Q.   Now did the postal inspection service review outgoing

17  mail from CCI?

18  A.   Yes, ma'am.

19  Q.   Did they find any of Joseph Romano's personal mail

20  being sent from CCI's offices?

21  A.   Yes, ma'am.

22  Q.   Did you have occasion to interview a 91-year-old man

23  who purchased coins from Russell Barnes while he was

24  working at CCI?

25  A.   Yes, ma'am.

63

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.    Can you tell the Judge basically the

2  misrepresentations that Mr. Barnes made to this

3  individual while he was working at CCI?

4          MR. CARNESI:    Objection.

5          THE COURT:    Well once again, I am sure it's to

6  the leading aspect of the question.    Maybe you can

7  rephrase that.

8          MS. TREINIS-GATZ:    Yes, your Honor.

9  Q.    What did this 91-year-old man tell you that

10  Mr. Barnes told him about the coins?

11  A.    Mr. Barnes told him that he needed to complete this

12  set of Benjamin Franklin half dollars.    And he said that

13  he had buyers that would purchase his coins after he

14  completed this entire set.    He went on to tell the victim

15  that there were in house graders who graded the coins

16  that he was purchasing.

17  Q.    Were you able to verify whether or not there were

18  three in house graders working at Collectible Coins,

19  Inc.?

20  A.    There were no such graders.

21  Q.    Was that a misrepresentation that was used during the

22  sale pitch in the subject companies?

23  A.    Yes, ma'am.

24  Q.    And did this 91-year-old man tell you about

25  Mr. Barnes' promising him to sell his points at some

Transcription Plus II        Rosalie Lombardi

64

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  point?

2  A.   Yes, he said he had buyers that would purchase the

3  coins after he finished the -- collecting the entire set.

4  Q.   And was this the same misrepresentations used by the

5  telemarketers of the subject companies including

6  Mr. Barnes?

7  A.   Yes, the only difference, I don't think he named a

8  buyer.  He just said that there were buyers.

9  Q.   Versus the subject companies where they named buyers?

10  A.   Yes.

11  Q.   Now directing your attention to an 88-year-old man

12  who you spoke with who purchased coins from Collectible

13  Coins, Inc., what did he tell you about his dealings with

14  Collectible Coins, Inc.?

15  A.   He told me essentially the same thing, that he had

16  been contacted by phone to collect these Benjamin

17  Franklin half dollars.  In subsequent calls he was told

18  that the value of the coins had gone up already.  And

19  that when he questioned the salesman about reselling the

20  coins, the salesman told him that the company right now

21  is at its selling season and not it's buying season.  And

22  that they would address the buy back of the coins when

23  the seasons changed.

24  Q.   Did the 88-year-old man have his coins graded?

25  A.   He did.

Transcription Plus II        Rosalie Lombardi

65

**Mr. Hessle - Direct - Ms. Treinis-Gatz**

1  Q.    And what, if anything, did he ascertain about the

2  coins?

3  A.    Well neither the grade nor the amount of value was

4  close to what they stated that they were.

5         MS. TREINIS-GATZ:  Can I have one moment, your

6  Honor?

7         THE COURT:  Yes.

8         (Pause.)

9  Q.    When you spoke to the two elderly individuals, did

10  they indicate to you they were promised a certain grade

11  and worth of a coin?

12  A.    The 91-year-old was getting a little concerned and

13  that's the one that Mr. Barnes dealt with.  He was

14  getting a little concerned because when he received the

15  coins, they didn't contain a grade on the invoice and he

16  repeatedly asked Mr. Barnes to -- Mr. Barnes was using

17  the alias of the name Wilson at the time -- he asked

18  Mr. Barnes if he could see to it that he got some type of

19  a written statement of grading as to the coins he had

20  received.  And he kept putting it off and putting it off

21  and putting it off and he never received that grading

22  system that he wanted.

23  Q.    Is this similar to what victims reported was

24  occurring with the subject companies with respect to the

25  grades?

66

**Mr. Hessle - Cross - Mr. Carnesi**

1  A.   The grades on the coins that were sold on the subject

2  companies had a grade written on the invoice.  In this

3  particular case, there was no invoice -- there was no

4  grade indicated at all on the invoice and that's what

5  triggered this 91-year-old's concern that he was -- he

6  wanted something definitive that he could say they sold

7  me this grade or that grade of coin.

8          MS. TREINIS-GATZ:  I have nothing further,

9  Judge.  Thank you.

10         THE COURT:  All right.  Cross-examination?

11         MR. CARNESI:  Judge, can we take a brief break?

12         THE COURT:  It's got to be very brief.  I have

13  a hearing that's scheduled to start in 20 minutes.

14         MR. CARNESI:  Okay.

15         THE COURT:  So --

16         MR. CARNESI:  I need five minutes.

17         THE COURT:  Five.

18         MR. CARNESI:  Thanks.

19         (Court recessed.)

20  CROSS-EXAMINATION

21  BY MR. CARNESI:

22  Q.   Mr. Hessle, in the course of your examination this

23  morning you told us that you were familiar or you had met

24  an individual by the name of David Mirkovic; is that

25  right?

67

**Mr. Hessle - Cross - Mr. Carnesi**

1  A.    That's correct.

2  Q.    And Mr. Mirkovic, to your knowledge, was the

3  registered owner of Collectible Coins, Inc.; is that

4  right?

5  A.    That's correct.

6  Q.    Okay.  Do you know when Collectible Coins, Inc. was

7  established?

8  A.    It was incorporated in February of 2009.

9  Q.    Okay.  And do you know when it began operation?

10  A.    I think the bank records indicate that the checks

11  started to come in, I think it was in April of 2009.

12  Q.    Okay.  And do you know what location was given as the

13  address for Collectible Coins, Inc. in April or February

14  of 2009 when it was initially established?

15  A.    On the incorporation or the -- I'm not sure.

16  Q.    Let's start with the certificate of incorporation.

17  A.    I believe the certificate of incorporation may have

18  given Mr. Mirkovic's home address as the address listed.

19  Q.    Okay.  Now eventually CCI, Collectible Coins, I'm

20  sorry, takes over a location that had been originally

21  rendered by Mr. Romano; right?

22  A.    That's my understanding; yes.

23  Q.    Okay.  And, in fact, during the course of your

24  examination this morning you were shown to two different

25  leases for that premises; right?

68

**Mr. Hessle - Cross - Mr. Carnesi**

1  A.    That's correct.

2  Q.    Okay.  The first lease was a lease that was issued in

3  February of 2009 and that was issued to Mr. Romano

4  personally.

5  A.    Yes.

6  Q.    Okay.  There comes a time in August of 2009 when that

7  lease or the arrangements under that lease were changed;

8  is that right?

9  A.    Yes.

10  Q.    And it was only in 2009 that Collectible Coins, Inc.

11  -- in, I'm sorry, in August of 2009 on that second lease

12  that Collectible Coins took over that property.

13  A.    Yes.

14  Q.    Okay.  Now you looked at the -- and you can take a

15  look at it again if you need to on Exhibit 3, I guess it

16  is, that second lease, August of 2009, reference was made

17  to a security deposit.

18  A.    That's correct.

19  Q.    Do you remember that?

20  A.    That's correct.

21  Q.    Okay.  And I think on examination by Ms. Gatz, you

22  had said that the security deposit had been made by

23  Joseph Romano.

24  A.    As stated on the lease; yes.

25  Q.    Okay.  What was actually stated was that Mr. Romano

69

**Mr. Hessle - Cross - Mr. Carnesi**

1   had made the security deposit on the original lease in

2   February of 2009; right?

3   A.    Yes.

4   Q.    And that that deposit was being transferred --

5   A.    Yes.

6   Q.    -- on the second lease in 2009.

7   A.    Yes.

8   Q.    As an accounting practice, if you will.

9   A.    Yes.

10          MS. TREINIS-GATZ:  Objection.  Objection to the

11   characterization, your Honor.

12          THE COURT:  Sustained.

13          MR. CARNESI:  Okay.

14   Q.    It was being transferred.  To your knowledge, there

15   was no money that was actually exchanged at that time;

16   right?

17   A.    I am not aware of any; no.

18   Q.    Okay.  Are you aware of whether or not Mr. Mirkovic

19   reimbursed Mr. Romano for that $5,000 security deposit.

20   A.    I have no idea.

21   Q.    Well you do know, do you not, that Mr. Mirkovic over

22   a period of time did give or lend to Mr. Romano a

23   substantial amount of money.

24          MS. TREINIS-GATZ:  Objection to the

25   characterization.

70

**Mr. Hessle - Cross - Mr. Carnesi**

1           THE COURT:  Sustained.  I mean I know it's
2    cross but in the framework of what was asked on direct
3    here, you're going to have to build up to this or lay
4    more of a foundation than you.
5           MR. CARNESI:  Sure.
6    Q.   Did you ever discuss with Mr. Mirkovic why certain
7    checks were issued on behalf of Mr. Romano from that
8    company?
9    A.    Mr. Mirkovic said that Joseph Romano was a friend of
10   his and that he was helping him out.
11   Q.    And what did you understand him to mean by that?
12   A.    That he was telling me that Joe Romano was his
13   friend.  He was a guy in need and that he was making his
14   payments for him.
15   Q.    Okay.  And did you know Mr. Romano at the time when
16   he was originally arrested on these underlying charges to
17   be an individual who had considerable wealth or holdings?
18   A.    Yes.
19   Q.    Okay.  And did you know that as a result of his
20   arrest, that he was no longer very liquid, that his bank
21   accounts had been frozen?
22   A.    Yes.
23   Q.    Okay.  So when Mr. Mirkovic told you that his friend
24   Joseph Romano was in need of assistance to pay bills,
25   that was something that was consistent with your own

71

**Mr. Hessle - Cross - Mr. Carnesi**

1  knowledge, was it not?

2  A.   Yes.

3  Q.   Now you also told us that Mr. Mirkovic had leased or

4  owned a number of cell phones; is that right?

5  A.   That's correct.

6  Q.   Okay.  Do you know how many cell phones he had,

7  Mr. Mirkovic?

8  A.   I don't know exactly how many but I know he had

9  several.

10  Q.   Okay.  And one of those phones we can agree was used

11  by Mr. Romano; right?

12  A.   Yes, sir.

13  Q.   Okay.  And among the people that he called on that

14  phone was myself.  He placed phone calls to my cell

15  phone; right?

16  A.   Yes.

17  Q.   I think you told us the phone calls were also made to

18  his own home.

19  A.   Yes.

20  Q.   To his brother, to his mother.

21  A.   That's correct.

22  Q.   Okay . And would it be fair to characterize those

23  phone calls as basically personal calls?

24  A.   I would assume so.

25  Q.   Okay.

72

**Mr. Hessle - Cross - Mr. Carnesi**

1  A.   I know no different.

2  Q.   Okay.  Now in the course of checking those telephone

3  records, were you ever able to determine that that cell

4  phone was used in any way in the telemarketing activity?

5       MS. TREINIS-GATZ:  Your Honor, I am going to

6  object to the form of the question.

7       THE COURT:  Well the question was was he ever

8  able to determine whether that phone was ever used in the

9  telemarketing business.

10      MR. CARNESI:  Yes.

11      THE COURT:  Is that correct?

12      MR. CARNESI:  Yes.

13      MS. TREINIS-GATZ:  My objection is, your Honor,

14  whether called victims themselves or called Mr. Barnes or

15  made other calls that are -- you know it's telemarketing

16  activities is a loose term.  Does he mean calling victims

17  himself?

18      MR. CARNESI:  Judge, that -- again the question

19  was posed to Mr. Hessle and I am assuming that he can

20  answer the question without being --

21      THE COURT:  All right.

22      MR. CARNESI:  -- things being suggested to him

23  by the assistant United States attorney.

24      THE COURT:  All right.  I will overrule it for

25  now.  Mr. Hessle can answer to the best of his knowledge

Transcription Plus II      Rosalie Lombardi

73

**Mr. Hessle - Cross - Mr. Carnesi**

1   at this point.

2   A.   So far I am not aware of calls made to any clients.

3   The analysis on those phones is -- on those records is

4   not done.  But I don't know if it was or if it wasn't.

5   Q.   Okay.  But as you sit here now, you have no

6   information to the effect that any potential investor or

7   client of Collectible Coins was ever called by Mr. Romano

8   on that phone?

9   A.   No.

10  Q.   Okay.  Now you also referred to a number of emails

11  regarding that leased premises.  Do you recall that?

12  A.   Yes, sir.

13  Q.   Okay.  And the emails were back and forth between

14  Mr. Romano and the owner of the subject premises.

15  A.   That's correct.

16  Q.   Okay.  And it referred to rent being paid.

17  A.   Yes, that's correct.

18  Q.   Now in one of the emails there was reference -- I

19  think if you read it literally to Mr. Romano saying

20  something to the effect that he was writing out a check.

21  A.   I believe that's correct.

22  Q.   Okay.  Did you ever see such a check that was written

23  by Mr. Romano for that rent?

24  A.   I don't believe so; no.

25

74

**Mr. Hessle - Cross - Mr. Carnesi**

1  Q.   Okay.  And, in fact, if you look at the second lease

2  for those premises, the one that was leased, the premises

3  -- I'm sorry.  Withdrawn.  Let me start again.

4      If you look at the second lease, the one that

5  replaced the original lease, there is a reference to a

6  guarantor on that lease.  Did you see that?

7  A.   That's correct.

8  Q.   Okay.  And who was ultimately the person who would

9  have been guaranteeing the lease based on the

10  arrangements of the original lease?

11  A.   I will have to look at --

12  Q.   Sure.  It's Exhibit 3.

13  A.   -- it's Exhibit 3.  According to Petitioner's Exhibit

14  3, the guarantor is Joseph Romano.

15  Q.   Okay.  So would it be fair to say based on those two

16  leases that at a certain point in time around August of

17  2009, the premises was transferred or the lease was

18  transferred from Joseph Romano, who was no longer the

19  primary person on the lease to Collectible Coins under

20  David Mirkovic?

21  A.   Could you --

22  Q.   Sure.

23  A.   -- ask that agin please?

24  Q.   I'm trying to follow the history of the lease.  In

25  February, it's originally leased by Joseph Romano.

75

**Mr. Hessle - Cross - Mr. Carnesi**

1  A.    Uh-huh.

2  Q.    In August, Joseph Romano's lease which was to have

3  run for a substantially longer period of time is now

4  changed.  And Joseph Romano is not the primary person on

5  the lease.  But the property, the lease is being taken

6  over by Collectible Coins and David Mirkovic; right?

7  A.    That's correct.

8  Q.    Okay.  And Joseph Romano no longer being the primary

9  person on the lease is released from that responsibility

10 but must -- but remains as the guarantor on the new

11 lease.

12 A.    I assume that's the way it was supposed to work.

13 Q.    Okay.  Now what's your understanding in the event

14 that the primary person on that lease, Collectible Coins,

15 or David Mirkovic, did not pay the rent, who would then

16 be obligated to pay the rent?

17 A.    Mr. Romano.

18 Q.    Now you also told us that there was surveillance that

19 was conducted in February of 2010 at that location; is

20 that right?

21 A.    That's correct.

22 Q.    Okay.  And, in fact, you had a number of photographs

23 that you looked at.

24 A.    Yes, sir.

25 Q.    And that have been introduced into evidence here.

76

**Mr. Hessle - Cross - Mr. Carnesi**

1  Was surveillance conducted on more than one day?

2  A.   Yes.

3  Q.   Okay.   How many days was surveillance conducted?

4  A.   Two.

5  Q.   Okay.   During that entire period of time, there was

6  only two surveillance conducted?

7  A.   It was February 2 and February 3.

8  Q.   February 2 and February 5?

9  A.   3rd.

10  Q.   I'm sorry, 3rd.

11  A.   February 2 and February 3.

12  Q.   Okay.   Was Mr. Romano observed on that location on

13  both days?

14  A.   No, he was observed on the 2nd.

15  Q.   Okay.   And that's when the photographs were taken;

16  right?   And the photographs show Mr. Romano in the

17  presence of Mr. Mirkovic; right?

18  A.   That's correct.

19  Q.   Okay.   Do you know how long a period of time

20  Mr. Romano remained at that premises before he's observed

21  exiting with Mr. Mirkovic?

22  A.   No, I do not.

23  Q.   Do you know if he went there to pick up Mr. Mirkovic

24  for lunch?

25  A.   I know that he was observed twice during the day.

77

**Mr. Hessle - Cross - Mr. Carnesi**

1  Q.   Okay.

2  A.   He left and he came back and then later on he left --

3  he wasn't observed coming back but he was observed

4  leaving again.

5  Q.   Okay.  Now during that period of time when you

6  observed or I am sorry, whoever the surveillance agents

7  were observed Mr. Romano, did anyone see him involved in

8  any way in the activities of that business?

9  A.   No, sir.

10 Q.   You told us that you had done an analysis of

11 Collectible Coins bank accounts in which you observed

12 there was a number of -- a substantial number of checks

13 that were cashed from that bank account; is that right?

14 A.   That's correct.

15 Q.   Okay. And do you remember as you sit here now how

16 much the total amount was of checks that were actually

17 cashed from that account?

18 A.   I could look it up.

19 Q.   Sure.

20        (Pause.)

21 A.   According to Government Exhibit 84, the checks that

22 were made out to cash from the Collectible Coin accounts

23 is that the --

24 Q.   Yes.

25 A.   -- account in question?

Transcription Plus II       Rosalie Lombardi

78

**Mr. Hessle - Cross - Mr. Carnesi**

1  Q.   Yes.

2  A.   $133,048.

3  Q.   Okay.  And I think you told us on direct examination

4  if I understood you properly, that you believe

5  approximately $50,000 or $55,000 was deposited from those

6  checks into Mr. Romano's account?

7  A.   Yes, $55,485.

8  Q.   Okay.  Did you discuss that with Mr. Mirkovic?

9  A.   I believe Mr. Mirkovic told me when I mentioned the

10  cashing of checks, he told me that approximately half of

11  the amount went to Joe Romano.

12  Q.   Did he tell you where the other half went?

13  A.   I think he said that if I recall correctly, that he

14  cashed some of the checks for himself, as well.

15  Q.   Okay.  And lastly, you told us that you had done an

16  analysis also of the phone in that office or a phone.

17  A.   The land line?

18  Q.   Yes.

19  A.   Yes, sir.

20  Q.   Okay.  How many land lines were there in that office;

21  do you know?

22  A.   As far as I could tell based upon the information

23  provided by the phone company, there was one phone.

24  There may have been split lines or something, however

25  that works, I am not sure, but there was one number.

79

**Mr. Hessle - Cross - Mr. Carnesi**

1  Q.   Okay.  And I think you also said that there was

2  reference or in your analysis of the records, you were

3  able to determine that a number of phone calls were

4  placed to my office from that phone.

5  A.   I believe there were three.

6  Q.   Okay.  And do you believe that those calls were made

7  in an attempt to engage me in telemarketing?  Do you

8  think they were telemarketing cold calls?

9  A.   I sort of doubt that.

10  Q.   Okay.  Other than those three phone calls, are you

11  aware of any calls that were made by Joseph Romano from

12  that land line?

13  A.   I don't believe so.

14  Q.   Okay. So would it be fair to say that based on your

15  investigation you didn't uncover any evidence whatsoever

16  that Joseph Romano used that land line to further the

17  telemarketing business.

18  A.   I would have to research those records -- again

19  because as I told you, they're not -- they haven't

20  completely been analyzed yet.

21  Q.   Okay.  But we're here today.

22  A.   But I --

23  Q.   Based on what you've looked at today --

24  A.   Uh-huh.

25  Q.   -- are you aware of any such evidence?

80

**Mr. Hessle - Redirect - Ms. Treinis-Gatz**

1  A.   I don't believe so; no.

2  Q.   Okay.  Thank you, sir.

3        MR. CARNESI:  I have no further questions,

4  Judge.

5        THE COURT:  All right.  Redirect?

6        MS. TREINIS-GATZ:  Briefly, Judge.  Thank you.

7  REDIRECT EXAMINATION

8  BY MS. TREINIS-GATZ:

9  Q.   The cell phone that we now apparently agree was used

10 by Mr. Romano, did that cell phone call Russell Barnes?

11 A.   It did.

12 Q.   Did that cell phone call Arizona Coin Exchange?

13 A.   It did.

14 Q.   Was Arizona Coin Exchange the wholesaler for

15 Collectible Coins, Inc.?

16 A.   It was.

17 Q.   Was Russell Barnes a telemarketer for Collectible

18 Coins, Inc.?

19 A.   Yes.

20 Q.   When you spoke with Mr. Newman regarding the primary

21 versus secondary person on a lease, who did he tell you

22 that he asked -- that he dealt with between the time the

23 leases first started and February of 2010, who was the

24 only person he dealt with with respect to lease payments?

25 A.   Joseph --

Transcription Plus II        Rosalie Lombardi

81

**Mr. Hessle - Redirect - Mr. Carnesi**

1          MR. CARNESI:  Objection.  I'm going to object,

2   I mean because there are two leases and to lump them

3   under February until 2010 is misleading.  I mean --

4          THE COURT:  All right.  Well you can ask the

5   question as to each individual lease.

6          MS. TREINIS-GATZ:  Yes.

7          THE COURT:  Go ahead.

8   Q.   As to lease number one that ended in 2009, who did

9   Mr. Newman tell you he dealt with with respect to getting

10  payments for the first lease?

11  A.   Joseph Romano.

12  Q.   And with respect to the second lease, up until

13  February of 2010, who did Mr. Newman tell you was paying

14  him and he was dealing with with respect to getting

15  payments for the second lease?

16  A.   Joseph Romano.

17  Q.   Thank you.

18         MS. TREINIS-GATZ:  Nothing further, Judge.

19         THE COURT:  All right.  Mr. Carnesi, anything

20  further?

21         MR. CARNESI:  Yes, just briefly, Judge.

22  RECROSS EXAMINATION

23  BY MR. CARNESI:

24  Q.   So were you able to determine whether or not

25  Mr. Romano was the only individual who used that cell

82

### Ms. Treinis-Gatz - Summation

1  phone?

2  A.   No.

3  Q.   Okay.  Thank you, sir.

4           THE COURT:  All right.  Anything further?

5           MS. TREINIS-GATZ:  No, Judge.  Thank you.

6           THE COURT:  All right.  You may step down.

7  Thank you.

8           (Witness excused.)

9           THE COURT:  Any other witnesses?

10           MS. TREINIS-GATZ:  No, your Honor.  Thank you.

11           THE COURT:  All right.  Anything on your side,

12  Mr. Carnesi?

13           MR. CARNESI:  No, your Honor.

14           THE COURT:  All right.  I will give you an

15  opportunity to make a brief closing if you both wish; all

16  right?

17           MS. TREINIS-GATZ:  Yes, Judge.

18           THE COURT:  All right.

19           MS. TREINIS-GATZ:  It's my burden, your Honor.

20           THE COURT:  It's your burden.

21           MS. TREINIS-GATZ:  Thank you.

22           THE COURT:  That's right.

23           MS. TREINIS-GATZ:  Your Honor, the government

24  has established and I am going to give the Court the --

25  both that the defendant committed a crime while on bail

Transcription Plus II        Rosalie Lombardi

83

### Ms. Treinis-Gatz - Summation

1   and that he violated terms and conditions of his bail.

2           Specifically, your Honor, with respect -- and

3   let me just go over the burdens.  The Court may revoke

4   and detain a defendant if following a hearing the Court

5   finds probable cause to believe the defendant has

6   committed any crime on release or finds by clear and

7   convincing evidence, a violation of any other bail

8   condition.

9           Your Honor, I think it's clear by the evidence

10  introduced at this hearing that the defendant, Joseph

11  Romano, while on bail in this matter picked up and opened

12  his identical operation in Florida and that's clear

13  through several things, your Honor.  First we note the

14  comparison between the subject companies that the

15  defendant was the admitted owner of and the company that

16  was opened in Florida.  And we see that the operations

17  are merely identical.  They're identical in many ways;

18  the pitch that's used, the wholesaler that's used, the

19  way the operation is run.

20          In addition to the similarities in the two

21  offices, the person who opens this new office in Florida

22  is a very, very close friends of the defendant's, a

23  neighbor of the defendant's who has no experience in the

24  coin business.  He is -- before opening this coin

25  business on paper, he sells cars.

84

### Ms. Treinis-Gatz - Summation

1    Now the defendant is seen at the location.
2  There's testimony that the defendant helped the
3  telemarketers with their pitch at the location.  There's
4  testimony the defendant had a cell phone -- that he was
5  using a cell phone that was registered to that location
6  to call all of these people, including Russell Barnes who
7  you heard testimony was a telemarketer of the subject
8  companies and who was now a telemarketer for CCI.
9    The link between CCI and Russell Barnes is the
10  defendant. So you heard testimony that the defendant was
11  brought to CCI -- excuse me, Russell Barnes was brought
12  to CCI by the defendant.  You also saw, your Honor, a
13  vast amount of checks going from CCI to pay Joseph
14  Romano's personal debts in the amount of almost $160,000.
15  You also saw through evidence introduced today, that
16  there's about $60,000 in cash that came out of
17  Collectible Coins, Inc., and was payable to the
18  defendant, deposited in his account.  We're talking about
19  $250,000 over a year period.
20    Now it's clear that the defense is that these
21  -- that this is a friend lending money to another friend.
22  If that's the case, why isn't he just writing him checks
23  and writing on the check for Joseph Romano?  Why isn't
24  there some indication?  Why is there all of this
25  intrigue?  Why writing out a check to cash, cashing the

85

**Ms. Treinis-Gatz - Summation**

1  check and then have the cash deposited in Mr. Romano's

2  account?  There's no other explanation for the fact that

3  these checks are being written out to cash and deposited

4  in that matter other than the defendant is trying to hide

5  his involvement with this company.

6       Same thing for the other checks. These checks

7  are written on the Collectible Coins, Inc. account to Mr.

8  Romano's debtors.  However, we don't know that unless we

9  call the debtors and find out who wrote you these checks

10 and what were they for.  It's clear that the defendant

11 was trying again to hide his involvement and that's clear

12 by the weight and manner in which he was paid.  Basically

13 this is his salary but his salary is being hidden by

14 these checks.

15      As I indicated, the defendant was seen there.

16 You heard testimony that a telemarketer said he was there

17 helping out.  He had an office there. He's emailing the

18 landlord, the lease is in his name and then it's

19 transferred some time in 2000 -- at the end of 2009, the

20 beginning of 2010.  He still remains the guarantor.  The

21 $5,000 deposit he made still remains.  The landlord is

22 dealing with him on a regular basis.

23      There are calls from the CCI cell phone and the

24 CCI premises to Mr. Carnesi and I gather from his

25 questions and answers that he is conceding that Mr.

Transcription Plus II        Rosalie Lombardi

86

## Ms. Treinis-Gatz - Summation

1   Romano is the person that placed those calls.  And the
2   cell phone records surely demonstrate that it was the
3   defendant using the phone.  There were a vast amount of
4   calls to his personal -- his family and his friends;
5   clearly a phone being used for personal business.

6          But there's also calls to Arizona Coin Exchange
7   which is the wholesaler for CCI and Agent Hessle
8   testified, your Honor, that CCI was also the wholesaler
9   for the subject company.  So Mr. Romano clearly had a
10  relationship with this company when he owned the
11  companies in New York and now his cell phone is calling
12  this company in Arizona while he is running CCI.  He is
13  paying his lawyer with CCI funds.  Again, I think that
14  was conceded.

15         And, your Honor, not only are we talking about
16  violating condition six of the defendant's bond which
17  specifically says "not to engage in telemarketing
18  activities of any kind," that doesn't mean picking up a
19  phone; that means of any kind.  That means giving other
20  telemarketers instructions.  That means opening a
21  telemarketing business.  That means advising anther
22  telemarketer how to run a business.  That means setting
23  up a telemarketer with a telemarketing business.  All of
24  those violate the defendant's bond.  That's the first --
25  and I believe the government proved by clear and

**Ms. Treinis-Gatz - Summation**

1  convincing evidence that the defendant absolutely and

2  utterly disregarded that condition of his bond.

3          Secondly, not only did the defendant violate

4  the conditions of his bond, he opened the identical coin

5  boiler room in Florida that he was running in New York

6  for eight years.  And that's clear by the testimony of

7  Mr. Hessle.  He spoke with at least two victims who

8  testified that the same pitches were being used in

9  Florida that were being used in New York. That you've got

10  to complete the roll set pitch and the investor pitch

11  telling people that the coins -- you need to buy as many

12  coins as possible to complete your roll set because it's

13  worth more money and then we have an investor lined up

14  who is going to buy your coins.  And we know that because

15  we spoke to the victims.  And your Honor, that's the

16  identical boiler room that the defendant was running here

17  in New York.  So it's clear that he is involved in

18  running both of these boiler rooms; both the subject

19  company boiler rooms and CCI.

20          And I believe that we have established probable

21  cause to believe that the defendant based on all of the

22  evidence committed a crime while out on bond,

23  specifically in violation of mail and wire fraud.  It's

24  18 USC 1341 and 1343 and 1349 which is conspiracy to

25  commit mail and wire fraud.  Thank you, your Honor.

### Mr. Carnesi - Summation

1    THE COURT:  All right.  Mr. Carnesi?

2    MR. CARNESI:  Thank you, Judge.  Judge, while I

3  agree with the government's premise that certain

4  activities beyond getting on the telephone would qualify

5  as telemarketing activity -- I'm sorry, I had it off -- I

6  disagree that that's what they have established here.  I

7  don't believe that accepting a cell phone from a friend

8  when all of your assets have been seized when your

9  ability to get a cell phone, to get credit on your own,

10  may have been compromised, is a violation of that bail

11  condition or is involvement in telemarketing activity.

12    What they've established is that he used that

13  phone to call his lawyer and to call his family.  What

14  they haven't established is that that telephone was used

15  in any way to facilitate this telemarketing activity of

16  Collectible Coins, Inc.  This idea that it -- Mr. Hessle

17  has acknowledged that there's no evidence that Mr. Romano

18  was the only individual who is using that phone.  It

19  would have been simple enough if they believe that he was

20  involved with this Arizona Coin company and that he was

21  doing business with them from the cell phone.  They could

22  have contacted them to find out who was their contact at

23  Collectible Coins, Inc.  That's not the case.  There is

24  no connection between him and the Arizona company, as far

25  as Collectible Coins is concerned.

### Mr. Carnesi - Summation

1    He did lease the premise prior to Collectible

2   Coins going in there but there is a paper trail.  Nothing

3   was done to avoid that.  There is a paper trail.  Nothing

4   was done to avoid the fact that he was the guarantor.

5   That's perfectly normal since he had the original lease

6   and was trying to get out of the lease that he would have

7   to remain as the guarantor since that was the person that

8   the landlord originally negotiated with.  There's nothing

9   unusual about that.

10    There is not a single telephone call from the

11   offices of Collectible Coins from which one could say

12   Joseph Romano was having contact with any client or

13   potential investor.

14    His bail conditions aren't violated by the fact

15   that he happens to be a friend of David Mirkovic, that he

16   was a friend of David Mirkovic's before Mirkovic went

17   into that business and he remained a friend of

18   Mirkovic's.  It isn't violated by virtue of the fact

19   that Mirkovic was willing to help him pay his bills.  The

20   prosecutor says well they tried to hide it because there

21   is no reference to Joseph Romano on those checks.  Yet as

22   I sat here this morning, I heard numerous references from

23   Mr. Hessle about the fact that in the memo section there

24   was reference to Joseph Romano.  Nothing was done to hide

25   any of this.

### Mr. Carnesi - Summation

1    Mr. Mirkovic spoke to the prosecutors.  They

2  interviewed him.  He spoke to Mr. Hessle.  He responded

3  to their questions and explained what his involvement

4  with Mr. Romano is.  He's identified other people,

5  frankly, Judge, we're not in a position to deal with.  I

6  mean when they get up and they say well some person said

7  that they had a meeting and this is what happened at the

8  meeting with Mr. Romano, well obviously we're at a

9  distinct disadvantage because we don't know when this was

10  supposed to have happened, who this individual is, what

11  his credibility is.  But we do know that today as we

12  stand here in this courtroom, Collectible Coins is in

13  business. David Mirkovic is operating that business in

14  Florida despite the accusations of criminal activity.

15  When all of this occurred, when they conducted their

16  investigation, when they spoke to Mr. Mirkovic and

17  whoever else they spoke to, that business remained viable

18  today.

19    There is no allegation against either Mr.

20  Mirkovic of the business itself that the business was

21  being operated in an illegal fashion.  This involves

22  strictly Mr. Romano's bail conditions that he not be

23  involved in telemarketing.  And most respectfully, there

24  is no evidence that was produced this morning that he was

25  involved in anything other than dealing with his friend,

91

**Proceedings**

1  meeting with his friend and accepting assistance from his

2  friend.  Thank you.

3          THE COURT:  All right.

4          MS. TREINIS-GATZ:  Judge, may I make just one

5  comment?

6          THE COURT:  Yes.

7          MS. TREINIS-GATZ:  I am sorry.  Your Honor, I

8  just ask the Court to review Government Exhibit 2 which

9  is the first lease.  That lease actually only ran from --

10 it expired July 2009.  So if a lease expires, there's no

11 reason the defendant couldn't have walked away from that

12 lease.  The next lease didn't start until August 1, 2009.

13 So he didn't need to leave his security deposit.  It was

14 a brand new lease.  And I just point that out, your

15 Honor, to refute counsel's argument.

16         THE COURT:  Thank you.  All right.  Having

17 heard the testimony here from the witnesses presented and

18 also the arguments of counsel, there are a number of

19 things I want to go through here before I render my

20 decision.

21         First of all, I look specifically at Government

22 Exhibit 1 which is the bond that I actually issued with

23 regard to Mr. Romano, the order setting the conditions

24 and release of bond back on November 25, 2008.  And at

25 that time, Mr. Romano was released on a $1 million bond

92

**Proceedings**

1  secured by property in Ocean Ridge, Florida.  And I have

2  a very specific recollection of this because on condition

3  number six where it says other conditions, the government

4  had filled in the language refraining from telemarketing

5  and I went back in myself and wrote in the words,

6  "activity," meaning telemarketing activity "of any kind."

7  And I meant exactly what I said there.

8          Going through the testimony that was presented

9  here, I will point several things in particular that

10  impact my decision.  The -- our first witness, Mr. -- I'm

11  sorry, what is his last name again?

12          MS. TREINIS-GATZ:  Hessle.

13          THE COURT:  Hessle.

14          MS. TREINIS-GATZ:  H-e-s-s-l-e, your Honor.

15          THE COURT:  Mr. Hessle testified that in

16  interviews with cooperating witness 1, he was told that

17  this person was approached by the defendant and told that

18  he was going -- opening a telemarketing business in

19  Florida and offered that person a job.

20          In early January of 2010, cooperating witness

21  2, during a business transaction that he spoke about that

22  occurred in the fall of 2009, went to CCI at the request

23  of the defendant.  This individual described the interior

24  of the business. It was set up for telemarketing

25  operation.  The cooperating witness 2 met with the

**Proceedings**

93

1  defendant in late 2009, went back into CCI and observed
2  telemarketers on the phone. And the defendant told
3  complaining -- I'm sorry, confidential witness number two
4  or cooperating witness number 2 that CCI was his company.
5
6         Mr. Mirkovic who is his obvious good friend
7  here in operating CCI, it's not a lost fact on me that
8  the testimony here was he told the investigator he had no
9  prior experience in the coin business and, in fact, was
10 selling cars at Mulroney Ford in Florida before he went
11 to work for CCI.  Cooperating witness 2 actually provided
12 the investigator here with the number of the business
13 which allowed the government to subpoena AT&T to get
14 specific information, that the phone was registered to
15 Mr. Mirkovic at the CCI address and I believe that the
16 government's representation here is accurate.  It appears
17 that there is a concession here that Mr. Romano used that
18 cell phone to call counsel, Mr. Carnesi, among others
19 including his family members.
20        Now what I find interesting here based on the
21 arguments made by defendant's counsel which really I
22 understand is an attempt to minimize the issue of the
23 purchase of the cell phone and given to him by his
24 friend.  In light of Mr. Romano's circumstances, in light
25 of the million dollar bond that he is out on and in light

**Proceedings**

94

1    of the Court's instructions to him, the fact that he

2    couldn't get a cell phone from somebody else other than

3    somebody who is involved directly in a telemarketing

4    business in Florida strikes me as being less than

5    credible.  He's got family members.  He's got other

6    people who certainly could have gotten him a cell phone

7    if his need for a cell phone was that great.

8         He's taking checks drawn on an account of a

9    telemarketing business.  I mean it seems to me that

10   common sense and judgment, when you're out on bail on the

11   serious charge that he's already out on bail in, would

12   certainly give one pause to be taking checks drawn on a

13   telemarketing account from another business.  I am

14   equally troubled by the calls being made from that CCI

15   phone to the Arizona wholesale coin distributor.

16        And once again, why you would continue or act

17   as a guarantor on a lease in a property where you know a

18   telemarketing business is being operated when you've been

19   told specifically to refrain from any telemarketing

20   activity of any kind, again escapes the logic of this

21   court.

22        The series of emails between the landlord and

23   the defendant here, the rent checks to the Newman Group

24   drawn on the CCI account, the landlord's statement to the

25   investigator here that there was no subletting of this

Transcription Plus II          Rosalie Lombardi

95

**Proceedings**

1  property, the surveillance of the CCI offices and the

2  observations of the defendant coming and going from those

3  offices, even if on a single day once again knowing full

4  well what the conditions were of the bond and release

5  that was given here, I cannot imagine anyone walking into

6  a telemarketing business understanding what the

7  conditions of that bond were.

8        And one can understand a friend helping out in

9  time of financial need when the defendant's bank accounts

10  were frozen, but to the tune of the amount of money

11  that's been demonstrated here in this court by the

12  government exhibits submitted evidencing those amounts of

13  money once again in my mind goes directly to the

14  credibility of what's been offered here on the defense.

15        The checks regarding Mirk Consulting and the

16  records showing the financial link between Mirk

17  Consulting and CCI and that the relationship between

18  those two is clearly one track through the defendant

19  here, Mr. Romano.

20        The investigation -- the investigator -- the

21  information provided to by the investigator shows that

22  Mr. Barnes was obviously out telemarketing while on bond

23  and it's clear that Mr. Mirkovic met Mr. Barnes through

24  this defendant.

25        Mirkovic told the investigator that he met

**Proceedings**

96

1  Barnes through a social visit with Mr. Romano and that

2  later that Mr. Barnes was hired by CCI through

3  Mr. Romano.  Once again, why Mr. Romano has to have any

4  of these connections given his status raises very

5  significant credibility issues here as far as the Court's

6  concerned.

7          And Mirkovic also told the investigator that

8  Romano arranged to have the phones installed in Copiague

9  so that Barnes could work for CCI from there.

10         The interviews with the telemarketers at CCI

11  who admitted making multiple misrepresentations to

12  potential clients and who also stated that Mr. Romano was

13  maintaining an office at CCI and was instructing them how

14  to telemarket.

15         All of these things lead me to the conclusion

16  that Mr. Romano, as much as he would like this court to

17  believe that whatever's happened here is inadvertent,

18  that Mr. Romano deliberately has violated the conditions

19  of his release and bond and I find that the government

20  has established that by clear and convincing evidence.

21         Having done that, frankly, I don't really think

22  it's necessary for me to make a finding with respect to

23  the probable cause issue because there's enough here

24  having met the clear and convincing standard with regard

25  to the bail that I am directing that the bail here be

**Proceedings**

97

1   revoked.  That is my ruling.

2         Is there anything further from the government?

3         MS. TREINIS-GATZ:  No, your Honor, we are -- we

4   expect to move to have the bond forfeited but we will do

5   that at a later date.

6         THE COURT:  All right.  Anything further from

7   the defense?

8         MR. CARNESI:  No, your Honor.

9         THE COURT:  All right.  We're concluded.  Thank

10  you, all.

11            (Matter concluded)

12                  -o0o-

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcription Plus II      Rosalie Lombardi

98

1                          I  N  D  E  X

2

3    **William Hessle:**

4    Direct Examination by Ms. Treinis-Gatz......13

5    Cross Examination by Mr. Carnesi...........66

6    Redirect Examination by Ms. Treinis-Gatz....80

7    Recross Examination by Mr. Carnesi.........81

8

9                      E  X  H  I  B  I  T  S

10

11   **Government's Exhibit Marked in Evidence:**

12   Government's Exhibit 1......................19

13   Government's Exhibit 85.....................23

14   Government's Exhibit 18.....................25

15   Government's Exhibit 20.....................25

16   Government's Exhibit 21.....................25

17   Government's Exhibit 22.....................25

18   Government's Exhibit 23.....................25

19   Government's Exhibit 24.....................25

20   Government's Exhibit 25.....................25

21   Government's Exhibit 26.....................25

22   Government's Exhibit 27.....................25

23   Government's Exhibit  2.....................29

24   Government's Exhibit  3.....................29

25   Government's Exhibit  4.....................33

99

I N D E X    (Continued)

1

2

3  Government's Exhibit  5......................33

4  Government's Exhibit  6......................35

5  Government's Exhibit  7......................36

6  Government's Exhibit  8......................38

7  Government's Exhibit 19......................39

8  Government's Exhibit  9......................40

9  Government's Exhibit 10......................40

10  Government's Exhibit 11......................40

11  Government's Exhibit 12......................40

12  Government's Exhibit 13......................40

13  Government's Exhibit 14......................40

14  Government's Exhibit 15......................40

15  Government's Exhibit 16......................40

16  Government's Exhibit 17......................40

17  Government's Exhibit 28......................41

18  Government's Exhibit 29......................41

19  Government's Exhibit 30......................41

20  Government's Exhibit 31......................41

21  Government's Exhibit 32......................41

22  Government's Exhibit 33......................41

23  Government's Exhibit 34......................41

24  Government's Exhibit 35......................41

25  Government's Exhibit 36......................41

100

**I N D E X** **(Continued)**

1

2  Government's Exhibit 41......................42

3  Government's Exhibit 42......................42

4  Government's Exhibit 43......................42

5  Government's Exhibit 44......................42

6  Government's Exhibit 45......................42

7  Government's Exhibit 46......................42

8  Government's Exhibit 47......................42

9  Government's Exhibit 48......................42

10  Government's Exhibit 49......................42

11  Government's Exhibit 50......................42

12  Government's Exhibit 51......................42

13  Government's Exhibit 52......................42

14  Government's Exhibit 53......................42

15  Government's Exhibit 54......................42

16  Government's Exhibit 55......................42

17  Government's Exhibit 56......................42

18  Government's Exhibit 57......................42

19  Government's Exhibit 58......................42

20  Government's Exhibit 59......................42

21  Government's Exhibit 60......................42

22  Government's Exhibit 61......................42

23  Government's Exhibit 62......................42

24  Government's Exhibit 63......................42

25  Government's Exhibit 64......................42

101

**I N D E X**  (Continued)

Government's Exhibit 65......................42

Government's Exhibit 66......................42

Government's Exhibit 67......................42

Government's Exhibit 68......................42

Government's Exhibit 69......................42

Government's Exhibit 70......................42

Government's Exhibit 86......................42

Government's Exhibit 71......................47

Government's Exhibit 72......................50

Government's Exhibit 75......................50

Government's Exhibit 76......................50

Government's Exhibit 77......................50

Government's Exhibit 78......................50

Government's Exhibit 73......................51

Government's Exhibit 74......................51

Government's Exhibit 79......................52

Government's Exhibit 80......................52

Government's Exhibit 81......................52

Government's Exhibit 82......................53

Government's Exhibit 83......................55

Government's Exhibit 84......................56

Transcription Plus II        Rosalie Lombardi

102

# C E R T I F I C A T E

I, ROSALIE LOMBARDI, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **2nd** day of **June** , 2010.



Rosalie Lombardi
Transcription Plus II

Transcription Plus II          Rosalie Lombardi