UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
UNITED STATES OF AMERICA,        :
        :
-against-        :
        :   **REPORT AND RECOMMENDATION**
JOSEPH ROMANO, SALVATORE        :
ROMANO, VINCENT ROMANO,        :   No. 09 Crim. 170 (SJ) (VMS)
THOMAS ARNOLD, MICHAEL DIBARI,   :
RUSSELL BARNES, and KEVIN WELLS,   :
        :
        Defendants.
------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

## I. Introduction

Defendants Joseph Romano, Salvatore Romano, Vincent Romano, Thomas Arnold, Michael DiBari and Kevin Wells (collectively "Defendants") are convicted of conspiracy to commit mail or wire fraud in violation of 18 U.S.C. § 1349.[1] Docket Nos. 189 (T. Arnold), 227 (J. Romano, S. Romano, V. Romano), 236 (K. Wells). The Government now seeks, pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. §§ 3663A, 3664, a restitution order in the amount of $19,070,401.25 for which Defendants would be jointly and severally liable. Docket No. 586. Defendants counter that the Court should not order restitution because, in sum and substance, they do not believe that there is any manner by which to fairly determine an appropriate restitution amount.

District Judge Johnson referred the Government's restitution motion to me for a report and recommendation. Docket No. 544. "The Court may refer any issue arising in connection

---

[1] The Second Superceding Indictment charged Defendants with money laundering conspiracy as well, but all of the Defendants pleaded guilty to the mail fraud conspiracy count alone. Docket No. 135. It should be noted that there was once a seventh defendant in this case, Russell Barnes. Mr. Barnes is deceased, and the Government dismissed the charges against him. Docket Entry 11/30/2012; Docket Nos. 567, 568.

with a proposed order of restitution to a magistrate judge . . . for proposed findings of fact and recommendations as to disposition, subject to a de novo determination by the court."  18 U.S.C. § 3664(b)(6).  I submit this report and recommendation to the District Judge pursuant to his referral of the restitution motion under 18 U.S.C. § 3664(b)(6).  I respectfully recommend that the District Judge **grant** the Government's motion for a restitution order in the amount of $19,070,401.25 against all Defendants jointly and severally except for Defendant Kevin Wells. As to Defendant Kevin Wells, I respectfully recommend that the District Judge also **grant** the Government's motion for a restitution order holding him jointly and severally liable for restitution in the lower amount of $13,975,339.60.  The reasons for my recommendation are explained below.

## II.    Factual Background

### a.    Synopsis Of The Case

Insofar as the Defendants pleaded guilty to mail fraud conspiracy, there is no trial record from which to recount the basic facts.  Accordingly, I compile the following summary from the Superceding Indictment in order to give context to the restitution motion.  Docket No. 135; REST-002417-002474.

Defendant Joseph Romano was the owner of three companies that sold coins:  Last Quarter Coin, Inc. ("Last Quarter"), which was operational from August 2001 until July 2004, id. ¶¶ 1, 4; American Coin Company, Inc. ("American Coin"), which was operational from June 2005 until June 2007, id. ¶ 2; and All American Coin Company, Inc. ("All American Coin"), which was operational from July 2007 until November 2008, id. ¶ 3.[2]  Defendant Vincent

---

[2] Hereinafter I will refer to these three companies collectively as the "Coin Companies" unless it is necessary to identify one of them in particular.

2

Romano was the sales and business manager for the Coin Companies.  Id. ¶¶ 5-6.  Defendant Salvatore Romano was a salesman for Last Quarter and American Coin, and he became a sales manager at All American.  Id.  Defendant Thomas Arnold and Defendant Michael DiBari were both salesmen at the Coin Companies.  Id. ¶ 9.  In this role, they contacted potential customers and persuaded them to buy coins.  Id. ¶ 9.  Defendant Kevin Wells was the general manager of American Coin and All American Coin, but he did not work at Last Quarter.[3]  Id. ¶ 8.

From August 2001 through November 2008, the Defendants devised and executed a scheme to defraud customers through the sale of coins using materially false and fraudulent representations and promises involving the coins.  Id. ¶ 17.  For example, the Defendants would tell customers that, in the event that the customer amassed a particular coin collection, the Coin Companies would introduce them to an investor who would buy the collection at a premium such that the customer would turn a profit.  Id. ¶¶ 18-21.  When a customer collected the coins as instructed and asked for the promised introduction to an investor, the Defendants would say that the investor had backed out.  Id.  Later, the Defendants would tell the customer that they had located a new potential investor, and press the customer to purchase even more coins, claiming that the new investor wanted the collection to develop even further before buying it.  Id.  Customers who were persuaded by the Defendants' fraud sent payment and received coins via Federal Expres, DHL or U.S. mail.  Id.

In addition to fraudulently inducing customers to buy coins with the promise of a waiting investor who would buy the customer's collection at a premium, the Defendants also falsely misprepresented the grade of the coins sold.  Id. ¶ 22.  The Defendants falsely told customers that

---

[3] The fact that Defendant Kevin Wells was only involved in the operations of American Coin and All American Coin is discussed below pursuant to his request that he not be held jointly and severally liable for restitution arising from Last Quarter's operations.

Benjamin Franklin half-dollars for sale were graded MS-64+ or higher, but this was not true.  Id. The Defendants also falsely told customers that proof Benjamin Franklin half-dollars for sale were graded MS-68 or higher, but this was not true, either.  Id.  As a result of this fraud, customers generally purchased coins that were worth a fraction of the purchase price.  Id.  Over the course of the Defendants' fraudulent scheme, they deposited more than $40,000,000.00 in revenue into the Coin Companies' bank accounts.  Id. ¶ 23.

Of that $40,000,000.00, in a period spanning between 2002 and 2008, Defendant Joseph Romano received $3,818,000.00; Defendant Vincent Romano received $764,696.00, Defendant Salvatore Romano received $1,122.700.00; Defendant Thomas Arnold received $3,327,000; and Defendant Michael DiBari received $828,661.00.  Id. ¶ 23.  Defendant Kevin Wells received $820,570.00 between July 2004 and March 2008.  Id.

### b. The Government's Restitution Motion, Defendants' Opposition And Evidence Entered In The Record Relating To Restitution

On March 17, 2014, the Government filed a motion seeking $19,070,401.25 in restitution from the convicted Defendants for the victims of the fraud conspiracy, asking the Court to make the Defendants jointly and severally liable.  Docket No. 586.  The Government's motion explained that it reached that figure through the use of loss affidavits submitted by the Defendants' victims in response to Government correspondence notifying them that they might be eligible for restitution.  Id.  In total, 226 victims (out of an estimated 1,569) returned a completed loss affidavit testifying that they had purchased coins from the Defendants and suffered loss.  Id., Exh. A; Docket No. 518 (citing Draft PSR ¶ 27).

On April 16, 2014, I held a conference and discussed the scheduling of a restitution

hearing and a related briefing schedule with the Parties.[4]  At that conference, the Government

stated that it did not request a restitution hearing because it wished to submit its motion with the

support of existing documentary evidence which included trial and restitution hearing testimony

taken during the Michael Romano prosecution.  Docket No. 604; Docket No. 609 at 4:2-21.  This

testimony came from Agent William Hessle, who is an investigator for the United States

Attorney's Office, during a restitution hearing, and Mr. Anthony Swiatek, who the Government

recruited as a coin expert, during trial.

I admitted Agent Hessle's testimony and Mr. Swiatek's testimony on the Government's

motion and, in the same vein, I granted Defendants' motion to admit defense witness testimony

from the restitution hearing in the Michael Romano prosecution, specifically that of Dr. Mark

Glickman, a statistics expert, and Mr. David Ganz, a coin expert.[5]  Docket No. 609 at 11:15-24;

Docket No. 614 at 21:7-15, 22:4-6, 25:18; Docket No. 618 (Defendant Vincent Romano's

counsel stating that, "[w]ith the consent of the parties, the Court has agreed to deem the

testimony at the Michael Romano restitution hearing incorporated herein by reference").  All of

---

[4] In anticipation of that conference, Defendant Thomas Arnold and Defendant Michael DiBari informed the Court that they "do not oppose the [G]overnment's position on restitution."  Docket No. 587, 588.  Defendant Salvatore Romano informed the Court that while he opposes the Government's restitution motion, he did not wish to participate in any of the restitution proceedings or make any arguments of his own, preferring instead "to rely on the arguments raised by [his attorney's] co-counsel . . . ."  Docket No. 597.  That leaves Defendant Joseph Romano, Defendant Vincent Romano and Defendant Kevin Wells, all of whom oppose the restitution motion.  Docket Nos. 589, 590, 595, 596.  Despite the fact that some of the Defendants oppose the restitution motion and some do not, I will refer to most defense arguments as being made by the Defendants generally for ease of discussion.  I will only identify which individual Defendant made an argument when that argument is specific to that Defendant.

[5] Generally speaking, these four witnesses' testimonies relate to the instant action because the Michael Romano prosecution also dealt with coin fraud.  See Michael Romano, No. 09 Crim. 170 (SJ) (VMS) (E.D.N.Y.).  Although true that the two fraud schemes were different in terms of actors, victims and certain other facts, the Government's restitution motions in each, and my analysis of related objections, are similar.  Defendants here have admittedly recited many of the objections to restitution in the Michael Romano prosecution.

these witnesses testified in the Michael Romano prosecution at trial (in the case of Mr. Swiatek) or at the restitution hearing (in the case of Agent Hessle, Dr. Glickman and Mr. Ganz) as to general facts that are relevant to the instant action.  For example, Agent Hessle testified in the Michael Romano restitution hearing about the Government's process in locating victims seeking restitution and calculating those victims' losses (which process the Government also followed in the instant case); Mr. Swiatek testified in the Michael Romano trial about general coin industry practices relating to coin grading and valuation (upon which practices the Government in the instant case also relies); Dr. Glickman testified in the Michael Romano prosecution that he could not verify that the Government's method of calculating restitution was statistically sound (which Defendants in the instant case argue is a continuing problem); and Mr. Ganz testified as to the subjective nature of the coin grading and valuation practices described by Mr. Swiatek (which Defendants in the instant case argue is a continuing problem).  Docket No. 604; Docket No. 609 at 4:18-5:4; REST 000514-REST-00828, REST-002475-REST-002588 (collecting the four witnesses' testimonies).

Defendant Joseph Romano did, however, request the opportunity to cross-examine Agent Hessle at a restitution hearing.  Docket No. 609 at 19:21-24; Docket No. 614 at 23:21-25:18.[6] Accordingly, I held a restitution hearing on July 15, 2014.  Docket No. 614.  At the July 15, 2014 restitution hearing the Government examined, and Defendant Joseph Romano cross-examined, Agent Hessle.  Docket No. 614.

---

[6] Defendant Joseph Romano also requested paper discovery from the Government in anticipation of the restitution hearing (primarily seeking the documents that the Government wished to rely upon for its motion).  Docket No. 609 at 17:12-14.  I held another status conference.  Defendant Joseph Romano requested additional paper discovery.  Docket No. 610 at 8:14-16.  The Government produced the requested discovery to Defendants.  Docket Nos. 598, 599, 601, 604, 615, 616.

### c.  Trial And Hearing Witnesses Relevant To The Restitution Motion

The following are brief biographies for Mr. Swiatek, the Government coin expert; Agent Hessle, the Government's investigator and coordinator of the restitution process; Dr. Glickman, a defense statistics expert; and Mr. Ganz, a defense coin expert.

### i.  Anthony Swiatek

District Judge Bianco, who oversaw the trial in the Michael Romano prosecution, designated Government witness Mr. Swiatek as a coin valuation expert for trial, and Mr. Swiatek testified.  REST-002475-REST-002588.  Mr. Swiatek is a professional numismatist, which is a person who studies, researches and buys coins.  REST-002475.  Mr. Swiatek has been a personal student of coins since 1952 and began his professional involvement in the coin industry in 1971. Id.  Mr. Swiatek has written books on the coin industry and has given seminars on coin-related topics.  Id.  He is a member of the Professional Numismatist Guild and the American Numismatic Association, and for that latter organization, he has served at various times as a member of the board, vice president and president.  Id.  Mr. Swiatek has also worked as a grader for his own personal coins, as well as for various professional grading organizations such as the Numismatic Guaranty Corporation ("NGC") and the Professional Coin Grading Service ("PCGS").  Id.  In these capacities, Mr. Swiatek has graded and valued over one million coins. REST-002476.

### ii.  Agent Hessle

Agent Hessle testified as a fact witness for the Government at a restitution hearing during the Michael Romano prosecution.   He also testified at the July 15, 2014 restitution hearing in this case.  Docket No. 614.  Agent Hessle has been contracted by the United States Justice Department as an investigator for approximately four years.  REST-00520.  Previously, Agent

Hessle worked as an inspector for the United States Postal Service for almost 25 years.  Id.  For eight of those 25 years, Agent Hessle's primary work was conducting fraud investigations; from 2007 through 2009, Agent Hessle investigated Defendants' coin fraud.  REST-00522.  Agent Hessle testified about the Government's procedure in preparing its restitution motion (for example, the identification of victims, checking the accuracy of restitution claims, and estimating losses).  Docket No. 614.

### iii.  Dr. Mark Glickman

Dr. Glickman testified at the restitution hearing in the Michael Romano prosecution as a statistics expert for Defendants.  REST-00650-REST-00731.  Dr. Glickman received a bachelor's degree in statistics at Princeton University; a master's degree and Ph.D in statistics from Harvard University; and a Ph.D. in statistics and medicine at Harvard Medical School.  REST-00651.  Dr. Glickman is a research professor of health policy and management at the Boston University School of Public Health.  REST-00650.  He also works as a senior statistician at the Center for Health Quality Outcomes and Economics Research, which has been named a United States Veterans Administration Center of Excellence.  Id.  He also serves as a visiting professor in the Harvard University Statistics Department.  REST-00651.  Dr. Glickman, who organized projects analyzing and designing survey data, has received awards and grants for his work as a statistician.  REST-00651-REST-00654.

### iv.  Mr. David Ganz

Mr. Ganz testified at the restitution hearing in the Michael Romano prosecution as a coin expert for Defendants.  REST-00736-REST-00828.  Mr. Ganz is an attorney, and he has long been involved in coin collecting, buying and selling coins for himself and for clients.  REST-00737-REST-00738.  Mr. Ganz has been a board member and president of the American

Numismatic Society, REST-00737, as well as a member of other numismatic organizations, REST-00738.  He published articles, treatises and books on subjects relating to coins, REST-00739, and worked pro bono with the Government on various coin-related projects, including the regulation of coin telemarketing operations, REST-00742.  Over the course of Mr. Ganz's career, he bought or sold between 1,000 and 10,000 coins, all of which he valued himself using certain industry publications known as Greysheets or Bluesheets.  REST-00741.

### d.  Facts Relevant To The Government's Restitution Motion

The following summary of facts relevant to the Government's restitution motion, and Defendants' response in opposition, is derived from the transcripts of testimony and other documentary evidence, as cited.

### i.  Coin Grading Generally

In the American coin collection industry, PCGS and NGC are the leading professional coin grading services.  REST-00526.  In grading a coin, PCGS and NGC describe a particular coin's quality by giving it a grade from zero to 70 on what is known as the Sheldon Scale, with 70 being the highest-quality grade.  REST-00524-REST-00525.  Coins that have never been used in commerce are called uncirculated and can be in mint state ("MS"); for that reason, they usually receive a grade at the higher end of the Sheldon Scale, i.e., 60-MS to 70-MS.  REST-00525.  A professional coin grading service frequently employs a practice called "slabbing," whereby the graded coin is encapsulated so that its condition at the moment of grading is preserved.  Id.

Coin graders typically consider four factors in grading a coin, which are: (1) strike (the quality of the mold that the mint used to strike the coin, i.e., was the mold in good or bad condition such that the coin produced has or lacks any flaws in its form); (2) luster (the visual

appearance of light bouncing off the coin, e.g., whether the coin is tarnished); (3) the existence

and location of contact marks (dings or scratches on the surface of a coin); and (4) eye appeal.

REST-00522-REST-00524.  In order to mitigate the influence of graders' subjective preferences

in coin grading, professional grading services such as PCGS and NGC usually have two or three

graders work on any single coin.  REST-00529.  If all three graders give the coin the same grade,

the coin will go to a finalizer who will finalize the grade according to whether he or she believes

the consensus is correct.  Id.  If the three graders give the coin different grades, the finalizer

reviews the disparate grades then assigns a final grade according to his or her own judgment.  Id.

One reputable professional grading service may grade a coin differently from another grading

service.  REST-00528.

### ii.  Coin Valuation Generally

It is a regular practice for those in the coin collecting industry to consult the publications

Greysheets and Bluesheets for the purposes of determining coin prices for graded coins.

Although both Greysheets and Bluesheets are described as publications meant for use by coin

wholesalers, REST-002482-REST-002483, REST-002511, it is accepted practice, at coin shows

and elsewhere, for coin retailers to use Greysheets and Bluesheets to quote retail prices for

collectors and investors, REST-002483, REST-002571.

Greysheets is most often used to determine the price of an encapsulated coin of a

particular type and grade if the buyer of the coin first has the opportunity to look at the coin

("sight-seen").  REST-00531.  By contrast, Bluesheets lists the standard industry price for an

encapsulated coin according to its type and grade if the coin buyer purchases the subject coin

without an opportunity to examine the coin first ("sight unseen").  REST-00529.

Greysheets and Bluesheets are formatted in a similar way, which is that each offers two

prices—a bid and an ask price—for any given coin based on its type and year of origin.  The bid

value signifies what a buyer will typically bid as a price to buy, and the ask value signifies what

a seller will typically ask as a sale price.  REST-002483-REST-002512.  The bid price is always

lower than the ask price, and so read together, a coin's bid and ask prices create a price range

between them, and buyers and sellers frequently negotiate a mutually acceptable price for a coin

sale within this range.

### iii.   The Government Identified 1,520 Of Defendants' Victims, And 226 Victims Submitted Loss Affidavits Seeking Restitution

In connection with its prosecution of Defendants, the Government notified 1,520 of the

Coin Companies' customers to inform them that they may have been a victim of Defendants'

scheme.  Docket No. 614 at 48:19.  That notification included guidance on how victims could

apply for restitution by submitting a loss affidavit stating (1) how much money the victim spent

on coins; (2) whether the victim still had those coins in his/her possession or whether the victim

had sold some or all of them; and (3) any supporting documentation relating to the victim's

original purchase or subsequent resale of the subject coins (for example, invoices from the Coin

Companies or a receipt relating to a subsequent sale).  Id. at 49:7.  As a result of the

Government's notice, 226 victims submitted loss affidavits in the pursuit of restitution.  Id. at

82:18-22; REST-00829-02416 (1,587 pages of affidavits and supporting documentation).

The Government was able to corroborate some of the victims' loss-affidavit claims and to

adjust any incorrect claims, because the Government obtained a computer database used by the

Coin Companies to show "every purchase that was made" from American Coin and All

American Coin between June 2004 to November 2008 (similar data from Last Quarter was not

available).  Docket No. 614 at 8:13-19.  The Government also corroborated the victims' loss-

affidavit claims through bank records, invoices, and sales journals maintained by the Coin

11

Companies' staff as available.  Id. at 8:13-25.  Agent Hessle had this to say about his process:

> I think in total we received about . . . 235 affidavits of loss . . . , and as is the case a lot of times . . . [t]here's . . . confusion on the part of some of the individuals, whether or not they . . . purchased coins from [the Coin Companies], and then of course there's always the issue [of whether] the amount that they submitted as having purchased is different than the amount of their loss or the amount that we have as far as documenting the purchases.  So when you factor in all those things there's a lot of subtractions being done . . . .

Id. at 16:12-17:1.  Agent Hessle went on to say that:

> [t]he [victims,] when they submitted the affidavits, said how much they had purchased.  We had, based upon the computer [database], based upon everything else, we had a ballpark figure as to how much it should be—as far as [the victim's] documentation.  We could document this amount.  There are—there are many individuals who surely did not give us a number that was equal to the amount that we could document.  In some cases the amount they submitted was more than we could document and that would be attributed to the fact that they were earlier purchases [from Last Quarter, the one Coin Company to which the Government was unable to recover records].  I can't dispute them.  In some cases they were less and in cases in which they said they had purchased less [than what the Government's records showed,] that loss number was based upon their lesser number and not the higher number that we knew they had purchased.

Id. at 28:11-24.  Agent Hessle testified that the Government, on the basis of these controls, discounted the restitution claims of 209 of the 226 victims submitting loss affidavits.  Id. at 35:16-19.  Agent Hessle also stressed that these adjustments only occurred to discount possible restitution, never to increase it, even if the Coin Companies' records contradicted a loss affidavit in that way: "In no case did we contact people to have them increase the amount that they [claimed]. . . ."  Id. at 50:14-15.

Some of the 226 victims who submitted loss affidavits could not demonstrate an actual-loss amount because they had never sold their coins to a third party.  These victims still had

12

possessed the coins sold to them by Defendants.  As to these victims, the Government devised a way to estimate their loss.

### iv. The Government Selected Four Victims Of The 226 Victims Seeking Restitution To Serve As A Study Sample, And Calculated A Weighted Average Value-To-Price Ratio For Their Coins

The Government's loss-estimate methodology began with the selection of four of the 226 victims in order to study the average loss of a sample of victims.  Docket No. 614 at 12:10-17. These victims were Lorne Kramer, Lorraine Black, Robert Neises and Ernest Poore.  Id. at 9:12-11:24; REST-00005-REST-00511.  According to the government, these four victims provided a large sample of coins for study because, between them, they had purchased approximately 2,200 coins from the Coin Companies.  Docket No. 614 at 11:18-19.

Agent Hessle initiated the study of Mr. Kramer's coins by picking them up in person from Mr. Kramer's house and having them delivered to the NGC for grading.  Id. at 9:12-23. Once NGC assigned grades to Mr. Kramer's coins, Agent Hessle had Mr. Kramer's coins delivered to Mr. Swiatek for valuation and comparison against the price Mr. Kramer paid to Defendants for the coins.  Id. at 10:1-6.  In November 2012, Agent Hessle calculated a 16.23% value-to-price ratio for Mr. Kramer's coins.[7]  Docket No. 586-2.  In other words, while Mr. Kramer had purchased $280,355.00 in coins from the Coin Companies, those coins were only worth $45,501.62 (16.23% of $280,355.00) on the collectible-coin market.  Id.

Ms. Black forwarded her coins to Agent Hessle, who in turn delivered them to John

---

[7] Mr. Swiatek originally calculated the value-to-price ratio relating to the four victims in 2010, when lower silver prices yielded a value-to-price ratio less favorable to Defendants.  In anticipation of these restitution proceedings, the Government recalculated the four victims' average value-to-price ratio in November 2012 so that the Defendants' restitution liability would reflect an improvement in the value of silver on the market at the time.  Docket No. 614 at 12:10-17.  Throughout this report and recommendation, I will refer to the November 2012 valuations because the Government's restitution motion rests on those figures.

Albanese for grading and valuation.[8] Docket No. 614 at 10:1-23. Mr. Albanese has more than 28 years in the field of numismatics, during which time he co-founded the PCGS and founded the NGC, which are two of the largest and most reputable coin grading services in the industry.[9] REST-00005. Mr. Albanese has, over the course of his career, personally graded more than 1,000,000 coins. Id. He has served as an expert witness for the government in coin fraud prosecutions which have resulted in twenty-seven convictions and approximately $6,000,000.00 in restitution for fraud victims. Id. Mr. Albanese graded and valued Ms. Black's coins, and as of November 2012, Ms. Black had a value-to-price ratio of 11.84%.[10] Docket No. 586-2. In other words, Ms. Black purchased coins from Defendants for $14,000.00 and Defendants sent her coins that were worth $1,657.60 (11.84% of $14,000.00). Id.

Mr. Albanese also graded and valued Mr. Neises's coins, and Mr. Neises's coins had a value-to-price ratio of 30.15%. Docket No. 614 at 9:24-10:3; Docket No. 586-2. Mr. Neises purchased $532,000.00 in coins from Defendants, yet Defendants delivered coins worth $160,398.00 to Mr. Neises (30.15% of $532,000.00). Id.

Finally, Agent Hessle worked with Ernest Poore's son (Mr. Poore was around 92 years old at the time) to deliver Mr. Poore's coins to Gary Adkins, who was the President of the

---

[8] The Government has submitted paperwork regarding Mr. Albanese's qualifications as a coin expert. Docket No. 614 at 25:1-15, 78:12-18 (stating that Mr. Albanese's methodology appears at REST-0005 in discovery). I accepted the Government's proffer of these documents. Id. at 25:9-15.

[9] Mr. Swiatek testified about his work for these organizations before District Judge Bianco, who designated him as a coin expert. REST-002475.

[10] Defendants complain that the Government does not explicitly state that coin experts conducted the November 2012 update of the coins' values, and Defendants argue that this makes the November 2012 valuations unreliable. I do not find the omission concerning, as the Government does not allege that an expert needed to revisit the coins' grades in September 2012, but only the value corresponding to the unchanged grades as a result of the higher price of silver.

Professional Numismatists Guild, for grading and valuation.[11]  Docket No. 614 at 11:10-17.  Mr. Adkins also served on the Guild's board of directors for twelve years and has over 45 years of experience buying, selling and personally collecting rare coins.  See www.coinbuys.com/pages/gary-adkins (last accessed December 11, 2014).  Mr. Poore had a value-to-price ratio in his coins of 11.66%.  Docket No. 586-2.  Mr. Poore purchased $105,145.00 in coins from Defendants, and Defendants delivered coins to Mr. Poore worth $12,259.91 (11.66% of $105,145.00).  Id.

The Government next calculated the weighted average of the four victims' value-to-price ratios as 24% (rounded up from 23.60%).  Docket No. 614 at 13:16; Docket No. 586, Exh. B.  In other words, for every dollar the four victims spent purchasing coins from Defendants, Defendants gave the four victims an average of 24 cents' worth of coins.[12]  Id.

### v. The Government Used The 24% Value-To-Price Ratio To Estimate The 226 Victims' Loss When Actual Loss Could Not Be Computed

The Government then calculated the 226 victims' loss using the 24% value-to-price ratio to estimate losses when actual figures could not be identified.[13]  Docket No. 586, Exh. A.  First,

---

[11] The Government has submitted paperwork regarding Mr. Atkins's qualifications as a coin expert.  Docket No. 614 at 25:1-15.  I accepted the Government's proffer of these documents. Id.

[12] When the Government originally calculated the weighted average value-to-price ratio in 2010, it was 16.3% because of depressed silver prices at the time.  As mentioned above, the government re-valued the four victims' coins in November 2012 in order to take into account the fact that silver had increased in value.  It was due to this re-valuation of the coins that the government's restitution motion states the average value-to-price ratio as 24%.  Docket No. 614 at 12:10-17.

[13] If a victim had sold all of his/her coins, the Government calculated his/her actual loss as the price received for the coins subtracted from the price the victim had paid Defendants for the coins.  In the event that a victim sold some of his/her coins, the Government calculated his/her actual loss for the sold coins and his/her estimated loss for the retained coins using the 24% value-to-price ratio.

the government split the 226 victims into three groups.  Docket No. 614 at 6:6-9, 7:13-19 (explaining that the 226 victims' loss affidavits and any supporting documents submitted with the loss affidavits were the source of this information), 82:18-25.  The first group consisted of 194 victims who still had all of the coins they purchased in their possession.  Id.  As to these 194 victims, the Government calculated their loss by multiplying .76 by the amount of money these 194 victims paid Defendants for the coins.  Id. at 83:8-10.  The second group consisted of 27 victims who had sold all of the coins they purchased from Defendants to third parties on the open market.  Id.  As to these 27 victims, the Government determined their actual loss by calculating the difference between the money these victims paid to Defendants for the coins, and the amount that third parties paid to the victims for the coins on the open market.[14]  Id. at 83:10-13.  Finally, there was a third group consisting of five victims who still had some of the coins they purchased from Defendants, but who had sold others.  As to these five victims, the Government employed a hybrid procedure to determine their loss, i.e., the government used the 24% value-to-price ratio to estimate loss relating to the coins still in these five victims' possession and added that figure to the actual loss suffered vis-à-vis the already-sold coins.  Id. at 83:10-13; Docket No. 609 at 11:2-9.

### vi.  The Government Concluded That the 226 Victims' Estimated And Actual Loss Totaled $19,070,401.25

As a result of the Government's study of the 226 victims' estimated and actual loss, the Government concluded that the Defendants' 226 victims suffered a total loss amount of $19,070,401.25 and are owed this amount in restitution.  Docket No. 586, Exhs. A-B; Docket

---

[14] For example, victim Eunice Collatz's paperwork demonstrated that she sold her coins to a third party and realized an actual loss of $79,843.00.  Docket No. 616 at 8.  The Government would have no reason to estimate Ms. Collatz's loss using the 24% value-to-price ratio under such circumstance, because it knew the actual loss she had suffered.  Id.

No. 614 at 82:18-83:5; Docket No. 616 (including a chart summarizing the data).

**vii.  The Amount Of Money That The Coin Companies Spent On Their Coin Inventory Is Approximately 22.5% Of The Coin Companies' Revenue During The Government's Period Of Study, A Percentage Which Roughly Tracks The 24% Value-To-Price Ratio Used By The Government To Estimate Victim Loss**

When studying the Defendants' coin fraud, Agent Hessle learned that the Coin Companies' overall revenue (not just revenue corresponding to the 226 victims seeking restitution) was approximately $40,000,000.00.  Docket No. 614 at 17:15-25.  Agent Hessle also learned that Defendant Joseph Romano spent approximately $9,000,000.00 to purchase the coins sold by the Coin Companies to generate the $40,000,000.00 in revenue.  Id. at 17:15-25, 64:21-23; REST-00325-REST-00512.  According to Agent Hessle, those figures demonstrate that the Coin Companies' cost on their coin inventory was roughly 22.5% of the price at which the coins were sold to victims, a number that is near to the 24% value-to-price ratio used by the government to estimate restitution.  Id. at 19:25-20:2.[15]

---

[15] According to Agent Hessle, the fact that the Coin Companies' markup on the coins roughly corresponds to the 24% value-to-price ratio used by the Government to calculate restitution corroborates the fairness of the 24% value-to-price ratio.  Docket No. 614 at 19:25-20:2.  The comparison of the Coin Companies' profit margin to the weighted average value-to-price ratio is a rough comparison.  In addition to the use of approximate figures, Agent Hessle admits that he does not know the price Defendant Joseph Romano paid for the coins sold by Last Quarter, as available records begin in June 2004 when Last Quarter had closed to make way for American Coin.  Id. at 20:23-21:4.

### viii. Statistics Expert Dr. Mark Glickman Testified In The Michael Romano Prosecution That He Could Not Say With Certainty Whether The Government's Sample of Victims Experienced Loss That Is Representative Of Loss Suffered By The Full Universe Of Victims[16]

Defendants' statistics expert Dr. Glickman testified in the Michael Romano prosecution that although he could not be certain whether the Government's victim sample was representative of all victims, it would be more likely to be representative if the sample size were larger. REST-00656. Dr. Glickman testified that he needed more data before he could say that a sample of victims' coins was not representative of all victims' coins, although he testified that it was possible that they were not representative. REST-00657, REST-00727. In rendering his opinion that there was a possibility that a sample of victims' coins were not representative of all victims' coins, Dr. Glickman explained that he never studied the entire universe of victims' coins. REST-00658.

Furthermore, Dr. Glickman testified that he conducted a variety of studies whereby he grouped the sample victims' coins by various indicators and came up with different average value-to-price ratios each time. For example, Dr. Glickman divided the victims' coins according to: (1) the document on which they were invoiced, (2) the victim from whom they came, (3) the coin type that they represented, and (4) mint year. REST-00658-REST-00689. In each of Dr. Glickman's studies of various subsets of the 1,800 coins, he calculated various value-to-price ratios other than the weighted average value-to-price ratio offered by the Government. For example, when he isolated coins of a single mint year, Dr. Glickman found that the average

---

[16] I will summarize Dr. Glickman's testimony here as he gave it in the Michael Romano prosecution, which is to say, where it was about a nine-victim sample used to estimate 221 victims' loss. Defendants want the Court to consider whether Dr. Glickman's testimony undermines the Government's restitution motion here for the same reasons, although the number of victims and victim sample are different.

value-to-price ratio diverged from the weighted average value-to-price ratio.  Dr. Glickman testified that this finding "doesn't address the issue about whether [the victim sample is] representative or not," but he claimed that it did suggest that "if you picked [a] different [sample of] victims, the [average] value-to-price ratio could have been different."  REST-00682.  Dr. Glickman explained that the significance of his studies was that he therefore could not say whether the sample victims' coins were or were not representative of all victims' coins without knowing whether "the distribution of coin types, mint year, bundlings of coins or the values of the coins" for all victims are "different in any substantive way from the [sample] customers that we analyzed."  REST-00696-REST-00697.

Dr. Glickman "never concluded that [the sample victims were] a good sample or a bad sample," or that the sample victims were not representative of all 211 victims.  REST-00708.  "It could be a good sample but it just happens that the value-to-price ratio varies by customer."  Id. However, Dr. Glickman testified that if he were crafting a true representative sample for a 220-victim group, he believed "you probably would want a larger number maybe close to 30 to 40 maybe . . . ."  REST-00698.

### ix.  Coin Expert David Ganz Testified

Defendants' coin expert David Ganz testified in a restitution hearing in the Michael Romano prosecution about coin value volatility, noting that coin prices may vary depending on which professional grading service grades a particular coin.  REST-00753-REST-00757.  Mr. Ganz testified that coin price volatility is due to the fact that, while the editors of Greysheets or Bluesheets seek data on large volumes of coin sales to assign values, the coin market is "not like the stock market where every purchase and every sale is recorded in some central source and then distilled down to a single price . . . . So the editor [of a coin valuation publication] will rely

on reported sales by large dealers . . . but [the dealers' sales reporting] never covers the entire market and hence it becomes the editor's opinion . . . ."  REST-00759, REST-762, REST-00783 (acknowledging the importance of investigating high volume sales to coin valuation accuracy).

To make his point, Mr. Ganz discussed a study that he conducted on 400 coins he selected arbitrarily of the sample of victims' coins studied by the Government, which he then priced using a November 2012 Greysheets' monthly supplement.  REST-00764-REST-00768.  Mr. Ganz testified that he believed that 3% of those 400 coins he chose out of the victims' coins had a higher value than the government's expert believed.  Id.

Mr. Ganz conducted another study in which he compared Mr. Swiatek's valuations for those same 400 coins against auction prices, and he found that 1.75% of the time a coin sold at auction for a higher price than Mr. Swiatek had given it.  REST-00768-REST-00775.

**III.    Legal Analysis**

    **a.  Overview Of Relevant Restitution Law**

"The purpose of restitution is to compensate victims for their losses."  U.S. v. Gonzalez, 647 F.3d 41, 65 (2d Cir. 2011).  The MVRA "provides for mandatory restitution in all sentencing proceedings for convictions of any offense that is, inter alia, an offense against property under Title 18 in which an identifiable victim or victims has suffered a pecuniary loss."  U.S. v. Skowron, 839 F. Supp. 2d 740, 743 (S.D.N.Y. 2012) (citing U.S. v. Bengis, 631 F.3d 33, 38-39 (2d Cir. 2011), and 18 U.S.C. §§ 3663A(c)(1)(A)(ii)-(c)(1)(B)).  A conviction under 18 U.S.C. § 1349, the offense of which Defendants stand conviction, constitutes an offense against property under Title 18 that triggers mandatory restitution.  See U.S. v. Donaghy, 570 F. Supp. 2d 411, 421 (E.D.N.Y. 2008) (stating that the crime contemplated by 18 U.S.C. § 1349 is an "offense against property" within the meaning of the MVRA).

As this is a case involving the victims' loss of money to Defendants as a result of the coin fraud scheme, 18 U.S.C. § 3663A(b)(1)(A) requires that the order of restitution direct Defendants to return the lost money "to the owner of the property or someone designated by the owner." 18 U.S.C. § 3663A(b)(1)(A).

Any disputes between the Parties as to the amount or fact of restitution must be resolved "by the preponderance of the evidence." 18 U.S.C. § 3664(e). "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." Id. The sentencing court has broad discretion in determining the procedure to be used to resolve disputes regarding restitution so long as the defendant has an adequate opportunity to present his position. See U.S. v. Sabhnani, 599 F.3d 215, 257-58 (2d Cir. 2010).

The loss for the purpose of restitution may be reasonably estimated. See U.S. v. Cheng, 96 F.3d 654, 657-58 (2d Cir. 1996) (holding that the district court drew a permissible inference to determine actual loss from the defendant's unlawful use of food stamps, i.e., that the third-party vendors receiving the food stamps cashed them in, causing government loss). However, "a court must base its restitution award on more than mere speculation about a victim's actual losses." Donaghy, 570 F. Supp. 2d at 423. "So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." U.S. v. Savoie, 985 F.2d 612, 617 (1st Cir. 1993).

In fashioning a reasonable estimate of restitution for victims, a court must keep sight of the fact that the MVRA does not just make some restitution mandatory, the MVRA makes restitution mandatory in the full amount of each victims' losses as determined by the court and without consideration of the economic circumstances of the defendants. 18 U.S.C. § 3664(f)(1)(A) (emphasis added). In United States v. Catoggio, 326 F.3d 323, 329 (2d Cir. 2003),

the Second Circuit vacated a district court's restitution order that undervalued the victims' losses. The <u>Catoggio</u> Court said that ordering partial restitution is inconsistent with the MVRA's requirement that restitution be ordered on the full amount of victims' loss, and it remanded for further proceedings. <u>Id.</u> Accordingly, "[u]ncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole." <u>Id.</u>; <u>see</u> <u>U.S. v. Schwamborn</u>, 467 F. App'x. at 38 (vacating restitution order and remanding case after finding that the government's decision to abandon its original request for $1,278,350.11 and to request only $413,450.08 suggested that this latter amount did not represent the full amount of victim loss, as required by the MVRA).

> **b. The Court Does Not Need To Physically Examine Each And Every Coin For Which The Government Seeks Restitution On A Victim's Behalf, When The Government Has Devised A Method By Which To Reasonably Estimate Restitution**

Defendants oppose the restitution motion by stating that the Government has not studied, the Court has not studied, and Defendants have not been permitted to study, each and every one of the coins for which the Government seeks restitution on a victim's behalf. <u>See, e.g.</u>, <u>Docket No. 618</u>; <u>Docket No. 609</u> at 25:14-21 (stating "there has to be some sort of chain of custody in this because how do we know whose quarter is mine and whose quarter is yours?"); <u>Docket No. 629</u> ("[The Court] need[s] to have the coins in front of [it] to make any determination about any question, or concern [about the quality of the coins, whether the alleged victims were overcharged, and whether the alleged victims were misled when they purchased the coins]. . . . [But] the government didn't produce the coins, so [Y]our [H]onor do[esn't] know what the coins look like."). Instead, the Government's motion for $19,070,401.25 in restitution is based upon (1) its study of the coins of a four-victim sample, chosen because those victims had a large amount of coins purchased from Defendants between them—2,200; (2) the Government's

application of the resultant 24% average value-to-price ratio to estimate the loss of victims who still have their coins in their possession; and (3) the Government's addition of those estimated losses to actual proven losses.  Docket No. 586; Docket No. 614 at 11:19.

Defendants argue that their expert, Dr. Glickman, called during the Michael Romano prosecution, established that a four-victim sample was a bad sample from which no meaningful restitution estimate could be extrapolated such that the Court should insist upon physical examination of each and every coin purchased from Defendants by victims.  Docket No. 609 at 7:20-25.

However, I do not find that that is what Dr. Glickman said is necessary.[17]  Dr. Glickman testified that he could not say with certainty that the victim sample used by the Government was or was not representative of the entire universe of victims without studying more victims.  Dr. Glickman stated that he "never concluded that [a victim sample of a particular size was] a good sample or a bad sample"—stating that "[the small sample used by the Government] could be a good sample[,]" but he just did not have enough information.  REST-00697-REST-00708.   In light of Dr. Glickman's inability to conclude with any certainty whether the four-victim sample was a good or bad sample, I do not find that his testimony undermines the Government's position that its use of the 24% value-to-price ratio produces a reasonable estimate of victim losses.  Further evidence that corroborates that the 24% value-to-price ratio is that the amount of money Defendants paid to buy their coin inventory is roughly 22.5% of the $40,000,000.00 in revenue that inventory produced, indicating that Defendants' markup and victim losses are both in the same range.  Docket No. 614 at 19:25-20:2.

---

[17] I previously made this same finding, which the District Judge adopted, in the restitution-related report and recommendation in the Michael Romano prosecution.  See Michael Romano, No. 09 Cr. 168 (SJ) (VMS), at 27-31.

In light of the foregoing, the Court need not physically examine each and every coin for which the Government seeks restitution, because Defendants' argument that the four-victim sample is insufficient does not undermine the Government's estimate calculations.

### c. The Government Has Devised A Method By Which To Reasonably Estimate Restitution

Defendants also call the Court's attention to Mr. Ganz's expert testimony on the volatility of coin grading and valuation. <u>Docket No. 618</u>. Defendants claim that the subjective nature of coin valuation renders the Government's restitution estimate unreliable. <u>Id.</u> However, Mr. Ganz's testimony about the volatility of coin valuation did not undermine the Government's 24% value-to-price ratio, calculated from a four-victim sample, as a reasonable figure from which to extrapolate a global figure for restitution.[18]

Mr. Ganz testified in the Michael Romano prosecution that when he reviewed the Government's work in establishing an average value-to-price ratio, he identified a very small percentage—4.8%—of coins for which he would have given a higher value than Mr. Swiatek had. REST-00764-REST-00768. If anything, I find that Mr. Ganz's testimony, meant to support Defendants' position, actually supported the Government's position because it suggested that there is an approximately 95% agreement between Mr. Swiatek's and Mr. Ganz's coins' valuations. This belies Defendants' claim that coin valuation is so subjective as to be an unreasonable means by which to estimate restitution.

In <u>United States v. Gushlak</u>, 728 F.3d 184, 203 (2d Cir. 2013), the Second Circuit ruled in the context of a securities-fraud restitution issue that "[a]ny identified potential imprecisions in [valuation in] what is by its nature an imprecise process would not render the restitution

---

[18] I made this same finding in the Michael Romano prosecution, which the District Judge adopted. <u>Michael Romano</u>, No. 09 Crim. 168 (SJ) (VMS), <u>Docket No. 393</u> at 59.

amount estimate unreasonable."  Therefore, even if Mr. Ganz had testified to a great discrepancy between his and the Government's valuations for the studied coins (which he did not), I believe that under <u>Gushlak</u> the Government's restitution estimate would be found reasonable.  <u>See</u> <u>U.S. v. Uddin</u>, 551 F.3d 176, 180 (2d Cir. 2009) (affirming a district court's restitution order in a food stamp fraud case that relied upon city-wide data to extrapolate loss amounts).

Viewing the totality of the record, I find that the Government has shown by a preponderance of the evidence that the restitution estimate of $19,070,401.25 (and the method it employed to reach it) is reasonable.  <u>See</u> <u>Cheng</u>, 96 F.3d at 657-58.  As a preliminary matter, I note that Agent Hessle testified that he used actual victim losses when possible, and not estimates.  Furthermore, Agent Hessle testified that he verified the accuracy of victims' loss affidavits when possible by comparing them against American Coin and All American Coin invoices and sales logs (Last Quarter records were not available).  Next, the Government updated the valuations of the sample victims' coins in November 2012, taking into account the improved price of silver on the market at the time in order to reach a more accurate restitution estimate.[19] Finally, the Government's calculation of a 24% value-to-price ratio for the four-victim sample has an additional indicia of reliability in that it closely tracks the 22.5% cost-to-price ratio that certain evidence suggests Defendants employed in their business.  Taking all of these facts together, I find the Government's restitution estimate to be reasonable, and "more than mere speculation about [the] victim[s'] actual losses."  <u>Donaghy</u>, 570 F. Supp. 2d at 423.  This is not to say that the 24% value-to-price ratio is an exact measurement, but "difficulties in achieving

---

[19] The earlier valuation study showed an average 16.3% value-to-price ratio.  <u>Docket No. 614</u> at 12:10-17.  The silver market therefore improved to the point where the Government asked the Court to estimate losses using a 24% value-to-price ratio, which leads to a lower total amount of recommended restitution.  <u>Cf.</u> <u>U.S. v. Turk</u>, 626 F.3d 743, 749 (2d Cir. 2010) (observing that "in a gentler universe, where the housing market had gone up instead of down," the defendant may have been entitled to a greater offset against the restitution order).

exact measurements [do] not preclude a trial court from ordering restitution," <u>Savoie</u>, 985 F.2d at 617, and "[u]ncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole," <u>Catoggio</u>, 326 F.3d at 329.

    The 24% value-to-price ratio can be used to estimate the victims' losses in this case because the Second Circuit has routinely upheld district courts' restitution orders founded on reasonable estimates.[20]  For example, in <u>United States v. Gushlak</u>, 728 F.3d 184, 203 (2d Cir. 2013), the Second Circuit reviewed and affirmed a district court's restitution order for the victims of securities fraud despite the defendant's claim that the Government's estimates lacked precision and were calculated from sources which the defendant alleged could be unreliable in some instances.  The Second Circuit rejected the defendant's argument and found that the district court had not abused its discretion in ordering restitution, saying that "[a]ny identified potential imprecisions in what is by its nature an imprecise process would not render the restitution amount estimate unreasonable."  <u>Id.</u>

    <u>Gushlak</u> is just one instance where the Second Circuit upheld a district court's informed and reasonable estimate of a restitution amount.  In <u>U.S. v. Uddin</u>, 551 F.3d 176, 180 (2d Cir.

---

[20] As is often the case in this report and recommendation, I rely upon some of the legal analysis I included in the restitution-related report and recommendation I submitted in the Michael Romano prosecution.  Defendant Joseph Romano objects that a reference to the restitution report and recommendation in the Michael Romano prosecution is unfair because he did not conspire with the defendants in the Michael Romano prosecution.  Where an identical legal argument is made in this coin-fraud case as was made in the Michael Romano coin-fraud prosecution, I believe that reference to the relevant report and recommendation in the Michael Romano prosecution is appropriate.  <u>See</u> <u>Michael Romano</u>, No. 09 Crim. 168 (SJ) (VMS), <u>Docket No. 393</u>.  Some Defendants acknowledge that the legal arguments in this case parallel those in the Michael Romano prosecution, for example, Defendant Vincent Romano's counsel leads his brief in opposition to the Government's restitution motion by saying that the arguments contained herein are drawn, in large measure, from our submission on restitution issues in the related [Michael Romano prosecution]."  <u>Docket No. 618</u>.

2009), the Second Circuit held that a district court did not abuse its discretion in ordering restitution in a food-stamp fraud case by estimating a loss amount caused by the defendants' offense using general data collected city-wide.  The <u>Uddin</u> Court acknowledged that "[a]lthough there will undoubtedly be situations in which a district court's estimate of loss amount falls outside the boundaries of reasonableness, we need not define precisely what those boundaries are.  It is enough that the district court here did not exceed them."  <u>Id.</u> at 181.  Here, the Government has not exceeded reasonableness in its restitution estimate.

Other examples in Second Circuit case law affirm the reasonable estimate of restitution orders, sometimes on novel facts.  <u>See</u> <u>U.S. v. Kerekes</u>, 2013 WL 5382066, at *2 (2d Cir. Sept. 27, 2013) (holding that the district court's adoption of a "conservative estimate of the Government's losses using a 20% capital gains tax rate was within its discretion," and finding that even if the Second Circuit would reach a different restitution rate, this does not mean that the district court abused its discretion); <u>U.S. v. Lundquist</u>, 731 F.3d 124, 138 (2d Cir. 2013) (holding that "a reasonable estimate of [the child pornography victim's] loss is all that is necessary"); <u>U.S. v. Perez</u>, 523 F. App'x. 842, 844 (2d Cir. May 7, 2013) (stating that the district court did not abuse its discretion in crafting a restitution order for victims—undocumented immigrants who paid defendant for promised legal status that never came—by "extrapolat[ing] the average amount of loss from known data and apply[ing] that average to transactions where the exact amount of loss is unknown") (citations & quotations omitted); <u>U.S. v. Hsu</u>, 669 F.3d 112, 122 (2d Cir. 2012) ("We do not say that the method chosen by the district court was the only way to measure loss in a Ponzi scheme case . . . other methodologies might have been appropriate in this case, and might even be preferable in other cases depending on the particular facts of the case . . . . [T]he district court's calculation is . . . reasonable and appropriately measures the scope of the

harm done to victims. We therefore have no reason to disturb it."); U.S. v. Melhado, Flynn & Assocs., Inc., 455 F. App'x. 81, 84 (2d Cir. 2012) ("[T]he loss figure adopted by the district court is not, as [defendant] contends, 'intolerably ambiguous.' [Restitution does] not require that losses be calculated with precision, and we find no error in the district court's reliance on the Government's expert analysis as a reasonable estimate of loss.").

This Court is guided by the logic of the above-cited cases here. This Court's finding of reasonableness is informed by my review of over 1,500 pages of victim loss affidavits and their addenda; hundreds of pages of trial transcripts; and hundreds of pages of restitution-hearing transcripts, in addition to presiding over the restitution hearings themselves in the Michael Romano prosecution and the instant action; and the Parties' written submissions and exhibits. In all, this Court has reviewed thousands of pages of material relating to the Government's restitution motion and Defendants' objections thereto, and is satisfied that a 24% value-to-price ratio modified categorical calculation reasonably approximates the losses of all 226 victims who submitted loss affidavits. See U.S. v. Price, 357 F. App'x 319, 324 (2d Cir. 2009) (holding that the district court, in determining actual victim loss, "considered over 600 pages of documents and the testimony of multiple witnesses in addition to several different calculation methodologies for computing loss. Based on the information presented . . . we cannot say . . . any aspect of the loss calculation, was clearly erroneous.").

Finally, Defendants argue that Mr. Swiatek is not qualified to assign value to coins, and that it is inappropriate to use his testimony to determine the extent of Defendants' coin valuations in the context of their fraud scheme. Docket No. 618. This is the fourth time that this argument has been made to the Court (the first three times in the Michael Romano prosecution). Id.; Michael Romano, No. 09 Crim. 168 (SJ) (VMS), Docket No. 393 at 50. I have already

rejected the argument in detailed legal analysis and findings in my restitution-related report and recommendation in the Michael Romano prosecution, which the District Judge adopted.  Michael Romano, No. 09 Crim. 09 Crim. 168 (SJ) (VMS), id. at 50-58.  Defendants claim that I should analyze the question anew because this is a different case; however, I find their position without merit because the relevant facts all come from Mr. Swiatek's trial testimony in the Michael Romano prosecution which, as discussed above, is incorporated in toto in the record here.  REST-2475-REST-2588.  Accordingly, I reject the argument again for all the reasons I previously discussed.  Michael Romano, No. 09 Crim. 09 Crim. 168 (SJ) (VMS), id. at 50-58.

In light of the foregoing, this Court finds that the Government has shown by a preponderance of the evidence that the 24% value-to-price ratio is a reasonable multiplier with which to estimate restitution for those victims who still have the coins they purchased from Defendants in their possession.

### d.  The Two Exceptions Cited By Defendants To Exempt This Case From The MVRA's Mandatory-Restitution Requirements Do Not Apply

Defendants argue that two statutory exceptions to mandatory restitution are applicable in this case.  Docket No. 618.  First, 18 U.S.C. § 3663A(c)(3)(A) provides that restitution is not required in cases where "the number of identifiable victims is so large as to make restitution impracticable."  18 U.S.C. § 3663A(c)(3)(A).  Second, 18 U.S.C. § 3663A(c)(3)(B) states that an exception to mandatory restitution arises when "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(B).

As to the first exception, I do not find that the 226 victims here is so large a number as to make restitution impracticable, because the Government has already (1) identified these 226

29

victims through their submission of loss affidavits; (2) devised a method by which to determine a reasonable estimate for restitution for all 226 victims; and (3) briefed and argued the appropriateness of that method.  See, e.g., Docket No. 586, Exhs. A-B.  Therefore, the Government's efforts, and my ability to review and understand the results, show evidence that restitution for 226 victims is not impracticable.  See Deming v. U.S., Case No. 01-CV-7450, 2002 WL 1467740, at *2 (E.D.N.Y. May 1, 2002) ("As the Government has already identified every victim of the conspiracy by name and the specific amount lost to each, the payment of restitution as funds become available is not impracticable."); see also Hsu v. United States, Case No. 07-CR-1066, 2013 WL 3771714, at *6 (S.D.N.Y. July 16, 2013) (holding that the MVRA exception applied in part because the Government itself asserted that "identifying [the defendant's] victims" would delay and burden the sentencing process).

In U.S. v. Catoggio, 326 F.3d at 328, the Second Circuit rejected the idea that 18 U.S.C. § 3663A(c)(3)(A) foreclosed restitution where "the record indicates that the district court, although aware of the difficulties involved in ordering restitution . . . did not consider the process too burdensome."  Here, as in Catoggio, I do not find that the restitution process is unduly burdensome.  Review of the loss affidavits shows that Defendants' victims suffered and continue to suffer extreme financial hardship as a result of the coin fraud.  This Court therefore believes that fashioning a restitution order for these 226 victims is important, feasible and deserving of the Court's attention.  In fact, many courts have found restitution practical even where greater amounts of money and numbers of victims were involved.  See, e.g., Catoggio, 326 F.3d at 328 (affirming district court's rejection of defendant's argument that the number of victims was too large and the issues too complex in a case involving $193 million and 10,000 victims); U.S. v. Brennan, 526 F. Supp. 2d 378, 384 (E.D.N.Y. 2007) (holding that the number of identifiable

victims was not so large as to make restitution impracticable in a case involving thousands of victims and over $100 million in losses); cf. In re W.R. Huff, 409 F.3d at 563 (holding that district court did not abuse its discretion in allowing a settlement agreement establishing a victims' fund in lieu of restitution where there were "potentially tens of thousands of victims of the [defendants'] crimes" and "a multitude of factual and causal issues [that] would extend the sentencing process").

With respect to the second exception to the MVRA's mandatory restitution requirement, I do not find the Government's restitution motion to raise particularly complex issues of fact relating to the amount of the victims' losses for all the reasons stated above, viz., the Government has devised a method for calculating a reasonable estimate of restitution, and it has presented the Court with that reasonable estimate. See Catoggio, 326 F. 3d at 328 (holding that deference to the district court's decision that restitution was not too complex if "the record indicates that the district court, although aware of the difficulties involved in ordering restitution[,] . . . considered restitution an essential part of [the defendant's] sentence").

Even if there were complex issues here, which I do not see, "the need to provide restitution" is an extremely heavy counterweight. Gushlak, 728 F.3d at 192-93; see U.S. v. Eisen, Case No. 90-CR-18, 1991 WL 180403, at *1 (E.D.N.Y. Sept. 3, 1991) ("In deciding whether restitution will unduly complicate and delay sentencing, the statute calls upon the courts to balance these factors against 'the need to provide restitution to any victims.'"). Victims in this case have suffered grave financial losses relative to their net worth as a result of Defendants' crimes, and many have found themselves in dire need of restitution in order to recover from the snowballing ill effects of Defendants' crimes. This is well documented by the loss affidavits that the victims and their representatives filed. REST-00512-REST-002097.

In light of the foregoing, I find that neither of the statutory exceptions to the MVRA's mandatory-restitution requirement cited by Defendants—18 U.S.C. §§ 3663A(c)(3)(A)-(B), forecloses restitution in this case.

### e. The Government Has Shown By A Preponderance Of The Evidence That The Four Victims Did Not Damage Their Coins Prior To Having Them Graded And Valued

Defendants argue that the weighted average value-to-price ratio of 24% is unreliable because, according to Defendants, the Government has not shown that the four victims did not materially damage their coins prior to grading and valuation. Docket No. 614 at 30:20-25, 41:11-15 (stating the possibility that dropping a coin on the floor degrades its value); Docket No. 618.

I find this argument without merit. The four victims had approximately 2,200 between them. It is reasonable to infer that the four victims did not damage the 2,200 coins so as to themselves cause a 76% reduction in value. Given that the victims bought these coins from Defendant as investment vehicles, it is not reasonable to speculate, as Defendants urge the Court should, that the victims may have treated all, or even some, of the coins that they purchased from Defendants in such a careless way. Docket No. 586-2.

Defendants also argue that the four-victim sample is unreliable because the four victims may have provided different coins for grading and valuation than the ones they purchased from Defendants. Docket No. 614 at 31:5-10. Defendants suggest that this may be a matter of the victims' absent-mindedness (because they conceivably have other collectible coins in their homes)[21] or an example of people misrepresenting themselves as victims during the restitution process in order to make easy money. Id. at 47:8-15 (Defendant Joseph Romano asking Agent

---

[21] Agent Hessle testified that there were instances when, in addition to victims buying coins from the Coin Companies, they also purchased coins from other vendors. Docket No. 614 at 57:7-12.

Hessle if he gave the victims a "pitch" that they might get money back).

I find this argument without merit as well.  I find that the Government has established by a preponderance of the evidence that the coins studied were the coins that the victims purchased from the Defendants.  First, the victims represented in affidavits to the Government that these were coins they purchased from Defendants.  Many of these affidavits were not signed in front of a notary public, but it is a federal crime to lie in completing them:  Section 1001 of the United States Code, Section 18, states that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title, imprisoned not more than 5 years . . . ."  18 U.S.C. § 1001.  Accordingly, the affidavits are reliable by virtue of the penalties that affiants face were they to make materially false statements on the affidavits.  Second, Agent Hessle testified that, when possible, he corroborated the victims' losses as best he could by comparing the loss affidavits against the Coin Companies' invoices and sales logs when it was possible, and making adjustments in Defendants' favor as necessary.  I am accordingly convinced that the Government has shown that its restitution motion is supported by the study of coins that victims actually purchased from Defendants.

For the foregoing reasons, I find unavailing Defendants' argument that the 24% value-to-price ratio is unreliable for the purposes of estimating the victims' losses because the Defendants may have materially damaged the coins or purchased them from other vendors.

    **f.  The Government Has Shown By A Preponderance Of The Evidence That Its Method Of Collecting Victim Loss Affidavits Was Proper And That Their Content Is True**

The Government's restitution motion seeks restitution for 226 victims who have filed loss

affidavits, and the Government has submitted those affidavits to the Court for review.  Docket No. 614; Gov't Exh. 1B (a binder containing, among other things, the 226 victim loss affidavits). Defendants claim that the victim loss affidavits were collected by an unfair method and urge the Court to find that the Government has not proven the identities of the victims by a preponderance of the evidence.  Docket No. 618; Docket No. 610 at 7:6-12; Docket No. 609: 30:1-20 ("I am being asked to rely upon a witness's affidavit . . . . [The government] sent out a standard document in most cases and had [the alleged victim] sign it.  'Hey, you want to get your money back?  Here's what you do.'").

The Court notes at the outset that each one of the 226 victim-loss affidavits identifies the name of the affiant-victim.  Docket No. 586, Exh. B; Gov't Exh. 1B.  Defendants do not contest this fact, but instead complain that the notification letter improperly suggested to the elderly and easily-confused recipients that if they only submitted a loss affidavit, they could receive restitution in the amount of 80-90% of the money they gave Defendants to purchase coins. Docket No. 618.  Defendants claim that the loss affidavits' veracity therefore cannot be trusted either because victims submitted them in a mentally confused state or with fraudulent intent to collect undeserved restitution.[22]  Id.  Furthermore, Defendants complain that the victims were not

---

[22] As an example, Defendants offer the loss affidavit of one Ellwood V. Werry, in which Mr. Werry states that he purchased $3,120.00 in coins from American Coin and estimates that his loss, if in the range of 80%, is $2,496.00.  Id., Exh. 1.  Defendants' example is that the Government did not use Mr. Werry's own loss estimate for the purposes of calculating restitution; instead, the Government applied the average 24% value-to-price ratio as explained to the Court, and afforded Mr. Werry a 76% loss, or $2,371.00.  Docket No. 632-1.  In other words, as I mentioned earlier, the Government has devised a well-explained and easily understood system by which it calculated the proposed restitution.  In another example, Defendants offer the loss affidavit of Maurice A. Harley for Richard E. Harley, who Defendants allege did not purchase his coins from the Coin Companies.  Docket No. 618, Exh. 2.  However, again it appears that the Government has already identified what portion of Mr. Harley's $10,585.00 claimed loss corresponds to the Coin Companies, for the Government states that Mr. Harley is only due $296.00 in restitution, not $8,044.00, the figure which would be 76% of the full

asked to provide proof of their alleged coin purchases.  Id.

As to the Defendants' complaint that the Government's notification letter told victims that they had the right to restitution in the event that Defendants' conviction and in the event that they suffered loss as a result of Defendants' fraud conspiracy, nothing is improper about such notification.  There is no reason the Government should not have provided notice to victims. Indeed, the Crime Victims' Rights Act ("CVRA") establishes that a crime victim has the right to be kept abreast of nearly all aspects of criminal proceedings in which they are implicated, as well as "[t]he right to full and timely restitution as provided in law."  18 U.S.C. § 3771(a)(6).  The Court therefore finds that the correspondence was sent in furtherance of the Government's statutory obligations.

Defendants' argument that perhaps senile or criminal-minded individuals submitted affidavits without having suffered loss is also rejected.  Docket No. 618.  Defendants point out that the Government did not collect proof of their coin sales (for example, invoices) from the victims at the same time the victims submitted loss affidavits.  Id. at 4.  But the victims do not have to submit additional invoices for their affidavits to have evidentiary value.  See U.S. v. Depiazza, 172 F.3d 38, at *1 (2d Cir. 1999) (rejecting the defendant's argument that victim loss declarations were not sufficiently itemized to support a restitution order, stating that "[t]here is no requirement that [victims'] losses be evidenced by receipts").  Although it is correct that an affiant's submission of a customer invoice would have produced more complete evidence, the affidavits lacking invoices still have sufficient indicia of reliability.  For example, the affidavits are corroborated by the fact that the Government pre-identified the affiants as Defendants' victims before receiving their loss affidavits.  Furthermore, Agent Hessle testified that the

---

$10,585.00 claimed loss.  Docket No. 632-1.

government compared the vast majority of the loss affidavits against the Coin Companies' invoices and adjusted errors as they discovered them in Defendants' favor. In other words, Defendants' complaint that the loss affidavits cannot be credited because the victims did not simultaneously submit their transaction invoices makes little sense in light of the fact that Defendants' invoices corroborated the loss affidavits (in their original or modified amounts).

Finally, and with respect to the suggestion that some affiants are attempting to defraud the Government and the Court so as to secure restitution to which they are not entitled, the Court observes that the affidavits state that the affiant-victim "swear[s] that the above information is true and correct." See, e.g., REST-00727. As noted above, it is a federal crime to lie in completing such affidavits. 18 U.S.C. § 1001. Accordingly, the affidavits are reliable by virtue of the penalties that affiants face were they to make materially false statements on the affidavits.

In light of the foregoing, this Court finds that the Government's method in collecting the victim loss affidavits was proper and, by extension, that the loss affidavits may be considered in these restitution proceedings as showing by a preponderance of the evidence the identities of the 226 victims seeking restitution as well as the money spent by each to purchase coins from Defendants.

**g. The Government Consistently Applied Its Methodology For Determining Loss**

Defendants argue that the Government's restitution petition should be denied because "there is no basis" for the Government to divide the victims into categories for the purposes of calculating restitution depending upon whether they sold some, none or all of their coins. Docket No. 618. I disagree. Classifying victims according to whether they have already realized actual losses permits the Government to calculate a restitution amount that reflects reality as much as possible, even though the law permits reasonable estimates. See, e.g., U.S. v. Coriaty,

36

300 F.3d 244, 253 (2d Cir. 2002) (finding that the district court correctly decided restitution because, inter alia, the defendant was responsible for the amount taken from victims less [the value that victims already had in their possession]).

The Court suspects that Defendants are really complaining that in some circumstances, a victim may have sold a coin to a third party for such a poor price that the Government is now asking that Defendants pay more in restitution than if the 24% value-to-price ratio were applied. The MVRA requires that victims receive restitution for the full amount of their losses, and although the 24% value-to-price ratio is an effort to reasonably estimate restitution, this Court will use concrete data where available to fashion restitution reflecting the full amount of a victim's loss.

In light of the foregoing, this Court finds that the Government's 24% value-to-price ratio modified categorical calculation of restitution is not just fair, but required on these facts by the MVRA.  See 18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant").

> **h. The Government Did Not Agree That It Would Not Move For A Restitution Order As A Term Of The Plea Agreements, But That It Would Recommend To The Justice Department That The Restitution Order Is Not Necessary In Light Of The Defendants' Stipulation To Forfeiture**

On September 28, 2010, Defendants pleaded guilty to conspiracy to commit mail fraud and stipulated to forfeiture.  See, e.g. Docket No. 522-1 (Defendant Joseph Romano forfeiting $7,000,000.00); Docket No. 578 (Defendant Vincent Romano forfeiting $760,000.00); Docket No. 525-1 (Defendant Salvatore Romano forfeiting $1,100,000.00); Docket No. 459 (Defendant Kevin Wells forfeiting $400,000.00).

Defendant Joseph Romano argues that when he stipulated to forfeiture of assets during

37

his guilty plea, the Government made a representation that it would not seek restitution against him, and that this restitution motion violates that promise. Docket No. 609 at 9:21-25 (inquiring whether the Government will "consent to . . . amounts already earmarked as forfeiture [being] applied to the restitution award"); Docket No. 609 at 30:21-25 ("There's also the consideration that I [forfeited] $8 million and on the day that I accepted the plea, [the AUSA] made a statement that she would recommend that that would satisfy the complete restitution.").

The Government clarifies with reference to the transcript of Defendant Joseph Romano's guilty plea that what the AUSA at the time in fact said was that

> The Government will make a recommendation to the Department of Justice that the restitution order, which is mandatory, be satisfied by the forfeiture that's going to be tendered through the plea agreements. However, . . . the EDNY recommendation to the Department of Justice is not binding on the Department of Justice and the Department of Justice has the right to decline to follow the recommendation which decision is not reviewable in court. In sum we will make the recommendation, but the DOJ does not have to follow it and the defendants could have to pay mandatory restitution in addition to the previously tendered forfeiture.

Docket No. 604 (citing REST-002441). After the AUSA made this statement during Defendant Joseph Romano's plea colloquy, Defendant Joseph Romano confirmed that he understood the procedure. Id.

Therefore, the record does not demonstrate that the Government reneged on a promise to recommend to the Department of Justice that a restitution order is not necessary in light of the previous forfeiture order. In fact, the moment for the Government to make the recommendation at issue has not yet arrived.

In light of the foregoing, I find without merit Defendant Joseph Romano's argument that the instant restitution motion is improper because the Government did not promise not to seek its entry.

**i.   Defendants Are Jointly And Severally Liable For The Full $19,070,401.24 In Restitution, Except For Defendant Kevin Wells, Who Is Jointly And Severally Liable for $13,975,339.60 In Restitution**

A sentencing court has discretion to "make each defendant liable for payment of the full amount of restitution or . . . apportion liability among the defendants to reflect the level of contribution to the victim's loss."  18 U.S.C.§ 3664(h).  Here, the Government seeks a restitution order holding Defendants jointly and severally liable, and does not ask for apportionment, arguing that "where, as here, [Defendants] are convicted of participating in a scheme, conspiracy, or pattern of criminal activity, each may be held liable, jointly and severally, for the full amount of losses causes by the scheme." U.S. v. Nucci, 364 F.3d 419, 423-24 (2d Cir. 2004) (affirming the district court's restitution order directing joint and several liability and not apportionment); see In re Newsday Litig., Case No. 08-MC-096, 2008 WL 2884784, at *3 (E.D.N.Y. July 23, 2008) ("Co-conspirators may be held jointly and severally liable for restitution owed to the victims of the conspiracy.").

The Defendants, by contrast, argue that any restitution liability should be apportioned amongst them according to the role each one of them played in the conspiracy to commit mail fraud, or the amount of time an individual Defendant conspired with his co-Defendants to commit mail fraud.  I will take these arguments in turn.

First, while Defendant Vincent Romano admits that he was the office manager for the Coin Companies and that his duties included grading coins, he maintains that he never directly sold coins to customers.[23] Docket No. 595.  As a result, Defendant Vincent Romano urges the

---

[23] Other Defendants make a similar argument.  See, e.g., Docket No. 610 at 8:1-5 (Defendant Kevin Wells discussing what his job responsibilities were).  While Defendant Salvatore Romano, Defendant Thomas Arnold and Defendant Michael DiBari made the offending phone calls, Defendant Kevin Wells was a sales manager, not a salesman, and did not call victims directly, either.  My analysis of Defendant Vincent Romano's argument is equally applicable to any other

Court to conduct fact hearings in order to enter a restitution order against him in an amount traceable to the amount of harm that Defendant Vincent Romano's specific conduct in the mail and wire fraud conspiracy occasioned upon victims.  Id.; 18 U.S.C. § 3663A(a)(2) ("For the purposes of [the MVRA], the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme . . . .).

Although it is true that "[a]s a general matter, restitution is permitted only for an amount of loss caused by the specific conduct forming the basis of conviction," the Second Circuit has in the past "affirmed a restitution award imposing joint and several liability payable by all convicted co-conspirators in respect of damages suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions[.]"  Gushlak, 728 F.3d at 195 n.7 (quoting & citing U.S. v. Silkowski, 32 F.3d 682, 688 (2d Cir. 1994), and U.S. v. Boyd, 222 F.3d 47, 50-51 (2d Cir. 2000)).

I find that it is appropriate on these facts to hold Defendant Vincent Romano jointly and severally liable with his co-Defendants for the $19,070,401.24 in restitution.  Defendant Vincent Romano claims that he never directly made fraudulent representations about the coins to victims. However, Defendant Vincent Romano was convicted of conspiracy to commit mail or wire fraud in violation of 18 U.S.C. § 1349, and this conviction subsumes the findings (1) that he was a member of the conspiracy, (2) that his actions were committed pursuant to the common plan of the conspiracy, and (3) that he could have reasonably foreseen that his co-conspirators would commit the substantive offense.  See Boyd, 222 F.3d at 51 (citing Pinkerton v. U.S., 328 U.S.

---

Defendant's like claim.

640, 647 (1946)) (stating that a conviction for conspiracy subsumes the finding that the conspirator reasonably foresaw that his co-conspirator(s) would commit the substantive offense). In fact, Defendant Vincent Romano told the Court while under oath at his plea colloquy that he "knew the salesmen made these representations from the telephone, using the telephone, and I knew the nature of it was untrue." REST-002453. In light of the law and this admission, I find that it is appropriate to hold Defendant Vincent Romano jointly and severally liable for the conspiracy's damage to innocent third parties.[24]

Defendant Kevin Wells also argues that he should not be held jointly and severally liable for the full amount of restitution, only he relies upon a different theory. Defendant Kevin Wells only worked for American Coin and All American Coin, but not Last Quarter. Docket No. 135 ¶ 8. As a result, Defendant Kevin Wells states that he should not be held jointly and severally liable for the damage caused by the conspiracy through Last Quarter's operations. See, e.g., Leve v. Franklin Cap. Corp., 148 F.App'x 3, 4-5 (2d Cir. 2005) (stating that the district court was correct to dismiss a civil fraud conspiracy claim against defendants who had "joined [the] conspiracy after" the disputed sale was consummated, "as the conspiracy was complete once the sale occurred"). I do not need to decide the question, however, because on April 26, 2012, District Judge Bianco already accepted Defendant Kevin Wells's argument and entered a

---

[24] Some Defendants also argue that restitution liability should be apportioned between them on the basis of how much money each Defendant made from the conspiracy, i.e., for example, Defendant Vincent Romano argues that his restitution liability should be limited because he only earned $800,000.00 as a result of his contributions to the conspiracy to commit mail fraud. Docket No. 609 at 56:3-8, 56:18-22 (alleging that Defendant Kevin Wells made $400,000.00 from his participation in the conspiracy); Docket No. 609 at 58:10-16 (alleging that Defendant Salvatore Romano also earned less than others from his contribution to the conspiracy). I find this argument without merit for the same reason that I find that restitution in this case should not be apportioned on the basis of Defendants' job responsibilities. See Gushlak, 728 F.3d at 195 n.7 (affirming a restitution award in respect of damages imposing joint and several liability payable by all convicted co-conspirators suffered by all victims of a conspiracy, regardless of facts underlying conviction in individual prosecutions).

restitution order against him in the amount of $14,677,352.51, which corresponded to the American Coin and All American Coin victim losses only.  Docket No. 457; Docket No. 462 at 6; Docket No. 609 at 14:23-15:5.

The Government does not oppose the $14,677,352.51 restitution order presently in force against Defendant Kevin Wells.  Docket No. 609 at 27:16-21 (the government stating that it "will agree that for the purposes of Mr. Wells, . . . there is a hard cap . . . the $14 million dollar number").  In fact, the Government helpfully sent a letter to the Court and Defendant Kevin Wells pointing out that, despite the Parties' agreement as to the $14,677,352.51 cap on Defendant Kevin Wells's restitution liability, Defendant Kevin Wells's restitution liability should actually be $13,975,339.60 because District Judge Bianco's April 26, 2012 Order did not take into account the Government's November 2012 revaluation of the victims' coins using the higher price that silver then commanded on the marketplace.[25]  Docket No. 620.

In light of the foregoing, I respectfully recommend that the District Judge **find** all Defendants jointly and severally liable for $19,070,401.24 in restitution except for Defendant

---

[25] Defendant Kevin Wells objects to the Government's letter suggesting that the restitution order against him be reduced by roughly $700,000.00, because he has "not had an opportunity to examine the witness who prepared [the November 2012 calculations as to his or her methods]." Docket No. 630.  Defendant Kevin Wells requests that I hold another restitution hearing in order to investigate that question.  I deny the request because Defendant Kevin Wells never asked to cross-examine the 2010 coin valuation experts at the restitution hearing as to their methods, and it is reasonable to infer that the Government had the coins revalued with much the same process as it had the coins valued in the first instance, a methodology that I have already described above in some detail.  I do not find the Court's acceptance of the Government's revaluation of the coins in November 2012 to be unfair because the revaluation only serves to benefit Defendants by changing the value-to-price ratio from 16.3% to 24%.  The Government may not have had to do the coin revaluation at all in light of the "reasonable approximation" standard of restitution.  In fact, the November 2012 revaluation was undertaken in part at the behest of co-Defendant Vincent Romano because he wished to benefit from the increase in the price of silver.  Docket No. 614 at 80:14-18.  Finally, it should be noted that Defendant Kevin Wells never asked the Government for the revaluation of the coins.  The Government itself noticed that Defendant Kevin Wells had not benefitted from the re-valuation, and submitted the recalculation of Defendant Kevin Wells's restitution on its own.

Kevin Wells.  As to Defendant Kevin Wells, I recommend that the District Judge **find** Defendant Kevin Wells jointly and severally liable with his co-Defendants for $13,975,339.60 of the restitution order.[26]  <u>Docket No. 457</u>; <u>Docket No. 462</u> at 6; <u>Docket No. 609</u> at 14:23-15:5.

**IV.    Conclusion**

In light of the foregoing, the undersigned makes the following recommendations to the District Judge in this case.  The undersigned respectfully recommends that the District Judge:

(1) **find** that it is unnecessary to physically examine and give value to each and every one of the victims' coins in order to calculate restitution in this case because the Government has devised a method by which to reach a reasonable estimate of restitution using a four-victim sample.

(2) **find** by a preponderance of the evidence that use of the 24% value-to-price ratio computed by the Government from a study of four victims' coins is a fair method by which to reasonably approximate restitution for all 226 victims.

(3) **find** that 18 U.S.C. § 3663A(c)(3)(A) and 18 U.S.C. § 3663A(c)(3)(B)—two exceptions to the MVRA's mandatory-restitution requirement, do not apply to foreclose restitution in this case.

(4) **find** by a preponderance of the evidence that the four victims studied by the Government as a representative sample to reach the average 24% value-to-price ratio did not materially damage their coins prior to having them graded and valued, or submit different coins than the ones that they purchased from Defendants.

(5) **find** by a preponderance of the evidence that the Government's method of collecting victims' loss affidavits was proper and that their content is reliable.

(6) **find** that the Government consistently applied its methodology for determining victim loss.

(7) **find** that Defendants' argument that the Government promised not to move for a restitution order in exchange for a forfeiture provision in Defendants' plea agreements is without merit.

(8) **find** that the Defendants are jointly and severally liable for the $19,070,401.24 in restitution, except for Defendant Kevin Wells, who is jointly and severally liable with his

---

[26] When District Judge Bianco entered the April 26, 2012 restitution order against Defendant Kevin Wells, District Judge Bianco allowed Defendant Kevin Wells the right to seek a modification.  <u>Docket No. 572</u> at 7:18-8:4.

co-Defendants for $13,975,339.60 in restitution.

## V.    Objections

Objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen days of service of this Report. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 1, 59(b)(2); see U.S. v. Hotte, Case No. 97-CR-669, 2007 WL 2891313, at *4 (E.D.N.Y. Sept. 28, 2007).  Failure to file objections within fourteen days will preclude further review of this report and recommendation either by the District Court or the Court of Appeals.

Counsel are directed to be in contact with District Judge Johnson's Chambers regarding a schedule for additional proceedings related to restitution.

Dated:  Brooklyn, New York
      January 6, 2014

_____/s/_____
VERA M. SCANLON
United States Magistrate Judge
