UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

 UNITED STATES OF AMERICA,

                -against-                    **MEMORANDUM & ORDER**
                                             09-CR-170(EK)(VMS)
 JOSEPH ROMANO, VINCENT ROMANO, and
 KEVIN WELLS,

                    Defendants.

-------------------------------------x
ERIC KOMITEE, United States District Judge:

           Defendants Vincent Romano, Joseph Romano, and Kevin

Wells pleaded guilty in 2010 to conspiracy to commit mail and

wire fraud.  ECF Nos. 227, 236.  Along with other co-

conspirators, they operated companies that sold collectible

coins at inflated prices based on false representations.  ECF

No. 135.  *See generally* Report and Recommendation ("R&R") 2-4

(describing *modus operandi* of the fraud), ECF No. 643.  The

Honorable Joseph Bianco sentenced Joseph Romano and Kevin Wells

in 2012, and the Honorable Sterling Johnson, Jr. sentenced

Vincent Romano in 2013.  After an appeal to the Second Circuit,

the case is before me now for a final order of restitution.

           In crafting this order, I consider the comprehensive

R&R issued by Magistrate Judge Vera Scanlon in January 2015.

Judge Scanlon recommended that the Court adopt the government's

proposed methodology for determining victim losses and

adjudicate the defendants jointly and severally liable to 226 victims in specified amounts.  R&R 43-44.

For the reasons set out below, I adopt Judge Scanlon's well-reasoned R&R in full, except that I reduce the restitution award to one victim by fifteen dollars.  Along with codefendants Salvatore Romano, Michael DiBari, and Thomas Arnold, defendants Vincent and Joseph Romano are adjudged jointly and severally liable in the amount of $19,070,386.25, and Kevin Wells is jointly and severally liable (to certain victims) in the amount of $13,975,324.60.  I also issue amended judgments together with this order.

## I.   Background

As relevant here, the history of this case is as follows.  The R&R contains a comprehensive summary of the relevant facts.

### A.   Pre-R&R Procedural History

Defendants Joseph Romano, Vincent Romano, and Kevin Wells pleaded guilty along with other defendants who did not join their appeal.  *See United States v. Romano*, Nos. 15-992-CR, 19-3507-CR, 19-3573-CR, 19-3815-CR, 2022 WL 402394, at *1 (2d Cir. Feb. 10, 2022).[1]  Judge Bianco sentenced Joseph Romano in

---

[1] Salvatore Romano, Thomas Arnold, and Michael DiBari are the three codefendants in this case who did not appeal.  Their cases are closed but remain assigned (for ECF purposes) to Judge Johnson.  The government also

February 2012 but deferred determining restitution under 18 U.S.C. § 3664(d)(5).  *See* Tr. of Sentencing of Joseph Romano, at 60:2-4, ECF No. 753.[2]  In April of that year, Judge Bianco imposed restitution in the amount of $14,677,352.51 at Kevin Wells's sentencing.  *See* Kevin Wells Amended Judgment dated May 24, 2012, ECF No. 462.  When pronouncing sentence, Judge Bianco permitted Wells to "seek a modification" if it later became appropriate "based upon other objections made by other defendants, or for some other reasons based upon new information."  Tr. of Sentencing of Kevin Wells 7:24-8:3, ECF No. 572; *see also id.* 34:17-25.

In October 2012, Judge Bianco recused himself because of separate criminal charges pending against Joseph Romano, ECF No. 526; the case was reassigned to Judge Johnson shortly thereafter.  *See* Docket Entry dated October 26, 2012.  Judge Johnson deferred the determination of restitution when he sentenced Vincent Romano in July 2013.  Tr. of Sentencing of Vincent Romano, at 8:18-19, ECF No. 765.  The proceeding was delayed for a time "by competency inquiries and a conspiracy to commit murder trial involving defendant Joseph Romano," Gov't

---

prosecuted two other defendants — Steven Candemeres and Anthony Lanza — for the same scheme, but charged them in two separate Informations under Docket Nos. 09-CR-788 and 09-CR-783.  The government and the three defendants subject to this order contend that Candemeres and Lanza should be jointly and severally liable for the restitution ordered here.  I discuss that contention in section II.D below.

[2] Page numbers in citations to record documents refer to ECF pagination.

3

Letter dated Mar. 17, 2014, at 1, ECF No. 586, following which
Judge Johnson referred the restitution issue to Judge Scanlon
for report and recommendation.  *See* Referral Order dated January
28, 2013, at 5, ECF No. 544.

The government filed its letter request for
restitution "as to all defendants" in the instant case (No. 09-
CR-170) with Judge Scanlon in March 2014.  Gov't Letter dated
Mar. 17, 2014.  That request identified 226 victims and
specified each victim's losses attributable to the defendants.
*Id.* at 1, 6-7.  Altogether, the government calculated the
victims' total losses at $19,070,401.25.  *Id.*  The government's
letter explained that the loss calculations were based on the
methodology Judge Scanlon had previously approved in the case of
*United States v. Michael Romano*, No. 09-CR-168 (E.D.N.Y. July
11, 2013), which involved similar allegations.  Gov't Letter
dated Mar. 17, 2014, at 4.  (Michael Romano is Joseph and
Vincent Romano's brother, but they were charged in different
conspiracies.[3])

The experts upon whom the government relied had
already testified in Michael Romano's trial or the subsequent
restitution proceedings in that case.  R&R 5.  The government

---

[3] Michael's case involved a coin fraud conspiracy, and the government
advocated for the same restitution methodology in both cases.  *United States
v. Michael Romano*, No. 09-CR-168 (E.D.N.Y.); *see also* Tr. of Conference dated
Apr. 16, 2014, at 20:18-19, ECF No. 609 (noting the familial relationship).

and the defendants agreed in this case that Judge Scanlon could receive, rely on, and incorporate by reference that testimony in this case. *Id.*[4]  Specifically, Judge Scanlon considered the testimony of federal investigator William Hessle; Anthony Swiatek, the government's coin expert at trial; Dr. Mark Glickman, the defense's statistics expert; and David Ganz, the defense's coin expert. *See* R&R 5 & n.5. *See generally United States v. Michael Romano*, No. 09-CR-168 (E.D.N.Y. July 11, 2013).  In July 2014, Judge Scanlon held another restitution hearing in this case. *See* Tr. of July 15, 2014 Restitution Hearing, ECF No. 614.  Agent Hessle gave substantial testimony at this hearing, on both direct and cross (by multiple defendants); the transcript of this hearing spans more than ninety pages. *Id.*

**B.   The Proposed Loss-Calculation Methodology**

The task of calculating restitution was fairly straightforward, at least at a high level: estimate each

---

[4] In the *Michael Romano* proceeding, Judge Scanlon held a hearing and issued an R&R recommending that the district court impose restitution according to the government's methodology. *See* Report & Recommendation dated December 17 2013, ECF No. 393.  Four months later, the government and defendants in this case asked Judge Scanlon to rely on testimony including that of investigating Agent William Hessle; Anthony Swiatek, the government's coin expert; and defense expert witnesses Mark Glickman and David Ganz from that case in determining restitution. *See* Tr. of Conference dated on April 16, 2014, 4:2-21, 11:13-20; *see also* R&R 5.  Some of the defense lawyers in that case also represented defendants here. *See* Gov't Letter dated Mar. 17, 2014, at 1 (explaining that Maurice Sercarz served as defense counsel in both cases).

victim's loss by starting with the total price they paid for coins purchased from the defendants and subtracting the (lower) value of the coins they received in return.  The government set out its proposed methodology for doing so in its March 2014 letter, *see* ECF No. 586, and Judge Scanlon described the methodology in detail in her recommendation that it be adopted. *See generally* R&R 11-20.  I will recite only certain highlights here.

During its prosecution of the defendants, the government reached out to 1,520 customers of the defendants' companies to notify them that they were potential victims, that the court was considering imposing restitution, and that they could seek to participate by filing an affidavit of loss and providing any available supporting documentation.  R&R 11.  The government received 226 loss affidavits in return.  *Id.*

The government then went about establishing the purchase price for each identified victim.  It began with the loss affidavits and checked them against the defendants' records of coin sales, including a computer database "used by the Coin Companies to show every purchase that was made . . . between June 2004 to November 2008" as well as bank records, invoices, and sales journals.  *Id.; see also* Testimony of Agent Hessle, Tr. of July 15, 2014 Restitution Hr'g 8:13-25.  When the affidavits' statement of loss conflicted with the defendants'

6

records of the purchase price, the government used the defendants' records to resolve the conflict *to the extent* that doing so redounded to the defendants' benefit.  R&R 12 ("Agent Hessle also stressed that these adjustments only occurred to discount possible restitution, never to increase it . . . ."); Testimony of Agent Hessle, Tr. of July 15, 2014 Restitution Hr'g 50:14-15.  This was the case in fully 209 of the 226 victims' self-reported losses.  R&R 12.[5]  To the extent the victims reported a lower purchase price than the defendants' records reflected, the government used that lower price.[6]

The task of determining the value that the victims received in return for their cash — that is, the amount to be subtracted from the purchase price — was somewhat more nuanced. The government divided the 226 victims into three groups for this purpose.  For the twenty-seven victims who had *resold* all the coins they purchased from the defendants, the government simply used the price the victims received in such resale.  R&R 16.

---

[5] This could have been for a variety of reasons: either their self-reported purchase price did not match the defendants' records, the affidavits were "incomplete," or the "companies they're alleging to have losses from weren't" defendants' companies.  Testimony of Agent Hessle, Tr. of July 15, 2014 Restitution Hr'g 35:16-19; *see also* R&R 12.

[6] *Id*. 28:11-24 ("In some cases [the victims' self-reported losses] were less and in cases in which they had purchased less [than what the records showed] that loss number was based upon their lesser number and not the higher number that we knew they had purchased . . . .").

For the 194 victims who *held* all the coins they
purchased, the government estimated the value they retained by
selecting a sample of coins and providing them to experts for
grading and appraisal.  R&R 15-16; Testimony of Agent Hessle,
Tr. of July 15, 2014 Restitution Hr'g 82:18-83:4.  They chose
four victims who had each purchased a large volume of coins —
totaling "approximately 2,200 coins" — from defendants.[7]
Testimony of Agent Hessle, Tr. of July 15, 2014 Hr'g 11:18-19.
The government then engaged a series of credentialed
professionals to grade and value the coins in the sample
according to industry standards.  R&R 13-15.

Once the government had the coins graded and
appraised, it calculated a "value-to-price ratio" for the
sample — taking the true value of the coins purchased from the
defendants and dividing by the price the victims paid.  *Id*. at
14-15.  The government performed this analysis twice, first in
2010 and again in 2012, after the price of precious metals had
increased.  R&R 13 n.2.  This second calculation redounded to
the defendants' benefit because the increase in the price of
those metals raised the value of the retained coins and reduced
the corresponding loss amounts.  *Id*.

---

[7] These victims were not chosen at random.  According to Agent Hessle,
they were chosen because they had each purchased a large number of coins from
the defendants, none of which they had sold, and they had invoices to
establish the purchase prices of all of the coins they purchased.  R&R at 13.

The government arrived at a value-to-price ratio of 24%; its arithmetic is summarized in Exhibit B to the government's initial letter to Judge Scanlon.[8]  Exhibit B to Gov't Letter dated March 15, 2014, ECF No. 586-2.  Put simply, the government determined that for each dollar a given victim spent purchasing coins, the victim received (on average) twenty-four cents of value from the defendants.  Given this ratio, a victim who purchased and held $100,000 in coins would be owed $76,000 in restitution, by the government's reckoning.

To calculate the amount owed to the five victims who sold some but not all their coins, the government employed a "hybrid" method, subtracting the resale amount from the purchase price and applying the 24% estimate to the resulting difference. Testimony of Agent Hessle, Tr. of July 15, 2014 Restitution Hr'g 82:23-83:4.

The government included final amounts of losses attributable to Joseph and Vincent Romano in its submission to Judge Scanlon.  *See* Exhibit A to Gov't Letter dated Mar. 17, 2014.  In August 2014, the government recalculated Wells's restitution figure to account for changes in precious-metals' prices, as described above; they asked Judge Scanlon to adopt those changes, and she did in her recommendation.  *See* R&R 42

---

[8] The government rounded this figure up from 23.60% – another choice that worked in the defendants' favor.  R&R 15.

n.25; *see also* Gov't Letter dated Aug. 13, 2014, at 1, ECF No. 620.

Judge Scanlon issued the R&R in January 2015. She adopted the government's proposed methodology and recommended holding Joseph and Vincent Romano jointly and severally liable with codefendants Salvatore Romano, Michael DiBari, and Thomas Arnold for all 226 victims' losses, totaling $19,070,401.24. R&R 2. She recommended imposing a lower restitution amount on Wells (compared to the Romanos) because Wells worked for only two of the three companies involved in the scheme (the company he did not work for was in operation for the scheme's first three years, before Wells joined the conspiracy), and because Judge Bianco had already (in 2012) limited Wells's restitution obligation to subsume only the victims who purchased coins from those companies. R&R 41-43. Judge Scanlon also accepted the government's re-calculation of Wells's liability, which had the effect of reducing his recommended restitution obligation from $14,677,352.51 to $13,975,339.60, for which she recommended he be held jointly and severally liable with the codefendants referenced above. *Id.*[9]

---

[9] Those loss amounts were included as an attachment to the amended judgment issued on October 16, 2019. ECF No. 717-2.

C.    **Post-R&R Proceedings**

Vincent Romano and Wells contested the government's proposal for restitution in briefing before Judge Scanlon and reiterated those arguments in timely (but not particularly specific) objections to Judge Johnson. *See* Vincent Romano Objs. to R&R dated Jan. 14, 2015, ECF No. 644; Vincent Romano Letter dated Aug. 12, 2014, ECF No. 618; Wells Obj. to R&R dated Jan. 15, 2015, ECF No. 645; *see also* Wells Letter dated Sept. 12, 2014, ECF No. 630. Joseph Romano did not submit timely objections, though he later sought to join in his co-defendants' objections on appeal. *See* Docket Order dated March 5, 2015 (denying Joseph Romano's motion for an extension of time to file objections to the R&R); *Romano*, 2022 WL 402394, at *4. Judge Johnson adopted the R&R in full and issued amended judgments in October 2019. *See* Tr. of Status Conference dated October 9, 2019, at 3:13-14, ECF No. 752-1 ("I will adopt Magistrate Judge Scanlon's . . . order."); Vincent Romano Amended Judgment dated October 16, 2019, ECF No. 722; Joseph Romano Amended Judgment dated October 16, 2019, ECF No. 711; Kevin Wells Amended Judgment dated October 16, 2019, ECF No. 716.

Defendants appealed the restitution award, arguing among other things that the district court did not conduct the required review of the R&R. In February 2022, the Second Circuit vacated the October 2019 amended judgments and remanded

for further proceedings.  *United States v. Romano*, 2022 WL
402394, at *6.  The Court of Appeals directed, *inter alia*, that
this Court review the timely objections of Vincent Romano and
Wells, determine whether Joseph Romano may join those
objections, and correct any clerical errors in the amended
judgments.  *Id.*

## II.    Discussion

The Mandatory Victims Restitution Act of 1996, Pub. L.
No. 104-132, 110 Stat. 1227, requires a defendant convicted of
an "offense against property" under Title 18, "including any
offense committed by fraud or deceit," to pay restitution.  18
U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii); *see also United States v.
Bengis*, 631 F.3d 33, 38-39 (2d Cir. 2011) (MVRA requires
restitution for any offense against property "in which an
identifiable victim or victims has suffered a pecuniary loss").[10]
The parties agree that the crime of conviction is subject to the
MVRA here.

The government bears the burden of demonstrating "the
amount of the loss sustained by a victim as a result of the
offense."  18 U.S.C. § 3664(e); *see also United States v.
Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013).  Losses for purposes

---

[10] Unless otherwise noted, when quoting judicial decisions this order
accepts all alterations and omits all citations, footnotes, and internal
quotation marks.

of restitution need not be exact; they may be reasonably estimated.  *See, e.g.*, *Gushlak*, 728 F.3d at 195-96.  Any dispute as to restitution "shall be resolved by the court by the preponderance of the evidence."  18 U.S.C. § 3664(e). "Uncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole."  *United States v. Donaghy*, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008); *see also United States v. Burdi,* 414 F.3d 216, 221 (1st Cir. 2005) ("[T]he district court's obligation was to attempt to come to a reasonable determination of appropriate restitution by resolving uncertainties with a view towards achieving fairness to the victim.").

In fraud cases involving the loss of property that cannot be returned, the MVRA requires defendants to "pay an amount equal to the greater of the value of the property on the date of the damage, loss, or destruction; or the value of the property on the date of the sentencing, less the value (as of the date the property is returned) of any part of the property that is returned."  *Id.* § 3663A(b)(1)(B); *United States v. Coriaty*, 300 F.3d 244, 252 (2d Cir. 2002).

The MVRA provides for two exceptions.  Restitution is not mandatory "if the court finds, from facts on the record, that . . . the number of identifiable victims is so large as to

13

make restitution impracticable." 18 U.S.C. § 3663A(c)(3)(A).

Nor is restitution mandatory when "determining complex issues of

fact related to the cause or amount of the victim's losses would

complicate or prolong the sentencing process to a degree that

the need to provide restitution to any victim is outweighed by

the burden on the sentencing process." *Id.* § 3663A(c)(3)(A).

A district court "may accept, reject, or modify, in

whole or in part, the findings or recommendations made by the

magistrate judge." 28 U.S.C. § 636(b)(1). Within fourteen days

after a party has been served with a copy of a magistrate

judge's R&R, the party "may serve and file specific written

objections to the proposed findings and recommendations." Fed.

R. Crim. P. 59(b)(2). When a party submits a timely objection,

a court "must consider de novo any objection to the magistrate

judge's recommendation." Fed. R. Crim. P. 59(b)(3).

I review the objections discussed below *de novo*, given

the timely objections by Vincent Romano and Kevin Wells (and

notwithstanding the brevity of their objections).[11] For the

---

[11] The objection letters, though timely, were fairly generic. For
example, Vincent Romano's four-sentence letter stating his objections to the
R&R simply "ask[ed] the Court to adopt the factual information, and
conclusions of law set forth in [his] submissions" before Judge Scanlon, and
appended a copy of those submissions to the letter. Vincent Romano Letter
dated Jan. 14, 2015. Courts often review objections of that variety for
clear error. *See, e.g., Pressley v. City of New York*, No. 11-CV-03234, 2016
WL 1271480, at *2 (E.D.N.Y. Mar. 31, 2016) (observing that a "sweeping, non-
specific objection . . . does not constitute a proper objection that merits
the Court's consideration"); *Armatas v. Maroulleti*, No. 08-CV-310, 2010 WL

reasons set out below, I adopt Judge Scanlon's R&R — including the victim-loss figures and the recommendations regarding joint and several liability, with one small exception: I reduce the restitution owed to one victim by $15.[12]

A.    **The Method for Identifying Victims Was Appropriate**

"The MVRA applies only when an *identifiable* victim or victims has suffered a physical injury or pecuniary loss." *United States v. Catoggio*, 326 F.3d, 323, 326 (2d Cir. 2003) (emphasis added).  As explained above, the government used the defendants' own records to reach out to potential victims and ultimately obtained loss affidavits from 226 victims.  R&R 11; Gov't Letter dated March 17, 2014, at 6.  The use of victim loss affidavits in calculating restitution is widely accepted, even though "the production of such affidavits is not required under the statute."  *United States v. Hall*, 467 F. App'x 47, 49 (2d Cir. 2012).

Defendants argue that the government's solicitation of affidavits from potential victims was "far from a neutral inquiry" — that it was, instead, unduly suggestive because the

---

4340334, at *2 (E.D.N.Y. Oct. 22, 2010) ("[G]eneral or conclusory objections . . . are reviewed for clear error.").  Nevertheless, I give Vincent Romano and Wells the benefit of the doubt and review the objections recited herein *de novo* rather than for clear error.

[12] The decision to adopt Judge Scanlon's R&R despite the objections that were filed in a timely manner renders moot the question of whether Joseph Romano may join those objections.  He will, however, benefit from the $15 reduction in the restitution amount resulting from the government's computational error.

notice "indicated that the coins were worth approximately 10-20% of the purchase price." Vincent Romano Letter dated Aug. 12, 2014, at 4. But this risk was effectively mitigated by the government's retention of independent valuation experts to ascertain value; the government was not, in the end, relying on any victim's subjective assessment of whether or to what extent they were defrauded. And the final estimate that average losses were 24% — 23.6% before rounding — shows that the 10-20% range was reasonable, if not perfect.

Moreover, it is not evident how the government would reach out to potential victims of a crime (as required by the Crime Victims' Rights Act[13]) without mentioning that they might be victims of a crime. Defendants also point to the old age of many of the victims, suggesting that this reduces the reliability of the affidavits. Vincent Romano Letter dated Aug. 12, 2014, at 4 (citing testimony that "many" recipients of the government's outreach were "infirm and easily confused"). That, too, is unpersuasive. Defendants point to no evidence that any elderly (or other) victim exhibited confusion in a manner that impacted any loss calculation. Again, the loss calculations were based on the *defendants' records* of purchase price, not the

---

[13] Pub. L. No. 108-405, 118 Stat. 2260 (2004) (codified at 18 U.S.C. § 3771, 34 U.S.C. § 20107-20108). The CVRA requires, among other things, that the government inform victims of the "right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6).

loss affidavits, except to the extent that reliance on the latter would benefit the defendants.  *See supra* section I.B*.*

**B.    The R&R's Loss-Calculation Methodology Is Sufficiently Reliable**

The government must establish "the amount of the loss sustained by a victim as a result of the offense."  18 U.S.C. § 3664(e).  Judge Scanlon properly concluded that the government's loss-calculation methodology was sufficiently reliable and neither impracticable nor so complicated that restitution should not be imposed.

Distilled to its simplest form, the methodology can be explained as taking the difference between the initial purchase price and the actual value victims received — whether that value takes the form of what victims received when reselling the coins or the retained value in the coins the victims kept.  That formula is, for obvious reasons, generally accepted as a measure of restitution.  *See Coriaty*, 300 F.3d at 253 (defendant is responsible for "the amount taken . . . less what he returned"); *United States v. Boccagna*, 450 F.3d 107, 116 (2d Cir. 2006) ("[F]air market value will generally be the most reliable measure of property value in the calculation of a restitution award . . . .").

The government's experts graded and appraised a 2,200-coin sample submitted by four victims pursuant to an adequate

sampling methodology, as described below.  This was enough.  "So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution."  *Gushlak*, 728 F.3d at 196.

The defendants' more specific objections to the methodology Judge Scanlon adopted are unavailing, for the reasons set out below.

1.   The Government's Experts' Coin-Grading and Appraisal
     Methods were Sufficiently Reliable

Defendants argue that grading coins is an "inherently subjective" enterprise, such that an accurate account of victim losses in this case is nearly impossible.  Vincent Romano Letter dated Aug. 12, 2014, at 4-6.  The Court of Appeals left little breathing room for this argument, however, when it rejected the defendants' Federal Rule of Evidence 702 challenge on appeal in the *Michael Romano* case.  *See United States v. Romano*, 794 F.3d 317, 330-33 (2d Cir. 2015).  In challenging their convictions, Michael Romano and William Kearney argued that Judge Bianco should have excluded the trial testimony of the government's coin grading and appraisal experts, including Anthony Swiatek, who testified at trial about industry norms of grading, valuation and pricing.  *Id.* at 331.  The Court of Appeals rejected the defendants' argument that such testimony was

"inherently unreliable because of the subjective aspects of coin grading" and affirmed Judge Bianco's conclusions.  *Id.* at 332-333.  "[D]espite the undisputed fact that both grading and valuation have a subjective component," the Court of Appeals quotes Judge Bianco as concluding, the experts "had demonstrated that the system for coin grading and valuation rests on well-established industry standards, publications, and market trends, which are sufficiently reliable to form the basis of expert testimony."  *Id.* at 332.  The Court of Appeals went on to observe that "[i]n the context of this industry, it was also well within the bounds of the district court's discretion to conclude that the experts' testimony was sufficient to show that the grading of coins provides a reliable indicator of their worth."  *Id.* at 332-33.  "The lack of unanimity as to the grade a particular coin should be given," the court concluded, "is not a basis for a conclusion that use of the Sheldon scale [the industry standard for grading coins] is unreliable or leads to wild disparities."  *Id.* at 333.

Even absent this guidance from the Court of Appeals, I would reject the defendants' contention that the valuation methods at issue were too subjective to be reliable, for the reasons that Judge Scanlon articulated.  She noted, among other things, that the coin experts who graded and appraised the coins were very well-credentialed.  *See* R&R 13-15.  The Numismatic

Guaranty Corporation ("NGC"), which provided grading services, is one of the leading grading authorities in the industry, *see Romano*, 794 F.3d at 322, 333; Swiatek, who appraised one of the victim's coins, is a professional numismatist and was the government's coin expert in the *Michael Romano* trial.  R&R 7, 13.  John Albanese, who graded and appraised two victims' coins, co-founded NGC and has graded more than 1,000,000 coins himself. *Id.* at 14.  Gary Adkins, who graded and appraised another victim's coins and whose qualifications Judge Scanlon had already accepted, *id.* at 14–15 & n.11, is a former President of the Professional Numismatics Guild and has over 45 years in the coin industry.  *Id.* at 14–15.

In addition, Judge Scanlon rightly observed that the 24% value-to-price ratio these experts calculated was corroborated — and compellingly so — by the ratio of the total price the defendants paid for their inventory of coins to their revenue during the period of the conspiracy.  *Id.* at 17. Defendants spent "approximately $9,000,000" to purchase the coins, and their revenue was "approximately $40,000,000."  *Id*. That put the defendants' costs at roughly 22.5% of revenue — very close to the 24% value-to-price ratio the government's experts calculated.  Judge Scanlon also persuasively recounted the defense's coin expert's testimony (from the *Michael Romano* prosecution) that in reviewing the government's appraisals, he

concluded that he would have given a higher value than the government's expert did *only 4.8%* of the time.  R&R 24.  This provides further indicia of reliability, rather than undermining the government's method, as the defendants believed.

  2. <u>The Sample Size was not Unreliably Small</u>

   Vincent Romano argued before Judge Scanlon that the value-to-price ratio was not reliable "since it was based upon an examination of the coins of only four customers."  Vincent Romano Letter dated Aug. 12, 2013, at 13.  He did not raise this point specifically in his letter objecting to the R&R, but I consider it *de novo* in any event.  For his part, Wells does not raise this argument in his objections either, but in his original letter brief to Judge Scanlon, he mentions "the small self-selecting and unrepresentative nature of the sample" as a way in which the government's methodology "suffered from debilitating problems."  Wells's Letter dated Sept. 12, 2014, at 2.  Defendants refer generally to the testimony of their statistician in the *Michael Romano* proceeding, without explaining (in a nonconclusory way) why that testimony undermines the sample used to create the value-to-price ratio in this case.  *See* Vincent Romano Letter dated August 12, 2013, at 10-11.

   Contrary to the defendants' suggestion, the selection of 2,200 coins submitted by the four victims served as a

sufficient sample from which to derive the value-to-price ratio.
*Cf. United States v. Jones,* 511 F. App'x 420, 423 (6th Cir.
2013) (affirming restitution calculation based on a sample of
210 fraudulent medical bills taken from a total population of
4,132).  On a similar remand from the Second Circuit in the
*Michael Romano* case, the Honorable Dora Irizarry adopted Judge
Scanlon's R&R and ordered restitution based on the government's
methodology that used a nine-victim sample of around 1,800
coins — fewer coins than here — to approximate victim loss.
*United States v. Romano*, No. 09-CR-168, 2021 WL 1711633, at *8
(E.D.N.Y. Apr. 29, 2021), *appeal docketed*, No 21-2585 (2d Cir.);
R&R 18 (identifying 1,800-coin sample used in *Michael Romano*
case).

　　　　If the defendants had sought to prove — or even
persuasively suggested — some particular reason to believe the
government's 2,200 coin sample was non-representative, that
might have provided additional cause to question the sample
size.  But they did not.[14]  Accordingly, there is no basis to
reject the R&R's recommendation on this ground.

　　　　The Court of Appeals has affirmed restitution orders
that employed more assumptions, and ultimately rendered more

---

[14] Judge Scanlon noted here that in Michael Romano's case, even the
*defendants'* statistician did not conclude that the sample was
unrepresentative.  R&R 19.

subjective estimations of loss, than the methodology in this
case.  For example, in *United States v. Uddin*, the Court of
Appeals affirmed the district court's use of an estimate of
victim loss in ordering restitution and forfeiture in a food
stamp fraud case against the owner of a grocery store.  551 F.3d
176, 178-80 (2d Cir. 2009).  The district court used "$50 as a
general point of reference for likely fraudulent transactions,"
which the Court of Appeals noted, "even if not based on precise
data, was reasonably based on known data such as the average
dollar amount of food stamp redemptions at small-to-medium size
grocery stores in New York City (around $12, according to
[United States Department of Agriculture witness]) and the
witnesses' observations of the size, inventory and setup of [the
defendant's] store."  *Id*. at 180.  The district court assumed
that 60% of the transactions over $50 were fraudulent without
indicating how it arrived at that percentage.  *Id*. at 180.
While *Uddin* used data from nearby stores unrelated to any of the
fraudulent transactions that occurred in that defendant's store,
as well as City-wide data, *id*. at 179, the government here
looked to a subset of actual victims.

    3.  Victims' Receipts

        Defendants also argue that many of the victims did not
provide receipts to verify their affidavits.  Vincent Romano
Letter dated Aug. 12, 2014, at 4.  Given the government's access

to (and reliance on) the defendants' own customer lists and sales records, this additional data was not necessary.  R&R 11-12; Testimony of Agent Hessle, Tr. of July 15, 2014 Restitution Hr'g 8:13-15.  Indeed, the government may have properly relied on these affidavits even absent the defendants' customer lists and sales data.  *See United States v. Schwamborn*, 542 F. App'x 87, 88 (2d Cir. 2013) (observing in restitution context that in "many circumstances," the "affidavits of witnesses are themselves sufficient to resolve the dispute").  As Judge Scanlon points out, the affidavits are sworn, and affiants could face criminal penalties under 18 U.S.C. § 1001 if they were proven to have lied on their affidavits.  R&R 33.

4.   Condition of Coins

Vincent Romano also contends that it was "impossible to determine whether the coins sent in for examination were in the same condition as the coins were in when first sold by the subject companies."[15]  Vincent Romano Letter dated Aug. 12, 2014, at 4.  He does not, however, point to any evidence suggesting that the coins were damaged or otherwise altered between the date of purchase and the date of appraisal.  *Cf. Donaghy*, 570 F.

---

[15] Vincent Romano also mentions that the four victims who made up the sample may have provided different coins for grading and valuation than the ones they purchased from Defendants.  Vincent Romano Letter dated Aug. 12, 2014, at 4.  He provides no evidence to suggest this is the case.  The four victims provided affidavits that the coins they provided were the ones purchased from Defendants.  R&R 33.

Supp. 2d at 423 ("Uncertainties with respect to the amount in question should be resolved in favor of the victim . . . ."). Nor does he suggest what, if any, specific discount should be applied to the coins based on this argument.  There is no natural reason to believe that the coins would have suffered significant wear-and-tear in the meantime; these coins were generally purchased for investment, and the owners had every incentive to maintain them in good condition.

  5. Wells's Objection to the August 2014 Revised
    <u>Calculation</u>

    After the July 2014 restitution hearing, the government revised the list of Wells's victims' losses *downward* so that he would benefit from the 2012 reappraisal, just as his codefendants did.  *See* Exhibit 1 to Gov't Letter dated Aug. 13, 2014, ECF No. 620-1.  This revised list used the 24% value-to-price ratio rather than the 16.5% ratio calculated in 2010 and resulted in Wells's restitution obligation being set nearly $700,000 lower.  Despite this, Wells objects that he did not "have the opportunity to examine the witness who prepared" this revision.  Wells Objs. to R&R dated Jan. 15, 2015, at 2, ECF No. 645; *see also* Wells Letter dated Sept. 12, 2014, at 4.

    This argument is without merit.  A district court determining restitution under the MVRA need not hold "a full-blown evidentiary hearing to decide a dispute about a proposed

restitution order." *United States v. Pierre*, 285 F. App'x 828, 829 (2d Cir. 2008). "All that is required is that the court afford the defendant some opportunity to rebut the government's allegations." *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996). Here, as Judge Scanlon pointed out, Wells had the opportunity to question Agent Hessle at the July 2014 restitution hearing — well after the 2012 revision — but unlike his codefendant Joseph Romano, he opted not to do so. *See* R&R at 42 n.25.

Indeed, it is not clear that the government had an obligation to perform the 2012 revision *at all*, let alone to Wells's liking. The MVRA provides that the restitution amount in cases involving offenses to property is based on "an amount equal to *the greater of* the value of the property on the date of the damage, *loss, or destruction*; or the value of the property on the date of the sentencing, less the value (as of the date the property is returned) of any part of the property that is returned." *Id.* § 3663A(b)(1)(B) (emphasis added). I read this formula to mean that if the defendants sold a victim a coin in 2008 based on fraudulent representations, and that coin was (at the time) worth only 24% of the promised value, then any value

recouped later because of changes in the value of precious metals would be irrelevant.[16]

     6.   <u>The R&R Incorporated One Computational Error</u>

The revised victim loss lists submitted by the government did include a fifteen-dollar computational error as to one victim's loss amount.[17]  Gov't Letter dated Sept. 17, 2014, at 1 n.1, 19, ECF No. 631.  While Wells does not raise this point in his objections to the R&R, the government pointed this error out before Judge Scanlon issued the R&R.  *Id.* Because the MVRA "does not authorize restitution to victims in excess of their losses," *United States v. Kinney*, 684 F. App'x 73, 75 (2d Cir. 2017), the amount of restitution the defendants owe will be reduced by fifteen dollars.  Thus Wells's total restitution owed is $13,975,324.60.  Vincent and Joseph Romano's total restitution owed is $19,070,386.25.

The same victim whose loss must be reduced by fifteen dollars is also the victim whose affidavit the government lost. Gov't Letter dated Sept. 17, 2014, at 19.  Wells points to that

---

[16] This reading comports with common sense as well as the statute.  The victims were induced to buy the coins here for investment purposes; they hoped to benefit from favorable movements in the value of the coins after their purchase (whether because of changes in commodity pricing or otherwise).  The fraud loss was fixed at the time they exchanged cash for coins at inflated prices based on fraudulent representations.

[17] For reference, that victim is identified as Jim Baer in attachments to the amended judgments.  His restitution amount is hereby reduced from $159 to $144 as to Vincent Romano, Joseph Romano, and Wells.

fact as a further reason why the restitution calculation is unreliable.  That, too, is unavailing.  The MVRA does not require each victim to file an affidavit of loss; the Court needs information "sufficient for the court to exercise its discretion in fashioning a restitution order."  18 U.S.C. § 3664(a).  And the Federal Rules of Evidence do not apply at sentencing.  Fed. R. Evid. 1101(d)(3).  That loss was appropriately included because the agent who collected the affidavit stored the amount in his log before the affidavit was lost, and by the time the affidavit was lost, the victim suffered from dementia and could not submit a reliable replacement affidavit.  Gov't Letter dated Sept. 17, 2014, at 19.  Defendants do not dispute this.

**C.   Joint and Several Liability**

Where more than one "defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."  18 U.S.C. § 3664(h).  Judge Scanlon recommends holding these three defendants jointly and severally liable with codefendants Salvatore Romano, Michael DiBari, and Thomas

Arnold.  R&R 42-43.[18]  Wells argues that if restitution is to be imposed at all, his liability should be apportioned based on his lesser involvement in the scheme relative to the other codefendants.  Wells Letter dated Sept. 12, 2014, at 8.  Wells was the general manager of only two of the three coin companies involved in the scheme and never graded any coins.  Gov't Letter dated March 17, 2014, at 5; Wells Letter dated Sept. 12, 2014, at 8.  While Vincent Romano does not raise the apportionment issue squarely, he indicates that he "was directly involved in only two aspects of the business."  Vincent Romano Letter dated Aug. 12, 2014, at 13.  He was the sales and business manager of all three of the coin companies involved in the scheme.  Gov't Letter dated March, 17, 2014, at 5.

The defendants shall be held jointly and severally liable for the total amount of restitution (Wells for the lesser amount of $13,975,324.60), for the reasons Judge Scanlon has already explained.  The defendants played integral roles in the coin fraud conspiracy to which they pleaded guilty and are liable for all the victim losses they caused.  They were members of the conspiracy and are liable for the reasonably foreseeable results of the actions of their coconspirators.  *See United*

---

[18] Discussion of the parties' argument that the Court should add additional defendants in separately docketed cases to the list of those held jointly and severally liable is discussed in section II.D.

*States v. Boyd*, 222 F.3d 47, 48 (2d Cir. 2000) (per curiam) (defendant convicted as co-conspirator was responsible for "full amount of the loss caused by the conspiracy as a whole").  As Judge Scanlon pointed out, the defendants pleaded guilty to committing mail and wire fraud and that conviction "subsumes the findings" that they were members of the conspiracy, their actions were commenced pursuant to the common plan of the conspiracy, and they could have reasonably foreseen that their co-conspirators would commit the substantive offense.  R&R 40.

Though Wells will not receive a lower, apportioned restitution obligation because of what he claims is his lower level of involvement in the scheme, he already benefits — and continues to benefit — from a cap on the restitution he is jointly and severally liable for because he was involved in the scheme for a shorter amount of time.  Wells is jointly and severally liable for only the victim losses that occurred while he was part of the conspiracy, which means that he owes no restitution for losses caused by coin sales from Last Quarter Coin, Inc.  That company was in operation from 2001 to 2004, before he joined the scheme.  R&R 41-42; *see also United States v. Bengis*, 783 F.3d 407, 413-14 (2d Cir. 2015) (concluding that when member joins ongoing conspiracy "without reasonable knowledge of [co-conspirator's] past activities, . . . he should not be held liable for the loss caused by those activities").

This comports with Judge Bianco's original restitution order as to Wells.  *See* R&R 41-42.  Thus, in the list of victims and corresponding restitution amounts (found in attachments to the amended judgments), Wells does not owe restitution for victim losses caused by coin purchases from Last Quarter.

**D. Schedule of Restitution Payments**

The MVRA requires the district court to determine a schedule for payment of restitution.  18 U.S.C. § 3664(f)(2). The statute generally prohibits consideration of "the economic circumstances of the defendant" in determining whether to order restitution.  *Id.* § 3664(f)(1)(A).  By contrast, when setting the restitution payment *schedule*, the statute instructs district courts to consider, among other things, the defendant's financial resources, projected earnings and other income, and any financial obligations.  *Id.* §§ 3664(f)(2)(A)-(C).

The R&R does not recommend a payment schedule, and the amended judgments for Vincent and Joseph Romano are silent on the subject.  *See* Vincent Romano Amended Judgment dated October 16, 2019, at 7, ECF No. 722; Joseph Romano Amended Judgment dated October 16, 2019, at 7, ECF No. 711.  The amended judgment for Kevin Wells provides that the full amount is "due immediately and payable at a rate of 10% of net disposable income while on supervised release."  Kevin Wells Amended Judgment dated October 16, 2019, at 7, ECF No. 716.  Given that

these amended judgments were entered three years ago, I invited the parties to provide supplemental briefing.

The defendants submitted letters in response; the government did not. Vincent Romano Letter dated July 1, 2022, ECF No. 763; Joseph Romano Letter dated June 30, 2022, ECF No. 760; Kevin Wells Letter dated July 1, 2022, ECF No. 762. Rather than propose a specific schedule, the defendants argue that a schedule of payment for restitution should not issue because they have no ability to pay, and that if one should issue it should be limited to nominal payments.

Vincent Romano refers to the Court's appointment of counsel on remand as evidence that he is indigent. Vincent Romano Letter dated July 1, 2022, at 1. Joseph Romano points out that he is serving two concurrent life sentences in prison and is under special administrative measures such that he cannot work and is unable to make even nominal restitution payments. Joseph Romano Letter dated June 30, 2022, at 2. In addition, he claims that his only asset is the home that his wife currently occupies. *Id.* Kevin Wells explains that "his only asset" is his home, which he lives in with his estranged wife. Kevin Wells Letter dated July 1, 2022, at 2. His projected income is "approximately $50,000 to $55,000" and his annual expenses are "approximately $45,000." *Id.*

Based on all the information available in the Pre-Sentence Reports and subsequent submissions, I order restitution paid on the following schedule:

*Vincent Romano.*  Due immediately and payable at a rate of 10% of net income (income less reasonable living expenses) per month while on supervised release.

*Joseph Romano.*  Due immediately and payable at a rate of $1 per year while incarcerated.  In the event that Joseph Romano is released from prison, his restitution will become payable at a rate of 10% of net income (income less reasonable living expenses) per month while on supervised release.

*Kevin Wells.*  Due immediately and payable at a rate of 10% of net income (income less reasonable living expenses) per month while on supervised release.

The statute requires, in addition, that any defendant who obtains a windfall during a period of incarceration shall pay it immediately towards restitution.  *See* 18 U.S.C. § 3664(n) ("If a person obligated to provide restitution, or pay a fine, receives substantial resources from any source, including inheritance, settlement, or other judgment, during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed.").[19]  At

---

[19] Pursuant to 18 U.S.C. § 3664(k), I order the defendants to:

33

the government's request, *see* Gov't Letter dated Oct. 19, 2017, at 5, ECF No. 690, and pursuant to 18 U.S.C. § 3612(f)(3), the defendants shall not be required to pay interest on restitution because they lack the means.

## E.   Clerical Errors in Amended Judgments

Lastly, the Second Circuit instructed the Court on remand to "[c]orrect any clerical errors in the amended judgments." *Romano*, 2022 WL 402394, at *6. The government and Defendants agree on what they view as the clerical errors in the amended judgments. The list of individual defendants held jointly and severally liable on the amended judgments issued on October 16, 2019, they contend, was mistakenly left incomplete. Those judgments, they say, should have included Steven Candemeres and Anthony Lanza as defendants held jointly and severally liable. Gov't Letter of March 10, 2022 at 1, ECF No.

---

notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

Given the passage of thirteen years since criminal charges were filed in 2009 and the age of many of the victims, this provision is especially important in this case.

746; Defendants' Joint Letter of May 20, 2022 at 1, ECF No. 754.
Candemeres and Lanza are docketed in their own individual cases
before another district judge.  The parties contend that they
are part of the same conspiracy, and there are indications that
Judge Johnson agreed: for example, Lanza's and Candemeres's
judgments hold them responsible for the same exact amount in
restitution as Judge Johnson ordered the defendants Joseph and
Vincent Romano to pay.

> To the extent the omission to include these defendants
in the list of joint and several liability was inadvertent,
however, it still does not constitute a clerical error.  Rule 36
authorizes correcting only "errors that are truly clerical,
i.e., minor, uncontroversial errors, such as errors of
recitation, of the sort that a clerk or amanuensis might commit,
mechanical in nature." *United States v. Lansing*, 71 F. App'x
84, 87 (2d Cir. 2003).  Rule 36 does not allow a court "to amend
a judgment to effectuate its unexpressed intentions at the time
of sentencing." *Id.*[20]

> The "errors" identified by the parties are not
clerical.  Adding Candemeres and Lanza to the list of those held

---

[20] Some examples of clerical errors include where the court "announces
forfeiture at sentencing" and fails "to include it at in the subsequent
written judgment," *United States v. Petix*, 767 F. App'x 119, 122 n.4 (2d Cir.
2019), "misstates the section under which the defendant was convicted,
misidentifies the pertinent count in imposing a statutory minimum, or reads
the defendant's name incorrectly." *United States v. Werber*, 51 F.2d 343, 347
n.13 (2d Cir. 1995).

jointly and severally liable would be a substantive change to the judgments entered on October 16, 2019.  Nowhere in the transcript did the Court mention Candemeres or Lanza.  Nor does the R&R refer to Candemeres or Lanza; instead, it mentions only Joseph Romano, Salvatore Romano, Vincent Romano, Thomas Arnold, Michael DiBari, and Kevin Wells (as well as a former defendant who died and for whom the government dismissed the charges).

The government makes much of an exchange at the October 9, 2019 conference in which Judge Johnson asked the government whether the Court needed to append the list of victims to the judgments.  Tr. of Oct. 9, 2019 Status Conference 3:16-21.  The government replied in the affirmative, and then went on to reference its letter of October 19, 2017, ECF No. 690, noting that it listed all the amendments that needed to be made to the judgments for each defendant.  Tr. of Oct. 9, 2019 Status Conference 3:16-21.  That letter does request that Candemeres and Lanza be included on the amended judgments, Gov't Letter of October 19, 2017, at 5, but that letter does not represent the expressed intentions of the sentencing judge.

In any event, the exclusion of Candemeres and Lanza from the list of those held jointly and severally liable will not prejudice Vincent Romano, Joseph Romano, and Wells.  *See, e.g.*, *United States v. Nucci*, 364 F.3d 419, 423 (2d Cir. 2004) (victims may not double-recover restitution); *see also United*

*States v. Gonzalez*, 647 F.3d 41, 67 (2d Cir. 2011 (victim must receive "the full amount of, but not in excess of, his, her or its loss").[21]

Thus, the amended judgments to be issued now will reflect the same list of defendants held jointly and severally liable as the October 16, 2019 amended judgments: Vincent Romano, Joseph Romano, Salvatore Romano, Kevin Wells, Thomas Arnold, and Michael DiBari.

## F.   Additional Restitution Procedures

This order serves as an adoption of Judge Scanlon's R&R and as the order of restitution itself.  The list of victim losses for which the defendants owe restitution is attached to the amended judgments issued with this order.[22]  The addresses of

---

[21] The parties provided letters on the question of whether a district court has the authority to make defendants not listed in the same case and before another judge jointly and severally liable, assuming that the exclusion of Candemeres and Lanza was a clerical error.  Gov't Letter dated May 6, 2022, ECF No. 752; Defendants' Joint Letter dated May 20, 2022, ECF No. 754.  In *United States v. Aumais*, 656 F.3d 147, 156 (2d Cir. 2011), the Court of Appeals suggested that joint and several liability may not be imposed among defendants across multiple cases.  Given my conclusion that the "error" is not clerical, I need not consider the question.

[22] The Eastern District of New York's Clerk's Office received letter requests from Timothy R. Simons, the heir of deceased victim Kathleen Simons, and Kathleen Elder, executor of the estate of deceased victim John Christensen, to assume the right to restitution payment that each victim possessed.  A "representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights."  18 U.S.C. § 3663A(a)(2).  The petitioners provide evidence that they are the appropriate individuals to assume the right to restitution of these deceased victims, including birth and death certificates as well as wills.  These successors were already mentioned in the list of victims attached to Judge Johnson's 2019 amended judgments, but for clarity, the Clerk's Office is respectfully directed to issue future restitution payments to them in the place of the aforementioned deceased victims.

each of these victims are on file with the United States
Probation Department.

Payment of restitution shall be made to the
Clerk of the Court for the Eastern District of New York.  Any
restitution funds paid by the defendants pursuant to this order
shall be distributed by the Clerk of the Court to each victim
identified in the lists attached to the amended judgments,
following a pro rata distribution.

This restitution order is a lien in favor of the
United States on all property and rights to property of the
defendants, as provided in 18 U.S.C. § 3613(c).  The liability
to pay the restitution shall terminate as provided by 18 U.S.C.
§ 3613(b).  *See also* 18 U.S.C. § 3613(f).

If the defendants knowingly fail to pay the
restitution required by this order or by law, they will be
subject to one or more of the actions permitted by 18 U.S.C. §
3613A.

### III. Conclusion

For the reasons set out above, I adopt the Report and
Recommendation with one exception: a $15 reduction in the
restitution owed to one victim.  Defendants are held jointly and
severally liable for restitution in the following amounts:
$19,070,386.25, except for defendant Wells who is jointly and
severally liable for $13,975,324.60, as specified in this order

and the lists attached to the amended judgments.  The Clerk of
Court is respectfully directed to enter amended judgments
consistent with this order.

SO ORDERED.


__/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


dated:    July 11, 2022
          Brooklyn, New York